# In The United States Court of Federal Claims

No. 08-700C

(Filed:  January 15, 2010)

Reissued:  February 1, 2010[1]
_____

| | |
|---|---|
| JAY ANTHONY DOBYNS,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | * Contract case; Motion to dismiss under<br>* RCFC 12(b)(1) and (b)(6); Jurisdiction; Tort<br>* claim arising primarily under contract;<br>* Breach of settlement agreement; Agreement<br>* to comply with applicable laws; Breach of<br>* covenant of good faith and fair dealing;<br>* Failure to state a claim; *Twombly* and *Iqbal*<br>* examined; Impact on *Conley*; Plausibility<br>* standard; Second amended complaint stated<br>* plausible breach claims; Freedom of<br>* Information Act. |

_____

## OPINION

_____

*James Bernard Reed,* Baird, Williams & Greer, Phoenix, AZ, for plaintiff.

*Kent Christopher Kiffner*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

**ALLEGRA, Judge:**

In this case, an agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) alleges that, following a highly successful undercover operation, ATF failed to protect him and his family from threats and violence, and otherwise subjected him to a hostile work environment. He asserts that ATF's malfeasance and misfeasance in these and other regards violated an agreement he had with the agency settling a prior employment dispute, thereby giving rise to contract claims over which this court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491. Defendant argues otherwise, registering its objections in a motion to dismiss almost all of plaintiff's claims under RCFC 12(b)(1) and (b)(6).

_____

[1] An unredacted version of this opinion was issued under seal on January 15, 2010.  The parties were given an opportunity to propose redactions, but no such proposals were made.

## I.     BACKGROUND

A brief recitation of the facts provides necessary context.[2]

Plaintiff, Jay Anthony Dobyns, has been employed as a Special Agent with ATF since 1987 and has performed extensive undercover investigative work.  For a period of twenty-one months, between 2001 and 2003, plaintiff was the lead undercover agent in "Operation Black Biscuit," an operation that infiltrated the Hell's Angels motorcycle gang.  Operation Black Biscuit represented the first-ever penetration of the Hell's Angels and led to the indictment of more than sixteen members of that organization.  During the operation, plaintiff was stationed in ATF's Tucson, Arizona field office and lived locally with his family.  Following the conclusion of the operation, plaintiff's identity became publically known, subjecting him to threats and retaliation from members and associates of the Hell's Angels.

At or around this time, plaintiff's relationship with his employer deteriorated.  Plaintiff alleges that, from 2004 to 2007, ATF ignored numerous retaliatory threats made against him and his family by the Hell's Angels, and took insufficient and ineffective action to protect plaintiff and his family or to "backstop" their identities.[3]  Plaintiff alleges that when he complained to his superiors about this treatment, he became the target of widespread retaliatory actions within ATF, which included character attacks on his personal and professional reputation, among them claims that he was psychologically unfit to perform his job.  At or around this time, plaintiff filed an agency grievance with ATF, as well as complaints with ATF's Office of Special Counsel and the Department of Justice's Office of Inspector General (OIG).

On September 20, 2007, plaintiff entered into a settlement agreement with ATF which, as stated therein, was intended "to fully resolve and settle any and all issues and disputes rising out of [plaintiff's] employment with [ATF]."  The settlement agreement provided that plaintiff would receive $373,000 in "full and final settlement for any and all claims that have been brought or could have been brought up to the date of [the] Agreement."  More than this, ATF undertook several prospective obligations –

- In paragraph 2, ATF agreed that "[s]hould any threat assessment indicate that the threat to [plaintiff] and his family has increased from the assessment completed in June 2007, the [ATF] agrees to

---

[2] These facts are drawn from plaintiff's complaint and, for purposes of this motion, are assumed to be correct.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (discussed below).

[3] As described in a report referenced in plaintiff's complaint, "[b]ackstopping is essentially the covert establishment of a fictitious identity for the agent."  Office of the Inspector General, U.S. Dept. of Justice, OIG Report on Allegations by Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent Jay Dobyns, at 3 (2008) (hereinafter "OIG Report").  Under this process, fictitious items of identification are provided to the agent and his or her family members, and various other fictitious records (*e.g.*, voter registration) are generated. *Id.*

fully review the findings with [plaintiff] and get input from
[plaintiff] if a transfer is necessitated."

- In paragraph 6, "[plaintiff] agrees that he will comply with [ATF]
  requirements and will seek permission for any outside
  employment, including speaking, writing, teaching or consulting."
  Correspondingly, "[ATF] agrees that it will handle such requests in
  a manner consistent with [ATF] practice and procedure."

- In paragraph 10, ATF agreed "that it will comply with all laws
  regarding or otherwise affecting [plaintiff's] employment by the
  agency."

Additionally, paragraph 13 of the agreement provided for an administrative remedy in the event
of a dispute over the settlement, ultimately authorizing an "appeal to the Equal Employment
Opportunity Commission (EEOC) for a determination as to whether the Department has
complied with the terms of the [settlement agreement]."

In August, 2008, plaintiff's home in Tucson was destroyed by a fire. Plaintiff and his
family fortunately were spared. The fire was subsequently determined to be arson. Plaintiff
believes this fire was set by members of the Hell's Angels (or their agents) with the intent to kill
him and his family in retaliation for his involvement with Operation Black Biscuit. He avers that
ATF's response to this incident was wholly inadequate, unreliable and inconsistent with
established ATF procedures. Specifically, he alleges that a single ATF investigator was
dispatched belatedly to the scene, thirty hours after the incident, and that ATF's pursuit of the
investigation was halting and erratic – first, it refused to get involved at all, then it took over the
investigation from the local police, and, later, it shifted the investigation to the Federal Bureau of
Investigation. Plaintiff further alleges that, although ATF internal procedures require that a
threatened agent receive support and information from ATF following an incident, he received
none. Plaintiff complained to his supervisor regarding ATF's poor handling of the incident and
its failure to follow internal protocols concerning the investigation.

Plaintiff alleges that on the same day he lodged these complaints, he learned that ATF had
named him as a suspect in the arson and attempted murder of his family. He allegedly told his
supervisor that, to clear his name, he was willing to submit to a polygraph, make all his personal
information available for investigation and provide a verifiable alibi. However, he avers that
ATF ignored this offer and refused to strike him from the suspect list. Plaintiff further alleges
that his supervisors attempted to manipulate the official investigative finding as to the cause of
the fire from arson to "undetermined," in an attempt to shift attention away from the agency's
inadequate response and investigation.

On September 2, 2008, the OIG released a report concerning plaintiff's complaints of
mistreatment. The OIG report concluded that, between 2004 to 2007, ATF had responded
inappropriately in investigating the threats against plaintiff and in relocating plaintiff and his
family. OIG Report, *supra*, at 1, 11, 15, 19. In this regard, the report found –

With regard to ATF's response to specific threats against Dobyns, we found that ATF appropriately decided to relocate Dobyns and his family to Santa Maria, California, in September 2004, following the receipt of the first of four specific threats made against him.  However, due to a series of miscommunications among the ATF managers responsible for implementing this decision, the transfer was handled as a standard change of duty station rather than an emergency relocation. As a result, Dobyns and his family were not provided appropriate support resources to protect their identities and location that normally accompany an emergency relocation.  Upon receipt of another threat, ATF became aware that the move to Santa Maria had been mishandled.  As a result, ATF relocated Dobyns and his family to Los Angeles with the appropriate safeguards in place.

With regard to the three other threats, we found that ATF needlessly and inappropriately delayed its responses to two of the threats.  We also concluded that ATF should have done more to investigate two of the threats.

*Id*. at 1.  In so concluding, the OIG determined that, in responding to various threats made against plaintiff during this period, ATF had not always followed its internal procedures for assessing, evaluating and responding to threats against agents.  Among these were ATF Order 3210.7C, which concerns reporting procedures for threats against agents; ATF Order 3250.1A, which sets forth emergency move procedures when an agent receives a threat; and ATF Order 3040.2, which provides additional guidance regarding assessment of threats against ATF agents.  *Id*. at 3-6.  The OIG opined that ATF should have taken threats against Agent Dobyns and his family "more seriously," *id.* at 11; *see also id*. at 15; and that its responses to various threats were "inadequate," "incomplete," and "unnecessarily" or "needlessly" delayed, *id*. at 15, 19.

On October 2, 2008, plaintiff (and his family) filed suit in this court, seeking damages for breach of contract and other ATF actions.  On December 30, 2008, defendant moved to dismiss this complaint under RCFC 12(b)(1), 12(b)(2) and 12(b)(6).  After the motion was fully briefed, the court issued an order setting a status conference.  In response to that order, on April 1, 2009, plaintiff filed a motion to file a first amended complaint, in which only he was listed as a plaintiff.  The court granted the latter motion following a status conference held on April 15, 2009.  On May 15, 2009, defendant filed a notice that it was renewing its motion to dismiss.  On May 19, 2009, plaintiff filed a motion to further amend his pleadings.  On May 20, 2009, the court granted this second motion to amend and established a briefing schedule on the defendant's renewed motion to dismiss.  Following the completion of briefing, oral argument on the motion was held on September 9, 2009.

## II.   DISCUSSION

Plaintiff's original complaint contained numerous legal defects – it listed twenty-seven private individuals as defendants; presented a number of claims that solely sounded in tort, *e.g.*, harassment, discrimination, slander, defamation; asserted contract claims on behalf of individuals (Agent Dobyns' wife and children) who lacked privity with the United States; and invoked a variety of statutes, *e.g.,* the Crime Victims' Rights Act, 18 U.S.C. § 3771, the violations of which

do not give rise to jurisdiction in this court either independently or under the Tucker Act, 28 U.S.C. § 1491(a).[4]  His first amended complaint corrected some, but not all, of these problems.  But, *these* are not the complaints before the court.  And defendant acknowledges – as it must – that most of the deficiencies it previously cited have been remedied in plaintiff's second amended complaint.  That most recent complaint views plaintiff's claims almost entirely through the prism of alleged breaches of the 2007 settlement agreement.  Nevertheless, defendant persists in seeking to dismiss virtually all the counts of this most recent complaint, either as ones over which this court lacks jurisdiction or those which fail to state a claim.[5]

A.      **Jurisdiction – RCFC 12(b)(1)**

Defendant first argues that, despite the refinements made by the two successive amendments, the majority of plaintiff's claims still sound in tort and thus must be dismissed for lack of jurisdiction.  To be sure, plaintiff continues to raise claims involving misrepresentation, slander, harassment and defamation.  Yet, as is evident from the second amended complaint, all the aforementioned claims, save one, now arise in the context of alleged breaches of the settlement agreement.

The Tucker Act waives sovereign immunity in all actions brought in this court "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ***in cases not sounding in tort***."  28 U.S.C. § 1491(a)(1) (emphasis added).  As the highlighted terms indicate, this court lacks jurisdiction to entertain tort claims, which, instead, are generally heard by district courts under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671.  *See Shearin v. United States*, 992 F.2d 1195, 1197 (Fed. Cir. 1993).  Yet, in *Bird & Sons, Inc. v. United States*, 420 F.2d 1051, 1054 (Ct. Cl. 1970), the Court of Claims stated that "'an action may be maintained in this court which arises primarily from a contractual undertaking regardless of the fact that the loss resulted from the negligent manner in which defendant performed its contract'" (quoting *Chain Belt Co. v. United States*, 115 F. Supp. 701, 711-12 (Ct. Cl. 1953)).  More recently, the Federal Circuit has instructed that "[i]t is well established that where a tort claim stems from a breach of contract, the cause of action is ultimately one arising in contract, and thus is properly

---

[4]  For a brief sampling of the many cases demonstrating these deficiencies, *see*, *e.g.*, *Jentoft v. United States*, 450 F.3d 1342, 1349 (Fed. Cir. 2006) (court lacks jurisdiction over claims sounding solely in tort); *Brown v. United States*, 105 F.3d 621, 624 (Fed. Cir. 1997) (court lacks jurisdiction over suits against Federal officials); *Chancellor Manor v. United States*, 331 F.3d 891, 899 (Fed. Cir. 2003) (no contract jurisdiction absent privity); *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (indicating that outside of contract, a substantive right enforceable against the United States for money damages must be based on a "money-mandating" statute).

[5]  Plaintiff asserts that defendant should be estopped from seeking to dismiss his second amended complaint because defendant's counsel had agreed to the changes made by plaintiff.  As discussed at oral argument, the court has considered this argument and finds it to be without merit.

within the exclusive jurisdiction of the Court of Federal Claims . . ." *Awad v. United States*, 301 F.3d 1367, 1372 (Fed. Cir. 2002); *see also Wood v. United States*, 961 F.2d 195, 197 (Fed. Cir. 1982) ("Where the claim is essentially for breach of contact and the liability depends on the government's alleged promise, jurisdiction is based on the Tucker Act not on the Federal Tort Claims Act."); *SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 655 (2006).[6]

Hoping to distinguish these cases, defendant seizes upon snippets from two prior decisions of this court. On brief, it asserts that "the Second Amended Complaint is 'nothing more than an attempt to reframe certain of [Mr. Dobyns'] tort claims as arising under' his Settlement Agreement with ATF," quoting *Edelmann v. United States*, 76 Fed. Cl. 376, 381 (2007). It likewise suggests that "parties cannot 'disguise or mask a substantive claim in tort as one in contract in order to attempt to secure claims court jurisdiction,'" quoting *Reforestacion de Sarapiqui v. United States*, 26 Cl. Ct. 177, 187 (1992), *aff'd*, 985 F.2d 583 (Fed. Cir. 1992). It is difficult, though, to understand what solace defendant derives from these cases. They hardly stand for the proposition that a plaintiff may not frame its claims so as to bring them within this court's jurisdiction. Nor do they suggest that claims which, on their face, appear proper should be dismissed if, when bathed in a skeptical acid, an underlying "tactical motivation" is revealed.[7]

----

[6] In *Chain Belt*, the Court of Claims explained the rationale for this rule thusly –

While it is true that this court does not have jurisdiction over claims sounding primarily in tort, an action may be maintained in this court which arises primarily from a contractual undertaking regardless of the fact that the loss resulted from the negligent manner in which defendant performed its contract. *Chippewa Indians of Minnesota v. United States*, 91 Ct. Cl. 97, 130, 131. A tortious breach of contract is not a tort independent of the contract so as to preclude an action under the Tucker Act. 28 U.S.C.A. §§ 1346, 2401, 2402. *United States v. Huff*, 5 Cir., 165 F.2d 720, 723. In the *Huff* case, the Government had leased lands occupied by others as grazing lands under leases. The Government desired the land for military purposes, and it was agreed that it would have the right to let down any wire on the then existing wire fences but that following the crossing of the fences by troops, the Government would re-staple the wire and leave the fences in as good condition and repair as they were at the time of entry on the premises by the Government. The Government failed to restaple the fences in a reasonable time and the grazing tenants were damaged. The court held that this failure of the Government was a tortious breach of contract but that such a breach was not a tort independent of the contract such as would preclude action under the Tucker Act. *See also Keifer & Keifer v. Reconstruction Finance Corp.*, 306 U.S. 381, 59 S. Ct. 516, 83 L.Ed. 784.

*Chain Belt*, 115 F. Supp. at 711-12.

[7] One is reminded of Holmes – "[a] man may have as bad a heart as he chooses, if his conduct is within the rules. In other words, the standards of the law are external standards." Oliver Wendell Holmes, Jr., The Common Law 110 (Dover ed. 1991).

Both cases, rather, involved tort claims that purportedly derived from implied-in-fact, oral agreements – contracts, as it turns out, that were found not to exist. *See Edelmann*, 76 Fed. Cl. at 381; *Reforestacion de Sarapiqui*, 26 Cl. Ct. at 188-89.[8] These cases thus represent no grand departure from the well-established line of Federal Circuit decisions discussed above (nor could they), but instead stand for the unremarkable proposition that a tort claim cannot arise "primarily" from a contract if there is none. The situation here, of course, is quite different. There is an express written contract here and, defendant's pettifoggery notwithstanding, plaintiff's core claims are based upon the alleged breach of that agreement (or the covenants associated therewith). That should be – and is – enough.[9]

As a fallback position, defendant asserts that plaintiff has insufficiently interlaced his claims with the allegedly-breached terms of the settlement agreement. While the second amended complaint could be clearer in this regard, ultimately, there is little mystery as to which portions of the settlement agreement (a scant six pages in length) are claimed to have been breached. To dispel any ambiguity in this regard, one need only juxtapose the complaint against the settlement agreement (which defendant submitted to the court for consideration as part of its motion and which the court deems part of the second amended complaint).[10] Doing so, it is

---

[8] In *Reforestacion de Sarapiqui*, this court briefly considered whether such claims could be based upon a written agreement between the parties, but discounted that theory as plaintiff had admitted that the written agreement was not breached by the United States. 26 Cl. Ct. at 188.

[9] For a strikingly similar case, *see SGS-92-X003*, 74 Fed. Cl. at 655 (no lack of jurisdiction where claim alleged that government negligently breached promises to maintain the secrecy of informant's identity and protect her from harm or injury, where "complaint is framed as a breach of contract action, not a negligence or intentional tort action"); *see also Bird & Sons*, 420 F.2d at 1054 ("where an alleged 'negligent act' constitutes a breach of a contractually created duty, the Tucker Act does not preclude relief").

[10] At oral argument, defendant admitted that it could not rely upon this agreement in its arguments, yet deny plaintiff that opportunity. This court, in fact, has often considered the content of a contract attached to a complaint in considering a motion to dismiss. *See, e.g., Phang v. United States*, 87 Fed. Cl. 321, 324 (2009); *Patterson v. United States*, 84 Fed. Cl. 583, 585 n.1 (2008); *Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29, 46 (2000), *aff'd*, 271 F.3d 1327 (Fed. Cir. 2001), *cert. denied*, 525 U.S. 1096 (2002); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Even though it submitted the settlement agreement for the court's consideration, defendant argues that plaintiff has not met the standard for pleading a contract claim set out in RCFC 9(k). The latter rule states that "[i]n pleading a claim founded on a contract . . . , a party must identify the substantive provisions of the contract . . . on which the party relies." *Id*. It goes on to state – in language not cited by defendant – that "[i]n lieu of a description, the party may annex to the complaint a copy of the contract . . . , indicating the relevant provisions." *Id*. In the court's view, a comparison of the second amended complaint to the settlement agreement, not to mention defendant's arguments on brief, leaves little doubt which substantive provisions of the agreement are operative here. *See Mendez-*

readily apparent that various provisions of the complaint, in particular, assert that ATF did not comply with paragraph 2 of the settlement agreement in terms of how it approached the assessment of threats to plaintiff and his family, including that posed by the alleged arson attack on their home.  Plaintiff also asserts that he did not timely receive payment of the amounts required to be paid under paragraph 3 of the settlement agreement.  In addition, he makes out a dozen or so other separate and related claims that defendant breached paragraph 10 of the agreement, which states that "[t]he Agency agrees that it will comply with all laws regarding or otherwise affecting [Mr. Dobyns'] employment by the [ATF]."[11]  These include assertions (Second Amended Complaint, ¶ 148) that the agency has, since the settlement agreement was executed in 2007, failed to take steps to:  (i) prevent ATF managers from retaliating against plaintiff and otherwise creating "hostile work conditions" for him; (ii) protect plaintiff and his family, including failing to provide him and his family with adequate covert identification in violation of "ATF agent safety protection policy;" (iii) investigate properly the arson of plaintiff's home; and (iv) refused timely to comply with nine requests for information under the Freedom of Information Act.  Finally, the complaint asserts that (*id*. at ¶ 148) the "ATF's continuing, selective enforcement and application of ATF's media policy" violated the settlement agreement, with the latter reference tied to paragraph 6 of the agreement, in which ATF agreed that it would handle requests for speaking requests "in a manner consistent with Agency practice and procedure."

Defendant takes no issue, at least in terms of jurisdiction, with plaintiff's claim that he was not paid on a timely basis in breach of paragraph 3 of the settlement agreement.  Nor does it seriously contest, for jurisdictional purposes, plaintiff's claim that ATF violated its media policy.  But, it strenuously contests plaintiff's reliance upon paragraph 10 of the settlement agreement in asserting that the violation of various statutes, regulations and agency policies gave rise to a compensable breach of the settlement agreement.  The plain language of the agreement, however, suggests otherwise, as it states that ATF "agrees that it will comply with all laws regarding or otherwise affecting [Mr. Dobyns'] employment by the Agency."  Under contract construction principles, of course, that plain meaning is ordinarily controlling.[12]  Defendant, moreover, offers

---

*Cardenas v. United States*, 88 Fed. Cl. 162, 168 (2009) (describing the requirements of RCFC 9(k)).

[11]  Defendant also flatly errs in asserting that the settlement agreement in question is not the sort of "contract" upon which jurisdiction may be premised under the Tucker Act.  The decisional law on this point is decidedly to the contrary.  *See Stovall v. United States*, 71 Fed. Cl. 696, 701-02 (2006) (stating that "decisional law leaves no doubt that settlement agreements generally fall within" the definition of express or implied contract with the United States as used by the Tucker Act); *see also Greco v. Dep't of Army*, 852 F.2d 558, 560 (Fed. Cir. 1988) ("It is axiomatic that a settlement agreement is a contract."); *Cook v. United States,* 85 Fed. Cl. 820, 822-23 (2009); *Greenhill  v. United States*, 81 Fed. Cl. 786, 790 (2008); *Taylor v. United States*, 73 Fed. Cl. 532, 545 (2006).

[12]  *See Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1362 n.35 (Fed. Cir. 2009) ("Ordinarily when a provision is found to have a plain meaning, that is deemed to

no competing construction of this language. Indeed, it does not argue that it is ambiguous, except seemingly to say that the language cannot mean what it says. The latter jeremiad, however, is little more than an invitation to ignore the language altogether, which the court is not at liberty to do, for it must instead "interpret the contract in a manner that gives meaning to all of its provisions." *McAbee Constr.*, 97 F.3d at 1435.[13] Despite defendant's entreaties, the court thus cannot render this language "surplusage." *Granite Constr.*, 962 F.2d at 1003.

Nor is the clause in question too general to be enforced. This is not a case, like several cited by defendant, in which special construction rules come into play requiring that the incorporation of laws by reference be specific. *See, e.g., Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008); *Smithson v. United States*, 847 F.2d 791, 794 (Fed. Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989); *see also St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008). These cases do not involve clauses in which the United States expressly agreed to comply with one or more categories of laws, but rather instances in which the plaintiff sought to imply as much based upon provisions indicating, for example, that an agreement was "subject to" a given set of regulations. *See, e.g., Smithson*, 847 F.2d at 794. It was in the latter context that the Federal Circuit opined in *Northrop Grumman*, 535 F.3d at 1345, that "the language used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract."[14]

---

conclusively establish the parties intent."); *McAbee Constr. Inc. v. United States*, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996) (same); *Ace Constructors, Inc. v. United States*, 499 F.3d 1357, 1361 (Fed. Cir. 2007) (same); *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993) ("if the provisions are clear and unambiguous, they must be given their plain and ordinary meaning"); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

[13] *See also United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997) (the court "must interpret [a contract] as a whole and 'in a manner which gives reasonable meaning to all its parts'" (quoting *Granite Constr. Co. v. United States*, 962 F.3d 998, 1003 (Fed. Cir. 1992), *cert. denied*, 506 U.S. 1048 (1993))); *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978) ("[A]n interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result."); *Spectrum Sciences and Software, Inc. v. United States*, 84 Fed. Cl. 716, 735 (2008) (same); *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 730 (2004) (same).

[14] Moreover, in *Northrop Grumman*, the Federal Circuit specifically rejected the notion that incorporations by reference had to be accomplished through some "magic words," stating "a requirement that contract language be explicit or otherwise clear and precise does not amount to a rule that contracting parties must use a rote phrase or a formalistic template to effect an incorporation by reference." 535 F.3d at 1345.

The situation here is starkly different.  To begin with, paragraph 10 of the settlement agreement does not purport to incorporate, by reference, any particular statutes or regulations. Rather, by design, it sweeps more broadly, undoubtedly to afford plaintiff a contractual remedy should ATF, in the future, not comply with all laws regarding or affecting his employment.[15] And it is precisely that remedy which plaintiff now seeks to invoke – a remedy not unlike that afforded private disputants under similarly-worded contract clauses.[16]  Whether it was wise for ATF to agree to such a provision here – one way in which defendant attempts to frame this issue – is, of course, quite immaterial.  What is relevant is that the agency did so agree.[17]  Hence, it appears that breaches of paragraph 10 of the settlement agreement do give rise to contract claims under the Tucker Act and that plaintiff has properly invoked this jurisdiction as to such claims.[18]

Finally, defendant claims that this court lacks jurisdiction over various claims made by plaintiff that defendant violated the covenant of good faith and fair dealing associated with the settlement agreement.  Plaintiff asserts that the agency's harsh treatment of him subsequent to the settlement agreement violated the covenant of good faith and fair dealing associated with the portions of that agreement that promoted him, assigned him to a new position, terminated various disciplinary actions pending against him, ordered various matters expunged from his personnel

---

[15]  Although defendant does not argue otherwise, it should be noted that, in a variety of contexts, the word "laws" has been construed to include not only statutes, but properly promulgated regulations, court decisions and other actions having the effect of law.  *See, e.g.*, *City of New York v. FCC*, 486 U.S. 57, 63 (1988).

[16]  *See Green v. Begley Co.*, 2008 WL 4449065, at *4 (S.D. Ohio Sept. 29, 2008) (breach of contract action existed where defendant allegedly failed to comply with "all applicable laws, ordinances, rules and regulations"); *Int'l Gateway Exch., LLC v. Western Union Fin. Servs.*, 333 F. Supp. 2d 131, 145-56 (S.D.N.Y. 2004) (party could pursue damages for breach of agreement to "comply in all material respects with all banking and consumer protection laws and regulations"); *see also Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*, 259 F.R.D. 151, 163 (N.D. Ill. 2009); *Beringer v. Standard Parking O'Hare Jt. Venture*, 2008 WL 4890501, at *6 (N.D. Ill. Nov. 12, 2008).

[17]  Defendant's assertion that no reasonable person would agree to such sweeping language seems strangely off key given the government's practice of regularly requiring the persons with whom it deals to do the same thing.  *See* 48 C.F.R. § 52.212-4(q) (requiring procurement contractors to "comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under this contract"); 24 C.F.R. § 883.310(b)(6) (making a similar requirement for recipients of Federal housing assistance).

[18]  As will be discussed below, this is not to say that all of the claims raised by plaintiff relate to violations of "laws regarding or otherwise affecting [Mr. Dobyns'] employment by the [ATF]."

file, and resolved various discrimination and retaliation claims then pending against the agency.[19] But, in a well-rehearsed argument, defendant claims that plaintiff cannot predicate jurisdiction upon a breach of the covenant absent corresponding violations of the underlying agreement. This court and the Federal Circuit, however, have repeatedly rejected this argument.[20]  They have done so reasoning, *inter alia*, that "[s]uch covenants require each party . . . 'not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'"  *Info Sys. & Networks*, 81 Fed. Cl. at 750 (quoting *Centex*, 395 F.3d at 1304); *see also Market St. Assocs. L.P. v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991) (Posner, J.) (indicating that a breach of the covenant occurs when there has been "sharp dealing").  The rationale of these cases fits plaintiff's case like a glove – that defendant, with one hand restored plaintiff to his proper position and emoluments, but, with the other, frustrated his enjoyment of the same.  Such a claim manifestly may be maintained in this court.  Defendant's arguments to the contrary are unpersuasive.

While plaintiff's second amended complaint is no model of clarity, the question here is not whether plaintiff could have exhibited better draftsmanship.  Rather, it is whether the second amended complaint, when viewed overall, adequately invokes this court's jurisdiction.  And, the answer to that question is – yes.  Accordingly, the court must deny that portion of defendant's motion predicated upon RCFC 12(b)(1).[21]

---

[19]  In this regard, he avers, *inter alia*, that ATF "knowingly and willfully allowed managers to perpetuate a hostile work environment . . . , including harassment and whistle-blower retaliation" (¶ 37); "knowingly and willfully continued prior or then-existing internal affairs investigations, along with reformatting and ordering new internal affairs investigations into [him] on over eleven different occasions" (¶ 38); and "sought to add to the [family's] misery . . . by serving Dobyns with a relocation transfer" (¶ 143).

[20]  *See Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005); *Jay Cashman, Inc. v. United States*, 88 Fed. Cl. 297, 308 (2009); *Info. Sys. & Networks Corp. v. United States*, 81 Fed. Cl. 740, 750-51 (2008), *aff'd*, 2009 WL 4755696 (Fed. Cir. Dec. 14, 2009); *North Star Alaska Housing Corp. v. United States*, 76 Fed. Cl. 158, 188 (2007).

[21]  Defendant asserts that the administrative review procedure set forth at paragraph 13 of the settlement agreement represents plaintiff's sole remedy for breach of the settlement agreement.  In support of this argument, it cites *Doe v. United States*, 513 F.3d 1348, 1355-56 (Fed. Cir. 2008).  But, that case involved a statute which, by its terms, offered the "exclusive" procedure for dealing with breaches of a collective bargaining agreement, *id*. at 1355 (citing 5 U.S.C. § 7121(a)(1)), and thus is inapposite.  Various cases in this court have correctly refused to construe contract clauses as precluding relief that would otherwise lie under the Tucker Act, unless the language to that effect is unmistakable.  *See, e.g.*, *Patterson v. United States*, 84 Fed. Cl. 583, 585 (2008); *Greenhill v. United States*, 81 Fed. Cl. 786, 791 (2008).  That is not the case here.

### B.        Failure to State a Claim

Defendant's arguments under RCFC 12(b)(6) – particularly as framed at oral argument – raise serious questions regarding the standard to be employed by this court in assessing whether plaintiff's complaint fails to state a claim.  In one way or another, those arguments revolve around the notion that despite its 147 counts and 43 typed pages, plaintiff's complaint lacks specificity – that it is, to quote one of defendant's briefs, "nothing more than 'an unadorned, the defendant-unlawfully-harmed-me accusation.'"  (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).  This is true, defendant asseverates, both because of the complaint's lack of factual specificity, as well as its failure to establish nexuses between the actions averred and the breach of particular paragraphs in the settlement agreement at issue.  Defendant grounds these claims on the new pleading precision it argues is demanded by two recent Supreme Court cases – *Twombly* and *Iqbal*.  A full discussion of those cases is thus in order.[22]

### 1.        Standard of review

In *Twombly*, the Supreme Court held that allegations of parallel conduct by competitors, without more specifics, were insufficient to plead an antitrust violation under the Sherman Act, 15 U.S.C. § 1.  550 U.S. at 548-49.  While the Court disclaimed any intent to require the "heightened fact pleading of specifics," *id*. at 570, it opined that, to state a claim under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  550 U.S. at 570.[23]  "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," the Court further explained, *id*. at 555 (citing the language in Rule 8), yet "[f]actual allegations must be enough to raise a right to relief above the speculative level" and cross "the line from conceivable to plausible."  *Id*.  In so holding, the Court rejected that portion of Justice Black's opinion in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), in which he wrote of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Twombly* held that "[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard," 550 U.S. at 563, one that merely "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival."  *Id*.

---

[22]  To say the least, these cases have drawn considerable attention.  *See*, *e.g.*, "Statistical Information on Motions to Dismiss re Twombly/Iqbal: Dec 2009) and "Caselaw Study on Post-Iqbal Cases (Rev. 1/12/10)" both *available at* http://www.uscourts.gov/rules (as last viewed on Jan. 12, 2010 at 1:15 pm).

[23]  Both RCFC 12 and RCFC 8, which will be discussed in greater detail below, are virtually identical to their federal rules counterparts.

Two years later, in *Iqbal*, the Supreme Court clarified that *Twombly*'s "plausibility" standard applies to all civil cases.[24]  *Iqbal* concerned claims by a Muslim that aliens who were detained on immigration charges following the September 11 attacks were selectively placed in their restrictive conditions depending upon their race and religion.  129 S. Ct. at 1951.  The Court found that the allegations in the complaint were insufficient to state a discrimination claim under the "plausibility" standard.  *Id*. at 1952.

The Court began "by identifying the allegations in the complaint that are not entitled to the assumption of truth."  *Id*. at 1951.  Employing language from *Twombly*, it described such allegations – in this case, the paragraphs describing the prongs of a constitutional discrimination claim – as those "that offer[] 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Id*. at 1949 (quoting *Twombly*, 550 U.S. at 555).  Such "bare assertions," which do no more than state legal conclusions, are "not entitled to be assumed true," the Court concluded – they, rather, are "disentitle[d] . . . to the presumption of truth" even if cast in the form of a factual allegation.  129 S. Ct. at 1951 (citing *Twombly*, 550 U.S. at 555).  Having culled these legal conclusions from the complaint, the Court proceeded to evaluate the remainder thereof under the "plausibility" standard.  That standard "is not akin to a 'probability requirement,'" the Court explained, and "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 129 S. Ct. at 1949.  *Inter alia*, it provides that "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id*. at 1949 (quoting *Twombly*, 550 U.S. at 557).  Determining whether this line is passed is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 1949-50; *see also Petro-Hunt, LLC v. United States*, 2009 WL 3765495, at *19 (Fed. Cl. Nov. 6, 2009).  That said, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not 'show[n]' – that the pleader is entitled to relief."  129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

In combination, *Twombly* and *Iqbal* prescribe a two-pronged approach to evaluating the sufficiency of a complaint – the court must first disregard any legal conclusions, such as the recitation of legal formulae, and then must subject the surviving allegations, presumed to be true, to the "plausibility" standard.  *See Kenney Orthopedic, LLC v. United States*, 88 Fed. Cl. 688, 697 (2009).  While this much is clear, "*Iqbal* and *Twombly* contain few guidelines to help the lower courts discern the difference between a 'plausible' and an implausible claim and a 'conclusion' from a 'detailed fact.'"  *Riley v. Vilsack*, 2009 WL 3416255, at *7 (W.D. Wis. Oct. 21, 2009); *see also Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 630 (6th Cir. 2009).  This lack of guidance has caused the courts to "reach varying conclusions about whether notice pleading remains or has been supplanted by something new."  A. Benjamin Spencer, "Understanding Pleading Doctrine," 108 Mich. L. Rev. 1, 7 (2009) (hereinafter "Spencer"); *see*

---

[24]  Notably, *Iqbal* was decided over the dissent of Justice Souter, the author of the majority opinion in *Twombly*, who characterized the 5-4 majority opinion as "bespeak[ing] a fundamental misunderstanding of the enquiry that *Twombly* demands."  129 S. Ct. at 1959; *see also Smith v. Duffey*, 576 F.3d 336, 340 (7th Cir. 2009) (making this same observation).

*also* "Pleading Standards," 123 Harv. L. Rev. 252, 261-62 (2009).[25]  The disparate judicial thinking on this subject may be arrayed over a spectrum, with the placement of a given decision dependent upon three variables.  The first variable involves the extent to which a given court adheres to the "notice pleading" concept in *Conley* or, conversely, how that court views what was abrogated in *Twombly*.  The second concerns how a court defines what sort of claims are *vel non* entitled to be presumed true – where, for example, the line is drawn between factual claims and mere recitations of legal elements.  The last variable focuses on how restrictively a given court has applied the "plausibility" standard first enunciated in *Twombly* and then elaborated upon in *Iqbal*.  *See* Spencer, *supra*, at 7-8.  This last variable is dominant, as it has the potential of driving the other two.

On one end of that spectrum are decisions that construe *Twombly* and *Iqbal* in minimalist terms.  These cases continue to view the Rule 8(a) pleading standard in forgiving terms, refusing to budge from all or nearly all the traditional concepts identified with notice pleading[26] – many of these decisions unflinchingly continue to cite precedents that predate the Supreme Court's decisions, some going so far as to quote the very "no set of facts" language in *Conley* that, of course, was jettisoned in *Twombly*.[27]  On the other end of the spectrum are decisions that view

---

[25]  The Third Circuit has explained how this confusion was engendered, thusly –

> What makes *Twombly*'s impact on the Rule 12(b)(6) standard initially so confusing is that it introduces a new "plausibility" paradigm for evaluating the sufficiency of complaints.  At the same time, however, the Supreme Court never said that it intended a drastic change in the law, and indeed strove to convey the opposite impression; even in rejecting *Conley*'s "no set of facts" language, the Court does not appear to have believed that it was really changing the Rule 8 or Rule 12(b)(6) framework.

*Phillips v. County of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008); *see also Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 337 n.4 (6th Cir. 2007) ("We have noted some uncertainty concerning the scope of *Bell Atlantic Corp. v. Twombly. . .*"); Spencer, *supra*, at 7; *see generally Smith*, 576 F.3d at 339-40 (noting that *Twombly* is "fast becoming the citation *du jour* in Rule 12(b)(6) cases"); Robert L. Rothman, "*Twombly* and *Iqbal*: A License to Dismiss," 35 Litig. 1 (2009).

[26]  *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008) (stating that *Twombly* "did not . . . supplant the basic notice-pleading standard"); *Mull v. Abbott Labs.*, 563 F. Supp. 2d 925, 930 (N.D. Ill. 2008) ("[T]he Court did not adopt a fact-pleading standard to supplant the notice-pleading standard that has long applied in federal court.").

[27]  *See, e.g., Grand River Enters. Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 935 (8th Cir. 2009) ("The motion should be granted if 'it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief.'" (quoting *Taxi Connection v. Dakota, Minn. & E. R.R. Corp.*, 513 F.3d 823, 826 (8th Cir. 2009))); *White v. Gregory*, 2009 WL 4506593, at *1 (S.D.

the Supreme Court opinions as having established a fundamentally-different, significantly-heightened pleading standard.[28]  These decisions hold that the adoption of the "plausibility" standard worked a sea change, supplanting *Conley*'s notice pleading in favor of a modified fact-pleading standard that denies the presumption of truth to any claim that has any significant legal dimension.[29]  Some of these decisions, moreover, could be viewed as exhibiting an increased willingness to discount individual factual allegations as implausible.  *See, e.g.*, *Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A.*, 2010 WL 46401, at *2-3 (D. Md. Jan. 6, 2010); *Feeley v. Total Realty Mgmt*, 2009 WL 2902505, at *4-5 (E.D. Va. Aug. 28, 2009).

Between the ends of this spectrum (some might say between the horns of this dilemma), there is, of course, a middle.  The cases in this central sector perceive varying degrees of tension between the "notice pleading" requirement of *Conley* and at least some iterations of the "plausibility" standard and assumption-of-truth principle.[30]  They recognize that a given complaint might not be viewed as crossing the "plausibility" threshold unless it pleads significantly more facts than might have been previously thought necessary.  They ponder how, to use the words of *Twombly*, a court should strike the balance between holding that "a complaint . . . does not need detailed factual allegations," but that "[f]actual allegations must be enough to raise a right to relief above the speculative level."  550 U.S. at 555.  Finally, while recognizing that *Iqbal* makes clear that the new standard applies to all civil cases, these cases hint at the

---

Ga. Dec. 3, 2009); *Anderson v. United States*, 2009 WL 4722229, at *3 (E.D. Wash. Dec. 2, 2009) (citing *Pillsbury, Madison and Sutro v. Lerner*, 31 F.3d 924, 928 (9th Cir. 1994)); *DePhillips v. United States*, 2009 WL 4505882, at *1 (D. Md. Nov. 23, 2009) (citing *Herlihy v. Ply-Gem Indus., Inc.*, 752 F. Supp. 1282, 1285 (D. Md. 1990)); *see also NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 460 (6th Cir. 2007) (Martin, J., dissenting).

[28]  *See, e.g.*, *Kasten v. Ford Motor Co.*, 2009 WL 3628012, at *2 (E.D. Mich. Oct. 30, 2009) ("Together, *Iqbal* and *Twombly* form a substantial departure from the traditional standard set forth by Justice Black in *Conley* . . .").

[29]  *See, e.g.*, *Travel Agent Comm. Antitrust Litigation*, 583 F.3d 896, 911 (6th Cir. 2009) (construing *Twombly* as requiring a plaintiff to plead enough specific facts "to raise a reasonable expectation that discovery will reveal evidence" establishing a claim); *id.* at 912 (Merritt, J., dissenting) (stating that the majority has "seriously misapplied the new standard by requiring not simple 'plausibility,' but by requiring the plaintiff to present at the pleading stage a strong probability of winning the case"); *Riley*, 2009 WL 3416255, at *1 (in *Twombly*, "the Supreme Court 'retired' the standard from *Conley* with little fanfare," thereby "reinvigorat[ing] motion practice under Fed. R. Civ. P. 12(b)(6)"); *Cacho-Torres v. Miranda-Lopez*, 2009 WL 1034873, at *2 n.1 (D.P.R. Apr. 16, 2009) ("*Twombly* abrogated the standard for notice pleading established in *Conley* . . .").

[30]  *See, e.g., Phillips*, 515 F.3d at 231; *McShane v. Merchants Ins. Co.*, 2009 WL 3837245, at *2 (W.D. Pa. Nov. 16, 2009).

prospect that the standard might resonate differently depending upon the legal and factual scenario encountered.[31]

Defendant's position, perhaps not surprisingly, leans toward the side of the spectrum that views *Twombly* and *Iqbal* as having significantly heightened pleading standards. Yet, for several reasons, this court believes that a middle of the road perspective – one that views the Supreme Court as having made several significant changes, to be sure, but not as having, *sub silentio,* entirely reworked Rule 8 – represents the most accurate statement of the law.

Under this view, the basic concept of notice pleading, as construed in *Conley*, survives. As Justice Black once wrote, "[t]he Federal Rules of Civil Procedure do not require a claimant to set out in detail all the facts upon which he bases his claim." *Conley*, 355 U.S. at 47. This approach stems directly from the language of Rule 8(a)(2), which, virtually since its adoption, has stated that a claim for relief need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief."[32] Any notion that the Supreme Court intended to go farther – that is, to replace the notice pleading standard in *Conley* with some heightened form of fact-pleading – is belied by that part of *Twombly* in which the Court stated that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." 550 U.S. at 561. This statement would not be accurate, of course, if all the facts "consistent with the allegations in the complaint" had to be in the complaint, *ab initio*. One arguing otherwise must deal with the line of decisions that post-dates *Twombly* in which the Court has reaffirmed the traditional notice pleading concept enunciated in *Conley*. A few weeks after it decided *Twombly*, the Supreme Court thus held in *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam), that under Rule 8, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"[33] As these and other recent decisions attest, the notice standard neither requires

---

[31] *See, e.g., Smith*, 576 F.3d at 339-40; *Brace v. Massachusetts*, 2009 WL 4756348, at *6 (D. Mass. Dec. 10, 2009); *see also U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) ("The new reading raises a hurdle in front of what courts had previously seen as a plaintiff's nigh immediate access to discovery – modest in its demands but wide in its scope."); *Tooley v. Napolitano*, 2009 WL 3818372, at *1 (D.C. Cir. Nov. 17, 2009).

[32] The Supreme Court in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002), compared this general language in Rule 8 to the "greater particularity" required by Rule 9(b). The latter rule states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances . . ." *See also* RCFC 8(b).

[33] In *Erickson*, the Court held that a prisoner's *pro se* complaint stating that the doctor's decision to withhold his prescribed Hepatitis C medication was "endangering his life" and causing "continued damage to [his] liver," was a sufficient allegation of substantial harm to survive a motion to dismiss. 551 U.S. at 91, 94. It rejected the heightened pleading standard used by the court of appeals as "departing in [a] stark . . . manner from the pleading standard mandated by the Federal Rules of Civil Procedure." *Id*. at 90. For other post-*Twombly* decisions

a claimant to "plead facts establishing a *prima facie* case" nor to "set forth all facts on which he relies to support his claim." *Swierkiewicz*, 534 U.S. at 511-13.  To view the law otherwise is to take a grand somersault backwards toward the form/code pleading rules that Rule 8, not to mention the remainder of the 1937 rules, were designed to replace.[34]  Yet, there is no indication that the Supreme Court intended, sans an actual modification of Rule 8, such a retrogression.  *See Iqbal*, 129 S. Ct. at 1950 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era.").

As an added point in its favor, the more measured reading of Rule 8 (and the Supreme Court's interpretations thereof) is reinforced by the remainder of the Federal Rules of Civil Procedure, particularly the provisions for discovery, pretrial and summary judgment.  *See* Clark, 2 F.R.D. at 468 (the new pleading rules "fit in naturally with, and are supplemented by, rules for discovery, pre-trial, and summary judgment").  This interpretation recognizes that "discovery," as the name implies, serves more than to verify facts already known (and pled).  Rather, as noted by the drafters of Rule 26, "[t]he purpose of discovery is to allow a broad search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of his case." Fed. R. Civ. P. 26(b) advisory committee notes, 1946 amend.; *see also Osage Tribe of Indians of Okla. v. United States*, 84 Fed. Cl. 495, 497 (2008).  The year after these comments were written, the Supreme Court emphasized that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation."  *Hickman v. Taylor*, 329 U.S. 495, 507

---

reaffirming the notice pleading standard, *see Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2135 n.1 (2008); *Iqbal*, 129 S. Ct. at 1940; *Tellabs*, 551 U.S. at 319; *see also Thomas v. Rhode Island*, 542 F.3d 944, 948 n.4 (1st Cir. 2008); *Petro-Hunt*, 2009 WL 3765495, at *19; Spencer, *supra*, at 6-7.

[34]  In 1943, Judge Charles Clark of the Second Circuit, who the Supreme Court has described as one of the "principal draftsman" of the Federal Rules, *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 283 (1988), remarked that one of the principal purposes of the form pleading concept was to induce admissions.  Charles E. Clark, "Simplified Pleading," 2 F.R.D. 456, 460 (1943).  He noted, however, that over time, the practice was viewed as "at best wasteful, inefficient, and time-consuming, and at most productive of confusion as to the real merits of the cause and even of actual denial of justice."  *Id.*  Commenting on the advent of notice pleading, Judge Clark further explained –

> This is a sound approach so far as it goes; but content must still be given to the word "notice."  It cannot be defined so literally as to mean all the details of the parties' claims, or else the rule is no advance.  The notice in mind is rather that of the general nature of the case and the circumstances or events upon which it is based, so as to differentiate it from other acts or events, to inform the opponent of the affair or transaction to be litigated – but not of details which he should ascertain for himself in preparing his defense – and to tell the court of the broad outlines of the case.

*Id.* at 460-61.

(1947).[35]  For discovery to have that leveling effect – particularly, where there is an initial informational imbalance among the parties, and, especially, where one of the litigants is a government agency that has privileged access to information[36] – a claimant must not be required, *ab initio*, to aver all or nearly all the facts subservient to its claims.  *See al-Kidd v. Ashcroft*, 580 F.3d 949, 977 (9th Cir. 2009) ("*Twombly* and *Iqbal* do not require that the complaint include all facts necessary to carry the plaintiff's burden.").  Rather, the "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz*, 534 U.S. at 512.[37]  It does not, as

---

[35]  In *Hickman*, of course, the Supreme Court also famously stated – "No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case." *Id*. at 507; *see also United States v. Procter & Gamble, Co*, 356 U.S. 677, 682-83 (1958).  A set of well-known commentators has described the relationship between the new pleading and discovery rules adopted in 1937 in interesting terms, thusly  –

> To understand the significance of the changes made by the discovery rules, it should be remembered that under the prior procedure the means by which parties could narrow the issues and discover information needed to prepare for trial were very limited.  Under the philosophy that a judicial proceeding was a battle of wits rather than a search for the truth, each side was protected to a large extent against disclosure of its case.  As already pointed out, the federal rules relieved the pleadings of their top–heavy burden of formulating issues and disclosing facts.  Under the procedure installed by the rules, the pleadings were called upon only to give notice generally of the issues involved in the case. The discovery procedures of Rules 26 to 37, together with pretrial hearings under Rule 16, provide the means for determining the precise issues and obtaining the information that each party needs to prepare for trial.

8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2001 (2d ed. 1990) (hereinafter "Wright, Miller & Marcus").

[36]  One of the reasons why Congress passed the Freedom of Information Act, 5 U.S.C. § 552, was "'to prevent a citizen from losing a controversy with an agency because of some obscure and hidden order or opinion which the agency knows about but which has been unavailable to the citizen simply because he has no way in which to discover it.'" *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 30 (1974) (quoting S. Rep. No. 813, 89th Cong., 1st Sess. 7 (1965)).

[37]  *See also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168-69 (1993) (noting that in the absence of an amendment to Rule 8 imposing a "heightened pleading standard," "federal courts and litigant must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later"); *Conley*, 355 U.S. at 47-48 ("'[n]otice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both

defendant seemingly would have it, "collapse discovery, summary judgment and trial into the pleading stages of a case." *Petro-Hunt*, 2009 WL 3765495, at *19; *see also Riley*, 2009 WL 3416255, at *9 ("Thus after *Iqbal* and *Twombly*, a court assessing the sufficiency of the complaint should ask:  if all the *facts* the plaintiff alleges in his complaint are accepted as true, but all the conclusions are rejected, is it still plausible . . . to believe that additional discovery will fill in whatever gaps are left in the complaint?" (emphasis in original)).

Nonetheless, it cannot – and should not – be denied that *Twombly* and *Iqbal* did more than repackage old notice-pleading standards in new terminology.  In abrogating the "no set of facts" language from *Conley*, the Court plainly intended that Rule 8(a) be construed less hospitably – of a fashion that would not so readily "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950. But, a review of these twin opinions, and the many cases decided in their aftermath, suggests that, properly construed, the impact of the new standards falls most heavily on two relatively narrow bands of cases – those few in which the rejected *Conley* language might otherwise have been salvific and those involving complex claims with multiple factual facets, especially those in which "factually suggestive" allegations are needed to distinguish between legal and actionable conduct.  At least some courts have concluded that these bands are what Justice Kennedy had in mind in *Iqbal* when, writing on behalf of the majority, he wrote that "determining whether a complaint states a plausible claim will . . . be a context-specific task."  129 S. Ct. at 1950; *see also Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009) (citing this passage and indicating that "the height of the pleading requirement is relative to circumstances"); *al-Kidd*, 580 F.3d at 974-76 (drawing a distinction between the allegations in *Iqbal* and a more typical civil rights case); *Courie*, 577 F.3d at 630 ("Exactly how implausible is 'implausible' remains to be seen, as such a malleable standard will have to be worked out in practice."); *Spencer*, *supra*, at 14 ("it appears that legal claims that apply liability to factual scenarios that otherwise do not bespeak wrongdoing will be those that tend to require greater factual substantiation to traverse the plausibility threshold"); *see generally*, *Riley*, 2009 WL 3416255, at *8 ("So long as the plaintiff avoids using legal or factual conclusions, any allegations that raise the complaint above sheer speculation are sufficient.").

All this tends to show that, beyond the few specific changes they wrought, *Twombly* and *Iqbal* probably are best seen merely as restating, in slightly different terms, propositions long held.[38]  After all, the most lenient interpretations of *Conley* aside, it has never been the case that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

---

claims and defense and to define more narrowly the disputed facts and issues."); 5 Wright, Miller & Marcus, *supra,* at § 1202.  Indeed, in *Twombly*, the Court commented that an otherwise "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely."  550 U.S. at 556.

[38] *See Aktieselskabet AF 21 November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008) (concluding that *Twombly* "leaves the long-standing fundamentals of notice pleading intact"); *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 803-04 (7th Cir. 2008) (cautioning that *Twombly* "must not be overread").

statements" were sufficient to state a claim. *Iqbal*, 129 S. Ct. at 1949.[39]  And, if this is true, it becomes important to recognize, then, what these cases do *not* hold.  Mainly and specifically, they do not treat the newly-minted "plausibility" paradigm as altering the way in which courts should apply other long-standing pleading requirements.  Thus, the Supreme Court did not, by requiring plausibility, transmogrify the "short and plain" pleading requirement of Rule 8 into a pedantical one that requires the extensive pleading of specific facts or every variation or corollary of a claim.  Nor did the Court really alter how the presumption of truth accorded factual allegations has been applied for more than a half century – either in defining what is "factual" or in allowing courts more liberty to second-guess factual allegations in the guise of applying the new plausibility standard.  *See Courie*, 577 F.3d at 629-30.  In short, that these well-established rules were restated in the context of decisions that made other changes does not mean that they themselves were changed.  *See McShane*, 2009 WL 3837245, at *2 ("nothing in *Twombly* or *Iqbal* has changed other pleading standards for a Rule 12(b)(6) motion to dismiss").

Having completed this *tour d'horizon*, the court must now consider the impact of this new standard on the second amended complaint before it.

### 2.    Plaintiff's Complaint

Recall, defendant asserts that "[t]he vast majority of the allegations [in] the Second Amended Complaint are conclusions that have no factual support in [the] pleading."  It contends that plaintiff has failed to demonstrate, with adequate specificity, which duties imposed by the contract were breached by defendant.  Nor, it claims, has plaintiff provided enough factual details regarding the specific actions that effectuated the alleged breaches.  However, a review of the second amended complaint, in light of the pleading requirements of RCFC 8, suggests that defendant's arguments are mistaken.

Before proceeding, first, a bit more context is required.  Although not precisely grouped in this fashion, the claims in plaintiff's second amended complaint readily can be organized into five categories, *to wit*, that ATF:

---

[39]  A small sampling of prior cases that have made this point includes – *Palda v. General Dynamics Corp.*, 47 F.3d 872, 875 (7th Cir. 1995) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)."); *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988) (stating that even under the liberal notice pleading standard, a plaintiff is still required to "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory"); *In re Plywood Antitrust Litigation*, 655 F.2d 627, 641 (5th Cir. 1981) ("Despite the liberality of modern rules of pleading, a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."); *Abrams v. Carrier Corp.*, 434 F.2d 1234, 1251 (2d Cir. 1970), *cert. denied*, 401 U.S. 1009 (1971) ("mere conclusions of law [are] insufficient under Rule 8(a)").

- failed to ensure timely payment of the settlement amounts;[40]

- has allowed ATF managers and others to perpetuate a hostile work environment for plaintiff, characterized by individual and institutional reprisals (including threats of relocation transfers), harassment, discrimination, slander, defamation, whistle-blower retaliation, the selective enforcement of ATF's media policy, and the misuse of personnel review and internal affairs mechanisms;[41]

- has failed to take adequate steps to protect plaintiff and his family, characterized by the agency's failure to follow internal agency policy and procedures relating to threats against employees, properly notify plaintiff of known and credible threats, provide proper security backstopping, and reissue essential protective documents necessary to obtain and maintain covert residency locations and safe daily existence;[42]

- has failed to take a variety of steps to investigate properly the arson fire, including failing to perform the investigation in a reasonable and timely manner, improperly listing plaintiff as a suspect, and manipulating the official investigative findings;[43] and

- has failed to respond to nine separate requests for information filed under the Freedom of Information Act, 5 U.S.C. § 552.[44]

Some of these assertions interlock – thus, for example, plaintiff avers that ATF's handling of the arson is one example of the "malicious reprisals" to which he has been subjected.  In the end, plaintiff claims a variety of "[d]irect and consequential damages" relating to these breaches of the contract, as well as the covenant of good faith and fair dealing.

---

[40] *See* Second Amended Complaint ¶¶ 35-36; 40; 148 (bullet point 1).

[41] *Id*. at ¶¶30-31; 33(B)-(F), (P)-(S), (V), (DD); 37-41; 125; 143; 148 (bullet points 2, 11, 13).

[42] *Id*. at ¶¶ 28-29; 33(I)-(O), (AA), (CC); 78; 85; 148 (bullet points 3-4, 9-10).

[43] *Id*. at ¶¶ 30; 33(G)-(H), (W)-(BB); 71-85 (detailing facts surrounding ATF's investigation of the arson at Agent Dobyn's home); 96; 124-25; 144; 148 (bullet points 5-6, 8).

[44] *Id*. at ¶¶ 33(v); 148 (bullet point 13).  The appendix to this opinion sets forth the pertinent portions of paragraphs 33 and 148 of the Second Amended Complaint.

While, again, defendant admits that plaintiff's timely payment assertion states a claim, it contends that the remainder of plaintiff's claims lack specificity and/or are inadequately tethered to specific provisions in the settlement agreement.  But, at its roots, this argument explicitly and implicitly relies upon several foundational premises that this court has now rejected.

Most fundamentally, defendant operates on the assumption that *Twombly* and *Iqbal* ushered in a new era of heightened pleading standards that necessarily require, *inter alia*, much more in the way of detailed factual allegations.  But, as demonstrated, this is not so.  While plaintiff makes a few allegations that are not entitled to the assumption of truth, none of these proves pivotal.[45]  Second, in contending that the complaint contains inadequate cross-references to the specific portions of the settlement agreement that were allegedly breached, defendant again ignores the broad sweep of paragraph 10 of the agreement.  Its view of that paragraph is based on a cramped construction that this court has now rejected.  Moreover, it is simply not true, as defendant suggests, that plaintiff failed to plead any more specificity as to the policies that were violated.  Indeed, paragraph 33 of the second amended complaint cites three specific orders (ATF Orders 3040.1, 3040.2 and 3210.7) that were allegedly violated and incorporates by references the findings in the OIG report indicating that ATF had failed to comply with its policies, procedures and orders.[46]  Third, defendant relies upon the notion – again rejected above – that one alleging the breach of the covenant of good faith and fair dealing must cite a specific provision of the contract that is breached.  Defendant's error in this regard is particularly important as to plaintiff's contention that he has been subject to a hostile work environment.  Finally, defendant discounts much of the factual detail in the complaint because it involves events that predate the settlement agreement.  The allegations in question, however, are closely linked to other facts that post-date that agreement.  In combination, these allegations aver that the patterns and practices that gave rise to the settlement agreement continued, unabated, thereafter.  Moreover, even a cursory reading of the complaint reveals dozens of factual assertions regarding ATF's handling of the arson of plaintiff's home – an event that occurred after the execution of the settlement agreement in question.

Based upon these and other observations – and taking the factual components of plaintiff's allegations as true – plaintiff has alleged sufficient facts to allow the court to find that his core breach of contract/covenant claims are plausible.  This is not to say that all of plaintiff's claims meet the plausibility standard.  Plainly, there remain in his second amended complaint certain less-developed, stray allegations that either sound entirely in tort or otherwise are totally

---

[45]  *See*, *e.g.*, *id*. at ¶¶ 33(a) (concluding that the settlement agreement was breached; 147 (concluding that the settlement agreement contained express and implied terms); 149 (concluding that ATF caused harm to plaintiff).

[46]  Contrary to defendant's claims, plaintiff was not required, at the pleading stage, to cite every single statute, regulation and policy that allegedly was violated by ATF's conduct.  *See County of El Paso, Texas v. Jones*, 2009 WL 4730303, at *23-24 (W.D. Tex. Dec. 4, 2009) (noting that plaintiff is not "required to reference specific statutes in its Complaint" provided that the allegations in the complaint provide adequate notice).

divorced from the settlement agreement.  *See* Second Amended Complaint at ¶¶ 33(t) (claim regarding ATF's failure to cooperate with OIG during its investigation); 148 (bullet point 7) (failure to implement OIG recommendations).  These claims must be dismissed.  Additionally, for several reasons, the court finds that plaintiff's FOIA claims are not proper.  For one thing, unlike many other claims raised by plaintiff, the FOIA statute does not appear to be a law "regarding or otherwise affecting [Mr Dobyns'] employment by the Agency."  Moreover, despite the broad language of the settlement agreement, the court is hesitant to consider this matter as Congress has conferred on the district courts, and not this court, the responsibility for enforcing the FOIA statute.  *See* 5 U.S.C. § 552(a)(4)(B); *see also Instrument Sys. Corp. v. United States*, 546 F.2d 357, 359 (Ct. Cl. 1976).  Finally, the court believes that, to the extent they are relevant to this case, plaintiff's unfulfilled FOIA requests have been overtaken by events and will be fulfilled, if it is appropriate to do so, by the discovery that will follow this ruling.  For all these reasons, the court dismisses, for failure to state a claim under RCFC 12(b)(6), plaintiff's FOIA claims.

Otherwise, the court believes that this case, in the main, should proceed.  Research reveals breach-of-contract complaints far less detailed than plaintiff's that have survived scrutiny under the dismissal standards outlined in *Twombly* and/or *Iqbal*.[47]  While it goes without saying (almost) that each case stands on the particulars of the complaint at issue, these cases, nevertheless, collectively belie the notion that a plaintiff must jump through considerably more hoops now, in pleading a breach of contract claim, than was the case previously.  In this court's

---

[47]  *See, e.g.*, *Scott v. Infostaf Consulting, Inc.*, 2009 WL 3734137, at *3 (W.D. Pa. Nov. 6, 2009); *Lindstrom & McKenney, Inc. v. Netsuite, Inc.*, 2009 WL 3754155, at *5 (E.D. Mo. Nov. 5, 2009); *Arime Pty, Ltd. v. Organic Energy Conversion Co., LLC*, 2009 U.S. Dist. LEXIS 99345, at *16-19 (W.D. Wash. Oct. 26, 2009); *DeFebo v. Andersen Windows, Inc. and Home Depot*, 2009 U.S. Dist. LEXIS 87889, at *10-14 (E.D. Pa. Sept. 24, 2009); *White Mule Company v. ATC Leasing Co., LLC*, 540 F. Supp. 2d 869, 900 (N.D. Ohio 2008); *see also Transport Int'l Pool, Inc. v. Ross Stores, Inc.*, 2009 U.S. Dist. LEXIS 32424, at *4-8 (E.D. Pa. Apr. 15, 2009).  One commentator has suggested that contract claims are not substantially affected by the new pleading standards because they tend to be straightforward and do not require the claimant to plead facts showing that otherwise unobjectionable conduct was, in the circumstances presented, wrongful.  Spencer, *supra*, at 33-34.  In this regard, the cited article explains –

> The key dividing line seems to be between claims that require suppositions to connote wrongdoing and those based on facts that indicate impropriety on their own.  For example, contract claims appear to be the kind of claim for which suppositions are not necessary to state a valid claim.  To prove a breach-of-contract claim, . . . one need establish the existence of a contract, the breach of a duty by the defendant, and resulting harm.  The plaintiff need not suppose any of these to be the case; she has first-knowledge of these facts – if they indeed exist – and may simply relate them to the court to state a claim.

*Id*. at 33.

view, plaintiff's contract claims have "enough heft" to traverse the new "plausibility" standard, *Twombly*, 550 U.S. at 557, and enough factual detail to put defendant on notice as to the basic nature of the claims raised, so as to allow this case to proceed to discovery.

## III.   CONCLUSION

This court need go no farther.  Based on the foregoing, the court **GRANTS**, in part, and **DENIES**, in part, defendant's motion to dismiss.  On or before February 8, 2010, the parties shall file a joint status report indicating how this case should proceed, to include a joint discovery plan.[48]

**IT IS SO ORDERED**.

s/ Francis M. Allegra_____
Francis M. Allegra
Judge

---

[48]  It is the court's intent to unseal and publish this opinion after January 29, 2010.  On or before January 29, 2010, each party shall file proposed redactions to this opinion, with specific reasons therefor.

# APPENDIX

# EXCERPTS FROM PLAINTIFF'S SECOND AMENDED COMPLAINT

32.     The current and historical bad acts of ATF supervisors have now contributed to an attempted murder of Dobyns and Family in the form of the arson and destruction of their home and belongings and to the ongoing damages they have suffered or are suffering.

33.     With a presentation of facts displaying ATF's bad actions against Dobyns and Family, Plaintiff will prove facts and elements which include but are not limited to the following, in demonstrating ATF's violation of the express and implied terms of the Settlement Agreement, including the implied covenant of good faith and fair dealing:

A)     ATF's breach of contract with Dobyns, the contract being the Settlement Agreement between and among the parties);

B)     ATF's ongoing use of reprisals;

C)     ATF's ongoing creation of a hostile work environment;

D)     ATF's ongoing harassment and discrimination;

E)     ATF's ongoing use of relocation transfers as a reprisal;

F)     ATF's ongoing use of slander and defamation;

G)     ATF's failure to assess and respond to the incident of arson of the Dobyns family home in any reasonable, timely or effective manner;

H)     ATF's ongoing failure to investigate the arson event in any reasonable and timely or effective manner;

I)     ATF's ongoing failure to follow internal agency policy and procedure related to threats against employees;

J)     ATF's ongoing failure to follow federal law related to victim-witness notifications and support;

K)     ATF's concealment of past and current information regarding threats to the health and safety of Dobyns and Family;

L)     ATF's ongoing failure to make proper notifications of known and credible information regarding threats or danger to Dobyns;

M)     ATF's ongoing failure to develop any form of database or \ control documents, organized threat assessments, or reasonable techniques needed to maintain the status of location of suspects known to have threatened violence against Dobyns and Family;

N)     ATF's ongoing failure to provide proper security backstopping, and intended with reasonable expectation to risk the health and lives of Dobyns and Family from known threats of violence;

O)     ATF's failure to reissue essential protective documents necessary to obtain and maintain covert residency locations and safe daily existence;

P)      ATF's improper use of internal legal resources and attorneys (Office of Chief Counsel and its staff attorneys) against Dobyns;

Q)      ATF's willful, intentional and retaliatory use of internal mechanisms to defame Dobyns and to destroy his reputation and credibility (Office of Internal Affairs, Professional Review Board);

R)      ATF's failure to remove persons known to ATF to be involved in Dobyns's complaints as material witnesses, adversely affecting the career of Dobyns, and the failure of ATF supervisors and attorneys to recuse themselves from this dispute despite being material witnesses;

S)      ATF's acts of empowering material witnesses to retaliate against Dobyns, with those witnesses ordering internal investigations and predetermining investigation outcomes and disciplinary measures against Dobyns;

T)      ATF's failure to cooperate with the Office of Inspector General for the Department of Justice, while investigating allegations made by Dobyns against ATF;

U)      ATF's known and intentional withholding of information critical to Dobyns's decision-making process prior to executing the Settlement Agreement contract, including violations of the federal Freedom of Information Act ("FOIA"), 5. U.S.C. Section 552, *et seq.,* as enhanced by the January 21, 2008 Presidential Executive Order regarding FOIA requests, requiring a presumption of disclosure, as implemented by Office of the Attorney General Memorandum for Heads of Executive Departments and Agencies regarding FOIA, dated March 19, 2009, and which violations include a failure to respond to the following FOIA requests submitted by Plaintiff: [listing nine requests];

V)      ATF's selective application of internal policies and procedures against Dobyns;

W)      ATF's current failure to reasonably investigate the arson of the home of Dobyns and Family;

X)      ATF's current inaction and indecision (mismanagement) leading to a delayed response to the investigation of the arson of the home of Dobyns and Family by outside agencies;

Y)      ATF's current classification of Dobyns as a suspect in the arson fire, either formally or informally (an act of retaliation);

Z)      ATF's current failure to take any meaningful investigative steps to eliminate Dobyns from the arson suspect list, intentionally compounding the distress caused by ATF to Dobyns and Family in a time of crisis, and constituting an additional act of retaliation;

AA)     ATF's violation of federal laws and statutes, which laws and statutes include those affording protections to victims of crime and witnesses to criminal acts, along with violations of HIPAA laws, obstruction of justice, acting as an accessory after the fact, defamation and conspiracy;

BB)     ATF's unlawful attempt to manipulate the official findings of a state and federal criminal (arson) investigation in order to intentionally damage Dobyns;

CC)     ATF's overall disregard for the physical, mental, emotional and financial safety and well-being of Dobyns and Family;

DD)     ATF's past uncorrected and ongoing tolerance for mismanagement, fraud, waste and abuse, and ATF's abuse of authority and whistleblower reprisals, all with reasonable cause to believe that these actions would cause significant damages to Dobyns and to Family, all which constitute breaches of contract terms with Dobyns, whether express or implied;

-26-

EE)     All pursuant to which ATF has knowingly engaged in and caused damages to Dobyns; and

37.     Among those allegations of breach, is that ATF knowingly and willfully allowed managers to perpetuate a hostile work environment for Dobyns, including harassment and whistleblower retaliations against Dobyns.

38.     ATF has knowingly and willfully continued prior or then-existing internal affairs investigations, along with reformatting and ordering new internal affairs investigations into Dobyns on over eleven different occasions.

39.     ATF ordered the recall of fictitious and covert identifications for Dobyns and his wife that were specifically designed and issued to protect the security of Dobyns and Family.


      *          *          *          *          *

### Count 1 - Breach of Contract (Settlement Agreement)

145.     Plaintiff re-alleges each and every allegation stated above and incorporates the same herein as though set forth at length.

146.     Prior to the filing of this lawsuit, Plaintiff Jay Dobyns entered into a Settlement Agreement with ATF.

147.     Within the Settlement Agreement are express terms of performance and implied terms of good faith and fair dealing.

148. ATF breached the Settlement Agreement with Agent Dobyns and caused injury to him by doing so. Examples of those breaches include, but are not limited to:

- ATF attorney Eleanor Loos's failure to ensure timely payment of the settlement amounts, as required by the Agreement, thereby forcing counsel for Agent Dobyns to threaten to take enforcement action under the Agreement.

- ATF's failure to perform express representations made by ATF Managers Ronald Carter and William Hoover to take enforcement actions with respect to the Agreement, including a commitment to take active steps to instruct senior ATF managers not to retaliate, harass or create hostile work conditions in any way against Agent Dobyns.

- Operations Security's improper and dangerous recall of covert identification documents of Agent Dobyns, which Agent Dobyns had been issued and were using to conceal their identities and location.

- Operation Security's failure to "backstop" Agent Dobyns subsequent to the Agreement, violating an implied term of adequate agent protection and forcing Agent Dobyns had to make application to the Pima County Superior Court Judge to request covert protections for his house title and other confidential protections.

- ATF's continued refusal to remove Agent Dobyns from a list of suspects in the arson of his Tucson, Arizona home.

- ATF's continued failure to properly investigate the arson and to take protective measures for Agent Dobyns's family and for Agent Dobyns himself, including a continuing failure

to formulate a list of persons of interest for the arson and questions regarding same. These failures give rise to constitute violations of **ATF Order 3210.7C** and the investigation obligation components of **ATF Order 3040.1 and 3040.2,** and accordingly constitute continuing instances of breach of the Settlement Agreement.

• ATF's continuing failure to take any responsive or corrective actions with respect to any of the findings of neglect and abuse by ATF towards Agent Dobyns in the Report by Office of Inspector General, dated September 22, 2008, entitled "OIG Report on Allegations by Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent Jay Dobyns."

1. The particular OIG findings call for remediation in the form of correction and/or discipline of responsible managers of Dobyns, neither of which has occurred.

2. It further requires proactive directives to other managers of Dobyns to act promptly and fully in compliance with ATF policies, procedures and Orders with respect to assessment of threats and acts of violence directed against ATF agents. ATF's failure to take those proactive, remedial measures, constitutes a continuing breach of the Settlement Agreement.

• ATF's misconduct and lack of investigation and followup with respect to the arson of the Dobyns's home, in violation of ATF "written policies and procedures that govern the treatment of threats made against its agents" as referenced in the OIG Report at page 1.

• ATF's continuing breaches of policy to protect against and investigate acts of violence directed against ATF agents include ATF's failures to take any form of safety outreach and "check in" with Agent Dobyns.

• ATF's continuing failure to provide backstopping of Agent Dobyns and his family in the form of covert identification and all of the private and public records involved in thorough agent safety backstopping, and ATF's continuing failure to correct the grossly improper withdrawal of covert ID's for Agent Dobyns, all constitute continuing violations of ATF agent safety protection policy and violations of the Settlement Agreement. The nature of those backstopping requirements are described in detail at pages 2-3 of OIG's September 22, 2008 Report.

• ATF's continuing actions by ATF indicating disregard for the seriousness of the arson on the Dobyns's home and a continuing failure to cure injuries done to SA Dobyns's professional standing and reputation. These ATF actions include internal and apparently (at least in the eyes of ATF senior managers) humorous disregard for media reports of the damage to Agent Dobyns's home from the arson.

• ATF's bad faith failure to respond to nine separate Freedom of Information Act (FOIA) requests by Agent Dobyns, impairing Agent Dobyns's ability to confirm the level of investigative effort by ATF regarding the arson of the Dobyns's home and impairing of Agent Dobyns's ability to confirm ATF's compliance with or violations of the Settlement Agreement.

1. Those same FOIA violations by ATF also violate the January 21, 2009 Presidential Executive Order "Memorandum for the Heads of Executive Departments and Agencies re: Freedom of Information Act."

2. Additionally, the continuing violation of ATF with respect to Agent Dobyns's FOIA requests violates March 19, 2009 Attorney General Guidelines on FOIA, creating a

presumption of disclosure, as articulated by President Obama in his January 21, 2009 Memorandum on FOIA. ATF's standing violation of the Attorney General Guidelines on FOIA in turn constitutes a breach of the Settlement Agreement.

- ATF's continuing, selective enforcement and application of ATF's media policy against Agent Dobyns in an arbitrary and capricious manner, intended to violate and undermine the outside employment authorization by ATF for Agent Dobyns as called for in the Settlement Agreement and in a manner inconsistent with prior directives of ATF to Agent Dobyns to participate in favorable media publicity with respect to Operation Black Biscuit, and further and finally, with respect to Agent Dobyns, selectively undermining recent internal ATF directives to seek favorable media for ATF. All of these activities constitute continuing, standing, uncorrected and un-remediated breaches by ATF of the Settlement Agreement.

149.    As a direct result of the breach of the settlement agreement, ATF proximately caused forseeable injuries to Agent Dobyns in an amount of damages to be determined at trial.