# In the United States Court of Federal Claims

No. 08-700C

(Filed Under Seal:  August 25, 2014)

Reissued:  September 16, 2014[1]

_____

| | |
|---|---|
| JAY ANTHONY DOBYNS, | * Trial; Settlement agreement; No breach of |
| | * contract; Contract interpretation; |
| Plaintiff, | * Incorporation of ATF Orders; Covenant of |
| | * good faith and fair dealing; Parameters; |
| v. | * *Metcalf* – covenant may be breached even if |
| | * there is no breach of the underlying contract; |
| THE UNITED STATES, | * Withdrawal of backstopping; Inadequate |
| | * responses to threats; Damages; Recovery for |
| Defendant. | * emotional distress, as well as pain and |
| | * suffering; Restatement (Second) § 353; |
| | * Counterclaim; No breach of employment |
| | * contract in publishing and promoting book; |
| | * *Snepp*; Waiver. |
| | * |

_____

## OPINION
_____

*James Bernard Reed,* Baird, Williams & Greer, Phoenix, AZ, for plaintiff.

*David Allen Harrington and Kent Christopher Kiffner,* Civil Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Stuart F. Delery; Jeanne E. Davidson,* Director; *Donald E. Kinner,* Assistant Director, Civil Division, for defendant.

_____

[1]  The court issued this opinion under seal on August 25, 2014, and invited the parties to submit proposed redactions by September 15, 2014.  The opinion published today incorporates some of the parties' proposed redactions; other proposed redactions are rejected as unwarranted.  *See United States v. Bartko,* 728 F.3d 327, 342-43, 347 (4th Cir. 2013); *see generally, Baystate Techs, Inc. v. Bowers,* 283 Fed. Appx. 808, 100 (Fed. Cir. 2006), *Allied Tech. Corp. v. United States,* 94 Fed. Cl. 16, 23 (2010).  The redacted material is represented by brackets [ ].  The opinion also corrects some minor nonsubstantive or typographical errors.

**ALLEGRA, Judge:**

> *"Who steals my purse steals trash; 'tis something, nothing;*
> *'Twas mine, 'tis his, and has been slave to thousands;*
> *But he that filches from me my good name,*
> *Robs me of that which not enriches him,*
> *And makes me poor indeed."[2]*

This contract case is before the court following an extensive trial in Tucson, Arizona, and Washington, D.C.  Jay Dobyns, an agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), alleges that ATF officials breached an agreement that he had with the agency settling a prior dispute.  He contends that ATF's conduct also breached the covenant of good faith and fair dealing associated with that agreement.  Both breaches, Agent Dobyns asserts, give rise to the imposition of damages.  Defendant, meanwhile, counterclaims that Agent Dobyns breached his employment contract with ATF, as well as federal regulations and ATF orders, by publishing a book based upon his experiences as an agent, and by contracting his story and consulting services to create a motion picture.

Based upon the extensive record, the court finds that there was no express breach of the settlement agreement here, but that defendant's conduct associated with that agreement effectuated a breach of the covenant of good faith and fair dealing.  Based upon the extensive record, the court concludes that defendant's conduct, indeed, constituted a gross breach of that covenant.  Damages for mental distress, as well as pain and suffering, will be awarded because of this breach.  As to the counterclaim, the court concludes that plaintiff did not breach his employment agreement with ATF by writing and publishing the book in question, because plaintiff's conduct was countenanced by the settlement agreement and by ATF officials.  The court thus rejects defendant's counterclaim.

## TABLE OF CONTENTS

I.      **FINDINGS OF FACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 03

      A.      ATF and Operation Black Biscuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .03

            (1)     ATF Organization  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 03
            (2)     Agent Dobyns and Operation Black Biscuit . . . . . . . . . . . . . . . . . . . .04

      B.      Threats Made Against Agent Dobyns between 2003-2007 . . . . . . . . . . . . . . . . 05
      C.      The Prelude to the 2007 Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . 07
      D.      The 2007 Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 08
      E.      Withdrawal of Credentials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      F.      The Arson at Agent Dobyns' Home . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

---

[2] William Shakespeare, Othello, Act III.

G.    The OIG and IAD Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      (1)    2008 OIG Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
      (2)    2012 IAD Report on House Fire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
      (3)    2013 IAD Report on Loss of Backstopping . . . . . . . . . . . . . . . . . . . . .24

H.    The Book . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
I.    Credibility Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
J.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

II.   DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

A.    Breach of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
B.    Covenant of Good Faith and Fair Dealing . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

      (1)    Legal Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
      (2)    Application of Covenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

C.    Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
D.    Defendant's Counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*          *          *          *          *

## I.    FINDINGS OF FACT

Based on the record, including the parties' stipulations, the court finds as follows:

### A.    ATF and Operation Black Biscuit

#### (1)    ATF Organization

ATF is a federal law enforcement organization within the Department of Justice (DOJ). Headquartered in Washington, D.C., ATF investigates a variety of federal offenses, including the unlawful use, manufacture and possession of firearms and explosives; acts of arson and bombings; and illegal trafficking of alcohol and tobacco products.  ATF is headed by a Director and a Deputy Director.  ATF headquarters has eight major offices, including the Office of Public and Governmental Affairs (OPGA), the Office of Field Operations, the Office of Professional Responsibility and Security Operations (OPRSO), and the Office of Strategic Intelligence and Information.



BUREAU OF ALCOHOL, TABACCO, FIREARMS, AND EXPLOSIVES

The Internal Affairs Division (IAD) of OPRSO investigates allegations of administrative and criminal misconduct, and makes reports to the Office of the Inspector General (OIG) of the DOJ on significant investigations.  Among ATF's other components relevant to this case is the National Integrated Ballistic Information Network (NIBIN), which provides federal, state and local law enforcement with various assistance, including access to an automated ballistic imaging system.

By way of further background, ATF's Office of Field Operations is organized by regions and further subdivided into Field Divisions.  Each region is headed by a Deputy Assistant Director (DAD) for Field Operations.  The DADs for Field Operations each oversee the Field Divisions in their geographical areas, each of which, in turn, are managed by a Special Agent in Charge (SAC).  The Phoenix Field Division is responsible for various ATF activities in Arizona and New Mexico.  This Field Division is run by a SAC and two Assistant Special Agents in Charge (ASACs).  There are also two Field Offices in the Tucson area, each headed by a Special Agent, known as a Resident Agent in Charge (RAC).

### (2)    Agent Dobyns and Operation Black Biscuit

Agent Dobyns became an ATF agent in 1987.  From early 2001 to July 2003, he participated in an investigation known as Operation Black Biscuit, which targeted members of the Hells Angels Motorcycle Club (Hells Angels).  For nearly two years, Agent Dobyns posed undercover as a member of the Tijuana-based Solo Angeles, as part of a task force that included other ATF agents.  As part of this operation, Agent Dobyns and others staged the fake murder of a member of the rival Mongols Motorcycle Club.  The staged murder impressed the Hells Angels leadership, causing the club to vote Agent Dobyns as a full "patched" member.

During this time, Agent Dobyns was stationed in one of ATF's Tucson Field Offices and lived with his family in the Tucson area.  In 2003, Operation Black Biscuit and parallel raids ended with the indictment of 36 people (16 as a direct result of the undercover operation), including 16 Hells Angels.  The individuals were indicted on racketeering and murder charges.  However, a number of setbacks involving the prosecution of these individuals eventually led to some of the defendants receiving reduced sentences and others having their charges dismissed.  The disclosure of Agent Dobyns' identity in court led to threats of death and violence directed at him and his family.

- 4 -

As a result of his work on Operation Black Biscuit, as well as on other investigations, Agent Dobyns received twelve ATF Special Act Awards, two ATF Gold Stars for critical injuries received during investigative operations, an ATF Distinguished Service Medal for outstanding investigative accomplishment, and the United States Attorney's Medal of Valor award.

**B.     Threats Made Against Agent Dobyns between 2003-2007**

Agent Dobyns' undercover activities placed him and his family at risk.  ATF conducts various evaluations when it identifies a credible threat to an ATF agent.  ATF Order 3040.2 specified the procedures used to report and manage these threats.  Under these procedures, ATF personnel conduct "Risk Assessments" that ascertain the impact of an undesirable event, analyze the identified threat (commonly referred to as a "threat assessment"), and identify vulnerabilities. They then evaluate the overall risk to make recommendations to minimize the threat.[3]  Once a threat has been identified, a further appraisal is done to analyze the intent underlying the threat, the capability of an individual or individuals to effectuate the threat, and any individuals or groups associated with the threat.

In 2003, as Operation Black Biscuit drew to a close, ATF's Undercover Branch issued fictitious identification (*e.g.*,[]) to Agent Dobyns and his wife.  This was intended to provide additional layers of protection to Agent Dobyns and his family.  At or around this time, the Undercover Branch took additional steps to enhance Agent Dobyns' security.  In the summer of 2003, ATF's Office of Operations Security (OPSEC), another branch of OPRSO, conducted a routine risk assessment to identify whether any ATF personnel associated with the Black Biscuit investigation were in danger as a result of their work on that case.  This assessment was preemptive and was not based on the receipt of any particular information involving Agent Dobyns or other ATF personnel.

OPSEC concluded that the safety of Agent Dobyns was at risk and recommended that he and his family be afforded a "cooling off" period away from the Tucson area.  OPSEC also recommended that Agent Dobyns be considered for an assignment in a location away from the West Coast.  Agent Dobyns disagreed with this recommendation because he felt that no specific threat had been made against him.  ATF ultimately agreed to allow Agent Dobyns to remain in the Tucson area.

On August 31, 2004, Agent Dobyns was threatened by Robert McKay, a member of the Hells Angels, who had been indicted as a result of Operation Black Biscuit.  As a result of the threat, McKay was arrested on charges of threatening a federal officer.  On September 17, 2004, ATF, after conducting an assessment of the risks faced by Agent Dobyns and his family, ultimately moved them to Santa Maria, California.  Senior ATF officials deemed this move an "emergency relocation."  Subordinates, however, mistakenly designated this move as a standard

---

[3]  Previously, threats against agents were covered by ATF Order 3210.7C, Investigative Priorities, Procedures, and Techniques, dated February 25, 1999, and ATF Order 3250.1A, Informant Use and Undercover Operations, dated October 26, 2001.

change of duty station.  Accordingly, when they were moved to Santa Maria, Agent Dobyns and his family were not provided the appropriate support and resources to protect their identities.

At or about this time, ATF learned that Curtis Duchette, an inmate who had been the subject of another of Agent Dobyns' undercover investigations, had allegedly made threats against Agent Dobyns.  An ATF agent spoke to an informant about Mr. Duchette, but the agent concluded that the informant was not credible and that Mr. Duchette lacked the means to carry out any harm against Agent Dobyns.

On November 3, 2005, ATF was informed by a prison inmate of an alleged threat to Agent Dobyns by an individual later identified as Dax Mallaburn.  On November 4, 2005, ATF interviewed the prison inmate who was the source of this information.  On November 30, 2005, ATF interviewed Mallaburn.  Mallaburn claimed that while incarcerated in Florence, South Carolina, he was given a "hit list" containing Agent Dobyns' name by a Hells Angels member known as "Rob."  Mallaburn claimed that he did not give this list to anyone and later destroyed it by flushing it down a toilet.  On November 30, 2005, OPSEC completed an updated threat assessment in which it found sufficient potential risk existed to warrant relocation of Agent Dobyns to a location outside of the western United States.[4]  In December 2005, Agent Dobyns asked a friend, Agent Joseph Slatalla, to look into Mallaburn's claims.  When he spoke to Agent Slatalla, Mallaburn made different allegations, stating that he had disseminated the "hit list" to a number of unidentified individuals.

In December of 2005, after receiving assurances from OPSEC that Agent Dobyns could be adequately protected in Los Angeles, California, ATF decided to detail him to ATF headquarters for one year.  After this year, Agent Dobyns was to receive an emergency relocation to Washington, D.C.  In late 2006, Agent Dobyns' detail to Washington, D.C. ended, and he returned to Los Angeles, where he began work in the Los Angeles Field Division.

On November 15, 2006, ATF Agent Daniel Hebert informed Agent Dobyns that a Hells Angels member incarcerated in Phoenix had told him that another member of the club had said that the Hells Angels were going to start a "campaign against Dobyns."  The informant involved with this communication provided Agent Hebert with an obscene letter written by imprisoned Hells Angels member Kevin Augustiniak, in which Augustiniak imagined a gang-rape of Agent Dobyns' wife and threatened other harm to Agent Dobyns and his family.  Agent Hebert considered the informant unreliable.  In subsequent interviews with ATF, the informant stated that the Hells Angels had no ongoing campaign to kill Agent Dobyns or to discover his whereabouts.  However, the informant recounted rumors about an alleged attempt by a Hells

_____

[4]  Earlier that year, in February 2005, Agent Dobyns returned to ATF a set of fictitious identification cards (in the names of William and Sasha Johnson) because he felt that he and his wife did not need them anymore.  When ATF learned of this new threat in November 2005, however, it reissued these identifications to Agent Dobyns and his wife.

Angels member to contract with a member of the Aryan Brotherhood to kill Agent Dobyns. After assessing this information, ATF concluded that the information was not credible.[5]

### C.       The Prelude to the 2007 Settlement Agreement

On May 2, 2006, Agent Dobyns filed a complaint with the Equal Employment Opportunity Commission (EEOC), alleging, *inter alia*, that ATF improperly investigated several threats that had been made against him, and had improperly instituted and managed the relocation of his family without full-backstopping, as had been recommended by OPSEC.[6]   In his EEOC complaint, Agent Dobyns was particularly critical of how threats against him were being handled by SAC William Newell, who was then the Special Agent in Charge of the Phoenix Field Division.  On November 20, 2006, ATF Deputy Director Ronald Carter denied Agent Dobyns' grievance, finding that there was an insufficient basis to support the allegations claimed.  Notwithstanding, ATF continued to engage in discussion about this matter and participated in a mediation conducted by ATF's Office of Special Counsel.

In May of 2007, Patrick Sullivan, a Senior Operations Security Specialist in the OPSEC Branch, learned that Agent Dobyns had been working on a book project based on his efforts in the Black Biscuit investigation.  Agent Sullivan contacted Crown/Random House vice-president Richard Horgan, requesting information about plaintiff's possible collaboration on a book project.  On May 4, 2007, Mr. Horgan wrote an email to Agent Sullivan, in which he stated –

> We're glad to have the chance to publish the book you heard about, which will
> focus on the community of outlaw bikers and ATF's efforts to rein in their
> criminal activity.  We have no set title or pub date and would encourage you to
> ask Jay Dobyns himself about the project as it develops.

Agent Sullivan immediately notified his superior, Chief Amy Walck, as well as another OPSEC agent, Bernard Conley.  On May 18, 2007, Agent Dobyns executed a contract with The Crown Publishing Group, a division of Random House, concerning a book, provisionally titled "Almost Angels."  It is unclear whether, at this time, other ATF personnel, and, in particular, the senior ATF personnel who were attempting to mediate the dispute between ATF and Agent Dobyns, were aware of the book project.

On May 24, 2007, Deputy Director Carter requested that OPSEC conduct a current threat assessment of Agent Dobyns and his family.  The assessment was completed on June 22, 2007.  Based on interviews with ATF agents and local law enforcement officials in Tucson and Phoenix, Arizona, during the period of June 12-14, 2007, ATF found that "no current indicators of a credible threat toward SA Dobyns and his family have been detected."  Nevertheless, ATF

---

[5]  In its 2008 report, the OIG found that ATF should have conducted additional interviews before ending its investigation and prematurely concluding that the "information the source had provided was not credible and that Dobyns faced no threat."

[6]  As will be discussed below, "backstopping" is a process by which ATF issues fictitious documents (*e.g.*,[]) to conceal an agent's identity.

found that potential threats to Agent Dobyns and his family still existed and that the current threat level was "medium" based on the threat criteria used by ATF.

During the summer months of 2007, Assistant Director William Hoover and Deputy Director Carter participated in the negotiation of a settlement agreement with Agent Dobyns. It appears that there were two or three meetings in this regard, which were extended in their duration. The record indicates that as part of the negotiations, Deputy Director Carter and Assistant Director Hoover discussed with Agent Dobyns concerns regarding how SAC Newell and other ATF managers had handled threats against Agent Dobyns. The record suggests that neither Deputy Director Carter nor Assistant Director Hoover inquired during these meetings as to whether Agent Dobyns had any book or movie deals pending.

### D.    The 2007 Settlement Agreement

On September 20, 2007, Agent Dobyns entered into a settlement agreement (the Settlement Agreement) with ATF. That agreement was executed on behalf of ATF by Deputy Director Carter and Assistant Director Hoover. According to internal documents, there were no attorneys for either side involved in the settlement negotiations; plaintiff's current counsel, however, had some role in the drafting of this agreement or at least in reviewing its terms.

According to its terms, the Settlement Agreement was to "fully resolve and settle any and all issues and disputes arising out of" Agent Dobyns' employment with ATF, "including, but not limited to the Agency Grievance filed by the Employee, the Employee's complaints to the Office of Special Counsel, and his complaints to the Department of Justice's Office of Inspector General." Among the basic terms of the Settlement Agreement were that ATF would: (i) promote Agent Dobyns to Grade 14 "retroactive for a period of one year" from the date of the Settlement Agreement, during which time Agent Dobyns was to "receive full back pay and benefits;" (ii) reassign Agent Dobyns to a NIBIN Coordinator position in Tucson, Arizona; (iii) agree that if any assessment indicated that the threat to Agent Dobyns and his family had increased from the assessment completed in June 2007, the agency would "fully review the findings with [Agent Dobyns] and get input from [Agent Dobyns] if a transfer is necessitated;" (iv) agree that "it will not pursue discipline against [Agent Dobyns] for any matter that is currently under investigation by the Department of Justice's Office of the Inspector General (OIG) or ATF's Office of Professional Responsibility and Security Operations (OPRSO);" and (v) agree to expunge from various files any document relating to the matter settled by the Settlement Agreement, including documents relating to Agent Dobyns' mental health, truthfulness or credibility.

In addition, ATF agreed to –

pay [Agent Dobyns] the sum of Three Hundred Seventy-Three Thousand Dollars ($373,000.00) in full and final settlement for any and all claims that have been brought or could have been brought up to the date this Agreement is executed by the parties.

The Settlement Agreement provided that "[e]xcept for the lump sum set forth in this paragraph and the back pay set forth [in the paragraph dealing with the retroactive promotion]," Agent

Dobyns "and his representative are not entitled to any other monies, expenses, costs, attorney fees, or any damages or relief regarding any matter that is subject to this Agreement, its preparation and its execution, or otherwise regarding [Agent Dobyns'] employment with the Agency."

  In exchange for this compensation, Agent Dobyns agreed to –

  withdraw and/or dismiss with prejudice his Agency Grievance, his discrimination/ retaliation complaints, any Whistleblower claims, any complaints filed by the Employee with the Office of Special Counsel, and any other complaints the Employee could have raised regarding his employment with the Agency as of the date this agreement is executed by the parties.

In addition, he agreed to release and discharge "the United States, the Department of Justice, the Bureau of Alcohol, Tobacco, Firearms and Explosives . . . from any and all liability, claims, causes of action, etc., resulting from or relating to, in any way whatsoever, the subject matter of this Agreement, or otherwise concerning [Agent Dobyns'] employment with the Agency, including underlying actions and claims, including his complaints of discrimination and retaliation."

  In a critical passage, the parties also agreed that the Settlement Agreement did "not constitute an admission by the Agency or [Agent Dobyns] of any violation of law, rule or regulation or any wrongful acts or omissions."  Further, ATF agreed "that it will comply with all laws regarding or otherwise affecting [Agent Dobyns'] employment by the Agency."  Agent Dobyns agreed that he would "comply with Agency requirements and will seek permission for any outside employment, including speaking, writing, teaching or consulting."  ATF agreed that it would "handle such requests in a manner consistent with Agency practice and procedure."  The Settlement Agreement also stated that if Agent Dobyns "believes the Bureau has failed to comply with the terms of this Agreement, [he] shall notify the Director, Department of Justice Equal Employment Opportunity Staff, Justice Management Division, in writing."  Finally, Agent Dobyns could request that the terms of the Settlement Agreement be specifically implemented, or alternatively, that his complaint against the agency be reinstated for further processing.

  Neither Deputy Director Carter nor Assistant Director Hoover conducted any due diligence in ascertaining what ATF officials knew regarding the book contracts prior to the execution of the Settlement Agreement.  Nevertheless, prior to the execution of the Settlement Agreement, at least several ATF officials were aware of the book deals.  Following the execution of the Settlement Agreement, and also related to the book deals, Agent Dobyns' media activities were investigated by OPRSO.[7]  In late September 2007, pursuant to the Settlement Agreement, Agent Dobyns was assigned to the position of Western Regional Coordinator for ATF's NIBIN.[8]

---

[7]  On December 7, 2007, OPRSO was informed that, on or about November 26, 2007, Agent Dobyns had appeared in two television programs on National Geographic and the History Channel about outlaw motorcycle gangs.  On July 8, 2008, OPSRO issued Report No. 2008019, revealing that Agent Dobyns did appear in, and release information during, the programs in

E.      **Withdrawal of Credentials**

Covert identification documents are used by ATF to create a fictitious identity for the user, and can include many documents that are ordinarily used in an individual's everyday life, such as []. This is known as "backstopping." []. Critically, such documents are used not only during undercover operations [], but also when such operations are completed, to continue to protect the identities and addresses of agents and their families. ATF Order 3250.1A establishes accountability requirements for ATF agents using or issued covert identification. Paragraph 34(a)(2) of this order provides that "[w]hen it is certain that the identification is no longer needed, it must be returned immediately to the [Undercover Branch of ATF's Special Operations Division]."

On or about October 3, 2007, Agent Dobyns was transferred to the NIBIN branch in Tucson, Arizona. On October 26, 2007, Agent Dobyns sent an email to Agent Sullivan, requesting that ATF assist him in renewing several expiring covert vehicle registrations. Agent Sullivan forwarded this email to Chief Walck, who, in turn, forwarded the request to Marino Vidoli, Chief of ATF's Special Operations Division. On October 31, 2007, SAC Newell, proceeding on the false or mistaken belief that Agent Dobyns had improperly used his undercover identification while using a vehicle during a surveillance operation,[9] sent an email to NIBIN Chief Steven Pugmire and OPSEC Chief Walck, questioning whether Agent Dobyns continued to need the fictitious identification. In this email, SAC Newell stated, "[b]ottom line for me is that if he no longer needs this U/C ID then I want it pulled because this could

---

question. That report took the position that the release of the information in the course of the programs, including undercover trade craft, by Agent Dobyns was without authorization. After consulting with the ATF Office of Chief Counsel, Deputy Director Carter and Assistant Director Hoover, the Professional Review Board (PRB), on January 12, 2009, issued a memorandum finding that Agent Dobyns' actions were covered by the September 20, 2007, Settlement Agreement. On that basis, the PRB issued a memorandum of clearance. The memorandum indicated that "the PRB considered your actions in this matter to be very serious, and did not concur with your rationalizations for proceeding with the documentaries," adding that the PRB "would have proposed severe disciplinary action against you if your actions had not been included in the settlement agreement."

[8]  NIBIN was a part of ATF's Office of Enforcement Programs and Services (EPS), which, for times relevant here, was headed by Assistant Director Carson Carroll.

[9]  The IAD report indicates that the vehicle in question had been registered to Jay Davis, an undercover identity used by Agent Dobyns during the Black Biscuit investigation. It appears, however, that the Phoenix Field Office had failed to change the registration on this vehicle after that investigation. Subsequently, the RAC in Phoenix received notification that the Pima County Sheriff's Department had run a check on the car in question. At trial, SAC Newell testified that while he later learned that the perceived misuse of Agent Dobyns' identification was an error, he never admitted to anyone at ATF that Agent Dobyns had nothing to do with the events that caused the "red flag" notification.

potentially cause interagency relationship problems for us if he's routinely using this U/C ID." (Notably, while he was downplaying any concerns for Agent Dobyns' safety, SAC Newell continued to bar Agent Dobyns from entering one of the Tucson Field Offices because he feared that Agent Dobyns' mere presence in that office posed unacceptable risks to the non-law enforcement personnel working there.)

On November 1, 2007, SAC Newell's email requesting the recall of the identification and Agent Dobyns' request for renewal of the fictitious license plates were forwarded to Chief Vidoli at essentially the same time. On that same day, SAC Frank D'Alesio forwarded SAC Newell's email to Chief Vidoli, indicating that "[w]e need to talk about this because obviously it is becoming a hot issue again." In November of 2007, a meeting was held between NIBIN Chief Pugmire, Chief Vidoli and Chief Walck. At this meeting, the parties discussed the ongoing need for the covert identification documents issued to Agent Dobyns. Chief Walck stated that pursuant to the assessment completed in June of 2007, OPSEC was unaware of any current credible threats to Agent Dobyns and his family. (This statement, of course, was inaccurate.) During this meeting, NIBIN Chief Pugmire indicated that Agent Dobyns had indicated to him that he "did not believe a threat still existed." Based on this assessment, Chief Vidoli ordered Agent Dobyns to return all the undercover identifications and license plates that had been issued to him and his family.

On November 23, 2007, Chief Vidoli issued a memorandum to Agent Dobyns' supervisor, NIBIN Chief Pugmire, requiring that Agent Dobyns return all fictitious identifications issued to Agent Dobyns and his wife. The memorandum listed the various items of identification used by Agent Dobyns during his undercover cases, as well as those that were issued to Agent Dobyns and his wife for their protection from threats. Again, Chief Vidoli required the return of these items, even though the June 22, 2007, threat assessment regarding Agent Dobyns was still extant. The subsequent IAD investigation revealed that information presented to, or available to, Chief Vidoli had confirmed that threats against Agent Dobyns and his wife had been substantiated as recently as the June 2007 update of the threat assessment. Moreover, it is remarkable that this was the only instance during his tenure that Chief Vidoli had ordered the withdrawal of the fictitious identification issued to an ATF employee.

The withdrawal of the covert identifications was completed in May 2008.[10] On June 18, 2009, the U.S. Office of Special Counsel classified Agent Dobyns as a "whistleblower" because of his allegations that ATF lacked adequate policies and procedures for reviewing and responding to threats of violence made against its agents and their families.

F.    **The Arson at Agent Dobyns' Home**

On Sunday, August 10, 2008, at approximately 3:29 am (PST), a fire occurred at Agent Dobyns' house, in Tucson, Arizona. Agent Dobyns' wife, Gwen Jones, his daughter, Dale, and his son, Jack, were home; Agent Dobyns was in Phoenix. Upon discovering the fire, Gwen

---

[10]  As part of the backstopping procedure, [] made about Agent Dobyns. For some unexplained reason, [].

placed a call to 9-1-1. Gwen, Dale and Jack were able to exit the house through the kitchen, without suffering physical injuries. The Rural Metro Fire Department and the Pima County Sheriff's Office (PCSO) were dispatched to the fire. The first engine arrived on scene at 3:37 am. The Fire Department personnel extinguished the fire and inspected the area where it originated. They then left the scene at approximately 7:30 am. At or about this time, Agent Dobyns learned of the fire for the first time, having retrieved an earlier voicemail from his wife. After the fire was extinguished, PCSO Deputy Ty Sutherland spoke to Gwen and released the scene because he concluded that no further law enforcement action was needed.

Later that same day, Agent Dobyns arrived at his home at approximately 10:15 am. At approximately 1:15 pm, PCSO fire investigator Deputy Jessica Martin arrived at the Dobyns house to conduct a cause and origin investigation. The fire scene had not been secured prior to Deputy Martin's arrival. At 1:40 pm, Agent Dobyns sent an email to his supervisor, Agent Mike O'Neil, informing him of the fire. In this message, Agent Dobyns stated that "[a]rson investigators are on the scene," but that "[n]o conclusions have been formed at this time."[11] The message continued that the "house and contents appear to be a total loss," noting that "[o]ne half of the house is charred and the other half has significant damage from the fire department response." Agent Dobyns concluded that he did "not want ATF to respond," adding that "[t]here is nothing that I need or want from ATF."[12]

After receiving this email, Agent O'Neil telephoned and briefed his supervisor, Raymond Rowley, who was the Chief of the Firearms Enforcement Division at NIBIN. Agent O'Neil requested approval to travel to Tucson to support Agent Dobyns and his family; Chief Rowley approved the request. Subsequently, Chief Rowley informed Assistant Director Hoover about the fire. At approximately 3:20 pm, Assistant Director Hoover called George Gillett, who was one of the ASACs in the Phoenix Field Office.[13] Assistant Director Hoover informed ASAC Gillett that a fire had occurred at the personal residence of Agent Dobyns in the early morning hours of August 10, 2008. He directed ASAC Gillett to send ATF agents to the scene. ASAC Gillett then called Agent Dobyns and left two messages on his cell phone. At approximately 3:40 pm, ASAC Gillett called Agent Charles Higman, the RAC for one of the Tucson offices, advised him of the fire and directed him to call the Pima County Sheriff's Office to obtain information about the status of the investigation. At approximately 4:00 pm, PCSO Deputy G.W. Carey and PCSO Detective P.L. Wilson came to the fire scene.

---

[11] The electronic message from Agent Dobyns to Agent O'Neil indicated that "[s]ome extenuating circumstances are present. I will discuss those with you later today once I have a chance to contain this situation."

[12] At the time of the arson, the Director of ATF was Michael Sullivan and the Deputy Director was Ronald Carter.

[13] The SAC for the Phoenix Field Division at the time of the fire was SAC William Newell. ASAC Gillett reported to SAC Newell. The two offices in Tucson were part of the Phoenix Field Division, each led by a RAC. One of these was Agent Charles Higman.

At the time Agent Higman responded to ASAC Gillett, his squad of eight agents in Tucson Field Office 2 was conducting surveillance at a gun show/swap meet in Tucson.  The squad remained at this scene until most of the participants at the swap meet left.  In their testimony, ASAC Gillett and Agent Higman suggested that ASAC Gillett ordered Agent Higman to have a couple of his agents respond to the Dobyns house.  However, it appears that neither Agent Higman nor any of his squad actually responded to the fire scene on August 10, 2008 – and that ASAC Gillett and Agent Higman, in fact, mutually decided instead that no agents would respond that day.[14]  Agent Higman's contrary claim – that he ordered his squad to respond to the scene – is flatly contradicted by the record, and includes details that are nonsensical.[15]  The

---

[14]  This was the conclusion reached in the 2012 IAD Report on the fire.  The IAD deposition of ASAC Gillett stated in this regard, as follows:

> Q.   Were you aware that Higman stated he did not intend to dispatch any agent to the crime scene until he was ordered to do so?
>
> A.   No.
>
> Q.   Okay.  Did you order him to do so – to not dispatch any agents to the crime scene?
>
> A.   Yes.
>
> Q.   You ordered him to not dispatch any agents to the crime scene?
>
> A.   It was a mutual decision.

[15]  This is one of many instances in which Agent Higman's testimony raises questions regarding his veracity.  At trial, for example, Agent Higman testified that ASAC Gillett instructed him thusly:

> A:   Yes, basically the idea was to send an agent or two, I don't know how many.  We sent down there just to get a quick overview, an understanding of what was going on, what it was, what happened.  And we did that.
>
> Q:   Did Mr. Gillett ask you to send any agent's that day?
>
> A:   We did.  That's, yes, that afternoon I broke one or two agents loose from the surveillance and sent them down to the scene.

Agent Higman testified that the intent was to have these agents arrive at the scene.  On this count, Agent Higman further testified as follows:

> Well, when they got down there, and again, I don't recall which agent it was, but I received a telephone call back.  My recollection is we were still at the gun show doing the surveillance operation.  They told me at that time, my recollection is that I was told at that time that a fire had occurred exterior to the – on the porch area of the house.
>
> My recollection is that I was told that the damage was relatively minor, that the fire had encroached the interior of the residence at some small level.  There were – and there were no injuries that occurred, and so that's what we had.  We had basically a relatively small fire with no injuries.

record also suggests that ASAC Gillett did not believe that the supervisory agent in the other Tucson office, Agent Sig Celaya, would respond to the fire scene because he disliked Agent Dobyns, having had major disagreements with him in the past.

On August 11, 2008, at 8:05 am, Agent Michael Hildick was notified about the fire by ATF Group Supervisor Jane Hefner.  Agent Hildick was assigned to ATF's Phoenix, Arizona, Field Division and is a certified fire investigator.  On that morning, SAC Newell and ASAC Gillett dispatched Agent Hildick to investigate the fire at the Dobyns' residence.  Agent Hildick arrived at the scene at approximately 10:45 am.  Despite the directions given by Assistant Director Hoover, no ATF personnel responded to the scene of the fire – or made any attempt to investigate the fire or secure the scene – until this time, which was approximately 19.5 hours after the Phoenix Field Division first became aware of the fire.[16]  Agent Hildick testified that when he arrived at the scene, he realized that the home was open and unsecured, and that the scene was no longer fresh.  Shortly thereafter, Agent Hildick was joined by Agent Tristan Moreland, an ATF Certified Explosives Specialist.  Agent Moreland was not dispatched by the Phoenix Field Office, but instead went to Tucson of his own volition.  Agent Moreland, who worked on a number of investigations, including the Atlanta Olympic bombing case, was shocked to find the scene unsecured.  The Phoenix Field Office failed to assign a supervisor to serve as the on-scene/incident commander at the fire scene – a standard practice in such circumstances.

Agents Hildick and Moreland assessed the fire scene and determined that the PCSO investigation had been inadequate.  At some point during the day, Agents Hildick and Moreland were joined by ATF Agents Thomas Mangan and Louis Quinonez, both of whom responded to the fire of their own volition.  During the day, Deputy Martin, Fire Chief Willie Treatch, and several PCSO detectives met at the Dobyns residence.  Agent Hildick, Deputy Martin, and others

---

In his trial testimony, Agent Higman testified that he confirmed that the agents actually went to the site on August 10, 2008, and he added details to support this view (*e.g.*, that he asked the agents to work with the Pima County Sheriff's Office to work the scene until nightfall).

[16]  These facts were confirmed by the OIG report, which included deposition testimony and other evidence indicating that SAC Newell, ASAC Gillett and Agent Higman were aware of the instruction that ASAC Gillett had received through the chain of command and, nonetheless, failed to dispatch ATF agents to the scene.  In its report on the fire, the OIG found that –

> The decision to delay the ATF response was based on incorrect assumptions and determinations by Phoenix FD management about the fire scene; an incorrect and negligent interpretation of ATF's authority to investigate the fire; and a determination by Phoenix FD management that another agency should investigate the fire, even though many SAs within the Phoenix FD believed it was entirely reasonable to suspect that the fire might have been an attempt to murder an ATF SA and his family in retaliation for the performance of the SA's official duties.

Testimony revealed that various ATF personnel who had become aware of the fire were confused as to why Agent Higman had not ordered agents to go to the fire scene right away and begin an investigation.

examined the fire scene.  Later that day, ATF agents from Phoenix and PCSO Deputy Danny Barajas met with a potential arson suspect, Mike Castro.  That same day, Deputy Barajas met with Robert McKay, a member of the Hells Angels, who had previously threatened Agent Dobyns.  Also that same day, Agent O'Neil flew on a commercial flight from his duty station in Washington, D.C., to Tucson, and arrived at the fire scene that afternoon.  Despite all the activity described above, agents from the Tucson Field Offices did not arrive on the fire scene until approximately 5:00 pm that day.[17]

On August 12, 2008, an investigator associated with the PCSO and his accelerant canine searched the area.  That same day, Agents Hildick and Moreland, as well as Agent Larry Bettendorf from the Phoenix arson group, returned to the fire scene.  Agent Hildick continued his investigation, taking samples of fire debris that were retained for laboratory examination.  Several agents from one of the Tucson Field Offices arrived at the scene; all but two of these eventually departed.  Agent Higman, in fact, ordered the Tucson agents to depart the scene and to have no further involvement in the fire investigation.  Also on August 12, Deputy Martin interviewed an electrical engineer that ATF had called to the scene.  The engineer concluded that the cause of the fire was not electrical.  The PCSO also interviewed Agent Dobyns and his family.  On that day, PCSO advised ATF that it would investigate the case and would not be collaborating with ATF on the investigation, other than at the scene.

Several days later, Agents Hildick and Moreland interviewed Agent Dobyns and his family regarding the fire.  Agent Dobyns was aware that a standard arson investigation required that the homeowner initially be viewed as a potential suspect.  Based on their interviews with the family and their observations of the fire scene, Agents Hildick and Moreland both ruled out Agent Dobyns and his family as suspects in the fire.  Despite this, the record reveals that several ATF officials, including ASAC Gillett and Agent Higman, continued to view Agent Dobyns as a suspect and did so for a number of years.[18]  On August 18, 2008, Deputy Martin advised his

---

[17]  Agent David Korn, an agent in one of the Tucson Field Offices, apparently responded to the fire scene that evening.  He later conducted an interview based on a lead provided by Agent Dobyns.  Agent Korn intended to conduct additional interviews at a local prison the next day, but was advised by other agents not to do so.  Agent Korn later had a conversation with Agent Higman, who told him not to conduct any further interviews.  Also on August 11, 2008, Phoenix Field Division Group Supervisor Peter Forcelli tried to send agents from his group to assist in the investigation, but was instructed not to do so by SAC Newell.  In this conversation, SAC Newell told Agent Forcelli that the fire was "just minor scorching and PCSO had it under control."  Pictures in the record reveal that SAC Newell's description of the fire was inexcusably inaccurate and that the fire was a total loss.

[18]  At trial, Agent Slatalla testified that, on the day of the fire, Agent Dobyns left him a voicemail informing him of the fire.  Shortly thereafter, Agent Slatalla conducted an investigation of cell phone records, as well as an analysis of cell tower mapping, which, in his view, established that Agent Dobyns was in Phoenix on August 9 and that his cell phone traveled down to Tucson on August 10.  Agent Slatalla made this analysis available to various ATF officials, including Agent Matt Bayer, who would eventually become the case agent for the fire

superiors that the case was being turned over to ATF.[19]   The IAD investigation revealed that, despite this transfer, Agent Higman and ASAC Gillett purposely slowed the investigation into the fire because they felt that another agency should be conducting the investigation; during this period, SAC Newell and ASAC Gillett each told various ATF special agents that the investigation of the fire was the responsibility of ATF headquarters.[20]   Along these same lines, in a conversation with Agent Bayer, Agent Higman indicated that he wanted the case to be on a "slow roll."  Agent Higman likewise indicated to Agent Robert Maynard, the other agent assigned to investigate the arson, that they were going to "slow walk this thing" until the FBI accepted the investigation.  ATF did not offer a reward for information regarding the fire, even though rewards had been offered in similar circumstances; other agents had recommended to SAC Newell and ASAC Gillett that such a reward be offered.

On Thursday, August 21, 2008, Assistant Director Carson Carroll, who then headed the Office of Enforcement Programs and Services (EPS), notified SAC Newell via email that he would be travelling to Arizona for a briefing on the arson investigation and to meet with Agent Dobyns.  SAC Newell forwarded Assistant Director Carroll's email to ASAC Gillett, and requested a briefing on the case prior to the meeting with Director Assistant Carroll.  ASAC Gillett forwarded SAC Newell's email to Agent Higman and advised Agent Higman that he and SAC Newell would brief Assistant Director Carroll on Monday, August 25, 2008.

This precipitated an email exchange on August 21, 2008, at 2:02 PM, between ASAC Gillett and Agent Higman in which the latter asked "is the continued contact w/the homeowner by supervisory ATF personnel necessary?"  The email continued:

> It goes to case integrity and confidentiality, and adds difficulty to the ongoing inquiry by making a SAC, DAD, etc. potential witnesses based on the homeowner's statements to them.
>
> At this point, all we know is that we have a preliminary C&O, and the assigned investigators haven't yet interviewed the homeowner nor substantiated any motive.  If the DAD, etc. have already assigned a motive, it makes objectivity that much more difficult for subordinate employees.  I'd like to isolate the homeowner/victim until we have developed more info; at minimum as an investigator and case supervisor, I'd like to know the substance of the contacts, any representations made, etc.

---

investigation.  Agent Slatalla testified that ATF officials associated with the investigation of the fire, including Agent Bayer, made no effort to review these records.

   [19]  The record reveals a disagreement as to the date on which the investigation was transferred from PCSO to ATF.  Agent Higman asserted that the transfer occurred sometime around August 15, 2008, while other information places that transfer as late as August 18, 2008.

   [20]  At trial, Agent Higman, in a rare unguarded moment, admitted that he viewed Jay Dobyns as being a "polarizing figure," adding that "[t]here were a number of people who had very strong positive feelings for Jay, and . . . others [who] didn't care for Jay."

At 4:02 PM, on the same day, ASAC Gillett replied to Agent Higman, stating in an email:

> I appreciate your thoughts and concerns and most appreciate that you are comfortable enough to raise them.
>
> That being said, it's not possible in this lifetime to control the Director, Deputy Director, ADs or so on down the chain from getting briefed on this case or contacting the homeowner and/or his family.
>
> However, what I can control (and fully intend to control) is the specific information that is briefed to the chain of command.
>
> I'll shoot straight, I think that you could tell during our meeting on Tuesday, I am no more happy about these circumstances than you.  However, like you, I've been ordered to proceed down this investigative path, so I will.  What I won't do is compromise my integrity or the integrity of this investigation.  I stand with you and your agents on this, so not releasing significant details (to anyone) that we may discover that would compromise our work won't come from me.  I'll go out of my way to conceal them.  Please trust that (and for the record I am not inferring anything from your prior comments) I have enough L.E. [law enforcement] and Intelligence community experience to know how to protect myself and my subordinates.  (I can hide the ball with the best of them).
>
> I have said it before, but for the record (and probably future disclosure in court) I'll say it again:  I fully intend that this is the last stop on the career path of George Gillett, but this case likely guarantees it.  I'm going to back you and your agents and do the right thing.
>
> I will also take very good notes on what's conveyed during any briefings and still know how to generate a 3120.2 if necessary.
>
> I will also convey the points you raise regarding the delicate current status of this investigation to Carson and others that I brief.

At 5:49 pm, Agent Higman responded to ASAC Gillett, stating:

> George, thanks for your detailed and thoughtful response to my below.  Like you, I do recognize the need to brief the boss on matters that ***they*** determine are of ***their*** interest.  I don't have to like it, and I'm not attempting to throw mud in the middle of the floor on that issue beyond my contact w/ you.
>
> Like you, the SA assigned and I are attempting to put process in place to make this inquiry thorough, unbiased and objective, to take this and any subsequently

developed matters where the facts lead us.  Similarly, we recognize the need to
support one of our employees during a time of difficulty such as we face here.[21]

(Emphasis in original).

On or about August 22, 2008, Agent Hildick completed a Cause and Origin Report with
respect to the fire at the Dobyns' residence.  Agent Hildick's report catalogued a series of
witness statements regarding the fire and made a series of findings documenting his examination
of the fire scene.  Agent Hildick believed that the fire was incendiary and started on the south
side of an armoire that was located to the north of the sliding glass door on the back (east side) of
the home.  Agent Hildick concluded that an open flame and available combustibles were used to
start the fire.

On August 22, 2008, and August 27, 2008, Agents Matt Bayer and Robert Maynard, at
the direction of Agent Higman, tape-recorded conversations with Agent Dobyns without his
knowledge.  Defendant has stipulated that ATF neither sought nor obtained authorization to
record Agent Dobyns without his knowledge.[22]  In the midst of these recording sessions,

---

[21]  This email from Agent Higman also indicated:

When you return from holiday I would like to more fully explore the opportunity
to at least memorialize in a substantive way contact between any Bureau
employee and the homeowner, even if that contact is minor and simply an inquiry
as to their well being.  Along those lines, I have contacted both Jane Hefner and
Sig Celaya, and ask[ed] that they direct their employees to prepare a detailed
statement as to their knowledge and activity regarding this matter; I have directed
four of the SA assigned to this office to do the same.  I expect to receive that
material at the beginning of next week.

[22]  In his testimony, Agent Higman suggested that "we set in motion the authorities to get
approval for electronic surveillance to record Jay Dobyns as part of the investigation."  It is
plain, however, that Agent Higman failed to take any of the required steps to seek authorization
for a recording.  When confronted, Agent Higman attempted to excuse this failure by stating:

My response to that is that this, we never interviewed Jay Dobyns.  We never
went through with an interview.  We never got to the stage where we actually
went to sit down with Jay Dobyns.  The contacts that were made with Jay were on
a telephone only.

And it's my recollection, I'm not an attorney and I don't – I don't claim judicial,
you know, legal knowledge, but my recollection at the time was it was one-party
consensual on a telephone.  We didn't need authorization.  That's my recollection
today on a telephone contact.  If we were to sit across from him on a – across a
table or anywhere else, we would have needed authorization.  But it never reached
that stage.

Assistant Director Carroll visited the Phoenix Field Division to obtain a briefing on the status of the Dobyns' fire investigation.  The record suggests that ASAC Gillett withheld information from both Assistant Director Carroll and SAC Newell at this time; among the information withheld was the fact that Agents Bayer and Maynard had been requested to record conversations with Agent Dobyns without his knowledge (the first of the recordings occurred before the meeting with Assistant Director Carroll; the second thereafter).  Overall, at or around this time, ASAC Gillett and Agent Higman took steps to prevent agents from the Field Division, as well as supervisors in ATF headquarters, from having access to information regarding the investigation into the Dobyns fire.  According to the IAD investigation, those measures included circumventing the reporting requirements in ATF's "N-Force" case management reporting system; designating the N-Force case file as being covered by Fed. R. Crim. P. 6(e) when no grand jury investigation existed; storing files off-site at a location provided by the United States Air Force; and withholding information from ATF superiors in briefings.[23]

On August 25, 2008, ASAC Gillett and Agents Hildick, Moreland, Bettendorf and Hefner held a meeting about the fire.  At that meeting, ASAC Gillett characterized the conclusions reached by Agent Hildick in his Cause and Origin report regarding the fire as being "unpopular" – a statement that was conspicuous to the agents in attendance, as Agent Hildick's report had not yet been released to anyone.  On August 26, 2008, Assistant Director Carroll and SAC Newell met with Agent Dobyns to discuss ATF's handling of the arson investigation.  Based on those discussions, ATF decided to refer the investigation of the arson to the FBI.  On that same day, ASAC Gillett sent an email to Agents Moreland, Hildick, Bettendorf and Hefner in which he described new procedures that were to be followed in filing case reports regarding the fire; these procedures differed from the standards followed in N-Force cases.[24]  On August 27, 2008,

_____

The record, however, plainly makes clear that Agent Higman instructed Agents Bayer and Maynard to record Agent Dobyns without proper authorization.  Agent Higman again suggested that it was ASAC Gillett who authorized the recording.

[23]  In his testimony, Agent Higman initially left the impression that he did not employ these procedures to shield information from N-Force and other proper channels, as no significant information was received from these channels.  But, deposition testimony adduced at trial made clear that Agent Higman was aware that agents working the fire had generated reports that were not being uploaded into N-Force.  These so-called "white papers" were maintained in individual envelopes that were stored in a file cabinet that Agent Higman kept at an off-site location (an Air Force base).  On this and other points, Agent Higman's testimony appeared to "evolve" as questions were adduced.  Agent Higman took the view that the procedures were dictated by ASAC Gillett; ASAC Gillett took the view that the procedures were established by Agent Higman.  At trial, Agent Higman acknowledged that he was unaware of any other investigation that was reported outside of N-Force after the program was adopted.

[24]  In the email, ASAC Gillett described these procedures as follows:

Pursuant to our meeting this date at approximately 10:20 AM, please note that the reporting procedures forwarded by GS Hefner and GS Higman were at my direction and by my orders.  Any deviation from the standard reporting procedures of special agents directly entering reports of investigation (3120.2) are

Deputy Martin met with Agent Bayer and turned over all reports, photographs, documentation, audio recordings, and transcripts available to date associated with the case.  On August 28, 2008, Agent Dobyns emailed a message to his ATF chain of command to protest ATF's handling of the arson investigation.  In the email, Agent Dobyns complained that ATF seemed to be treating him as the prime suspect in the fire.  The record reveals that following the arson, ATF failed to conduct a new threat assessment, instead continuing to rely on the assessment done in June 2007.

On September 2, 2008, Deputy Martin was advised that the case was being transferred from ATF to the FBI.  On September 3, 2008, Deputy Martin met with FBI Agent Brian Nowak to turn over to him all additional photographs, transcripts, and audio interviews that had not previously been provided to ATF.  (The record, however, suggests that either Agent Higman, or perhaps, ASAC Gillett, failed to turn over to the FBI all or a portion of the files that had been stored outside the normal protocols for N-Force.)  On or about this date, Agents Higman, Maynard and Bayer met with FBI Agent Nowak to turn over the case.  During that meeting, Agent Higman expressed negative opinions regarding Agent Dobyns to the FBI personnel, making references to Agent Dobyns' forthcoming book and to his having sued ATF (in fact, there were no such suits).  On September 4, 2008, Assistant United States Attorney Beverly Anderson became involved in the fire investigation at the request of the FBI.  Ms. Anderson was never contacted for approval to use electronic surveillance in the Dobyns fire investigation.

On October 17, 2008, OPSEC produced a Significant Information Report (SIR) regarding a potential suspect in the investigation of the apparent arson at the Dobyns' residence.  According to the report, a source advised ATF that the Hells Angels were preparing to target relatives of Agent Dobyns who allegedly resided in the San Diego, California, area.  The source relayed information suggesting that Robert Johnston, a former Hells Angel, was responsible for the fire at Agent Dobyns' house.  Two ATF agents from New Orleans, Louisiana, were assigned to investigate this threat.  It was determined that the information provided by the source was not

---

in an attempt to maintain the integrity of this investigation and to limit access to this sensitive investigation by person(s) that do not have a need to know. Additionally, restricting case access is to deny access to those personnel that are not directly involved in this investigation.  Further, as has been the case to date and will continue to be the case, you are ordered and directed to write your reports based upon your professional knowledge of events and, where applicable, your professional opinions as to the origin and cause of this fire.  If you are approached by anyone that attempts to dissuade you from your professional responsibilities or otherwise attempts to influence your official reporting of the events surrounding this investigation, I am ordering you to report any such attempts to me directly and immediately.

When your reports are complete, please e-mail them to me directly in word format and I will make arrangements for you to cut and paste the reports into the N-Force case file from my work station.

Agent Hildick, among others, objected to these procedures, because he believed that it was highly unusual for an agent who was directly involved in an investigation to be denied normal access to the case files.

credible and did not warrant additional investigation.  On April 16, 2009, Assistant Director Carroll sent a memorandum to Agent Dobyns offering to relocate him and his family to the ATF National Academy in Glynco, Georgia; the ATF Field Division in Denver, Colorado; or the ATF Field Division in Seattle, Washington.

In early 2012, Thomas Atteberry, the new SAC for the Phoenix Division, reopened ATF's investigation into the arson at Agent Dobyns' residence.[25]  On May 14, 2012, ATF Agent Creighton L. Brandt, who was working with the FBI, identified, as a person of interest, a juvenile serial arsonist, who was setting fires on the east side of Tucson in 2007 and 2008.  It is unclear how the investigation of the arson has progressed since.

### G.    The OIG and IAD Reports

In 2008, the DOJ OIG issued a report concerning ATF's handling of external threats made against Agent Dobyns.  In 2012 and 2013, IAD at ATF issued reports dealing with ATF's

---

[25]  Testimony at trial indicated that Valerie Bacon, an attorney in ATF's Office of General Counsel, attempted to convince SAC Atteberry not to reopen the arson investigation.  In this regard, SAC Atteberry testified:

Q.    . . . Did you get any kind of discouragement in any respect from anyone at ATF with respect to reopening this arson investigation?

A.    Yes.

Q.    Please explain.

A.    When I was seeking guidance to reopen the investigation, I had a phone conversation with somebody from Counsel's office in ATF headquarters.

THE COURT:  Can you be more specific, Agent?  Do you know who it was?

A.    I believe it was Valerie Bacon.

THE COURT:  All right.  Proceed.

A.    I had a phone conversation, and I also believe I talked to her in person one time when she was in Phoenix, and I believe during the telephone conversation she made a comment to me that if you, meaning myself, reopen the investigation that would damage our civil case.

On or about March 21, 2013, defendant's attorneys (and their supervisors) received emails from plaintiff's attorney complaining about the contacts made by Ms. Bacon to SAC Atteberry.  It appears that defendant's attorneys did not respond to these emails or take any action in response thereto.  Neither party notified the court of these contacts until SAC Atteberry testified in court.  In a filing subsequently ordered by the court, defendant's counsel acknowledged the contacts made by Ms. Bacon to SAC Atteberry, as well as to another potential witness in this case (Agent Carlos Canino).  That filing suggests that Ms. Bacon had a discussion with Agent Canino that was similar to the one she had with SAC Atteberry, described above.

handling of the arson and removal of backstopping for Agent Dobyns and his family.  Because these reports corroborate critical facts, their findings are summarized here.[26]

### (1)    2008 OIG Report

On September 22, 2008, the OIG released a report entitled "OIG Report on Allegations by Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agent Jay Dobyns" (the 2008 Report).  The 2008 Report concluded that between 2004 and 2007, ATF severely mismanaged a series of three threats that were made against Agent Dobyns.  In this regard, the OIG Report found that "[w]ith regard to . . . [these] three threats, . . . ATF needlessly and inappropriately delayed its response to two of the threats . . . [and] should have done more to investigate two of the threats."  The OIG found that in reviewing these threats, ATF had not followed its internal procedures for assessing and responding to threats against agents.

The 2008 OIG Report particularly focused on ATF's decision, in September of 2004, to relocate Agent Dobyns and his family to Santa Maria, California.  The Report found that due to a series of miscommunications among ATF personnel responsible for the transfer, the decision was handled as a standard change of duty station rather than an emergency relocation.  As a result, Agent Dobyns and his family were not provided with the proper support and resources needed to protect their identities and location.  The 2008 OIG Report indicated that upon receipt of another threat, ATF became aware that the Dobyns' relocation to Santa Maria had been mishandled.  As a result, ATF relocated Agent Dobyns and his family to Los Angeles, with the appropriate safeguards in place.

### (2)    2012 IAD Report on House Fire

In April of 2012, IAD initiated a formal investigation regarding multiple complaints from Agent Dobyns concerning ATF's response to the fire at his residence and subsequent follow-up.  The investigation was initiated by Julie Torres, the Assistant Director of IAD.  On October 11, 2012, IAD completed Report of Investigation No. 20120079.  The report was submitted by Agent Christopher J. Trainor, reviewed by SAC John F. Ryan and eventually approved by Assistant Director Torres.  Agent Trainor's work in completing this report was exhaustive, and entailed interviewing a number of witnesses; reviewing depositions; checking for compliance with ATF Orders; scrutinizing documents, files and logs available through the N-Force case management system; and reviewing various other internal ATF memoranda.

---

[26]  Contrary to defendant's intimations, there is no doubt that the reports fall within the exception to the hearsay rule for public records and reports.  Fed. R. Evid. 803(8).  There is no indication that "[e]ither the source of information []or other circumstances indicate a lack of trustworthiness."  *Id.*; *see also L-3 Comm'ns Integrated Sys., LP v. United States*, 91 Fed. Cl. 347, 356 (2010); *Yankee Atomic Elec. Co. v. United States*, 2004 WL 2450874, at *1-8 (Fed. Cl. Sep. 17, 2004); *see generally*, *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338 (Fed. Cir. 1999).  In the court's view, this is also an appropriate situation for invoking the residual exception to the hearsay rule.  Fed. R. Evid. 807.  Of course, in the normal course, ***defendant*** generally seeks the admissibility of its own investigative reports.

IAD made several findings regarding the mismanagement of the response to the fire and the subsequent investigation thereof. IAD concluded that the leadership of the Phoenix Field Division, including SAC Newell, ASAC Gillett and Agent Higman delayed ATF's response at the residence of Agent Dobyns in ways that harmed the subsequent investigation. IAD found that these individuals failed properly to staff the investigation of the fire and failed, in particular, to protect the fire scene and secure evidence available at the scene. IAD also faulted SAC Newell, ASAC Gillett and Agent Higman for their poor coordination of the investigation, including the failure to assign a supervisor at the scene to coordinate ATF's response.[27]

IAD further concluded that SAC Newell, ASAC Gillett and Agent Higman targeted Agent Dobyns as a suspect in the arson of his home, even after highly-respected agents within the Phoenix Field Office had concluded otherwise based on interviews and evidence found at the scene of the fire. IAD found that this conduct led investigators to ignore credible suspects. IAD also found that, during this time, two recordings of Agent Dobyns' phone calls were made without his knowledge or consent, and that proper authorization for the use of that surveillance was not obtained from ATF Headquarters or from the U.S. Attorney's Office for the District of Arizona. *See* ATF Order 3530.2 and ATF Brief 3100.05. This use of electronic surveillance, IAD determined, was not documented in the fashion required by various ATF orders, and the surveillance evidence so produced was not stored in the Field Office's evidence vault, as required by ATF Orders.[28] IAD, moreover, found that ASAC Gillett and Agent Higman instituted a system to report investigative activity regarding the fire that violated ATF policy and took steps to prevent the full and accurate briefing of information and investigative activities to their superiors, including SAC Newell and the Director and Deputy Director of ATF.[29] The IAD report further found that Agent Higman provided a briefing to the FBI (when the latter took over

---

[27] The IAD report rejected, as untenable, several of the excuses Agent Higman gave as to why the Tucson Field Office did not respond sooner to the fire, including the claim that another office was responsible for the investigation and that ATF did not have jurisdiction over the investigation.

[28] The IAD report revealed that on August 21, 2008, Agent Higman falsely advised Agents Bayer and Maynard that he had received authorization from ASAC Gillett to record Agent Dobyns without his consent. The report further noted that the recordings were not provided by DOJ attorneys in response to plaintiff's discovery requests in this case because the recordings were not properly stored.

[29] As discussed above, part of the *ad hoc* system adopted by ASAC Gillett and Agent Higman to report case activity was the generation of "white papers" written in the form of Word documents, rather than as ATF Reports of Investigation (ROIs) on ATF Form 3120.2, as required by ATF Order 3270.10C. IAD found that the "white papers" were used to restrict access to case information within N-Force, preventing ATF management from obtaining accurate and timely information on the status of the investigation. Among those locked out of the investigation by this process was Agent Hildick, who wrote the Cause and Origin report for the fire at the Dobyns' house. The IAD report found that SAC Newell failed to ensure that personnel within the Phoenix Field Division utilized N-Force to report investigative activity.

the investigation from ATF) that included false information and portrayed Agent Dobyns as ATF's lead suspect in the fire – even though Agents Hildick and Moreland had eliminated Agent Dobyns as a suspect based on their interviews with him and his family and their review of the evidence at the scene.

On October 29, 2012, ATF's Professional Review Board (PRB) considered Report of Investigation No. 20120079, in determining whether disciplinary charges against ASAC Gillett and SAC Newell should be proposed.  On November 30, 2012, the PRB, after reviewing, *inter alia*, a variety of documents, issued a memorandum to ASAC Gillett, in which it concluded that he had impeded the Dobyns arson investigation by "agreeing to circumvent required reporting in N-Force, marking the N-Force case file as 6(e) when no grand jury information existed, and agreeing to withhold information in briefings to Phoenix Field Division and ATF Headquarters (HQ) supervisory personnel."  The PRB further concluded that ASAC Gillett displayed "poor judgment" by: (i) withholding information from senior ATF officials about Agent Dobyns' status as a suspect and about the secretly recorded phone calls with Agent Dobyns; (ii) instructing investigators to violate ATF procedures for documenting investigation results; and (iii) continuing to target Agent Dobyns in the arson investigation long after he should have been eliminated as a suspect.  Based on those conclusions, the PRB proposed that ASAC Gillett be removed from his position and from Federal service.

On November 30, 2012, the PRB issued a similar memorandum to SAC Newell.  The PRB concluded that SAC Newell displayed poor judgment by: (i) failing to respond promptly to the crime scene on the day of the fire; and (ii) restricting access to the arson investigation records when he allowed the case to be improperly designated as involving confidential grand jury 6(e) information.  The PRB proposed that he also be removed from his position and from Federal service.

The PRB memoranda allowed ASAC Gillett and SAC Newell to respond to these notices.  ASAC Gillett did not respond to this notice, allegedly because he had already submitted his request to retire from ATF.  While it is unclear how senior ATF officials responded to the memorandum involving SAC Newell, it appears that at least one of the charges involving SAC Newell was sustained, and others were not.[30]  At all events, SAC Newell was allowed to remain at ATF, albeit with a different position.

### (3)    2013 IAD Report on Loss of Backstopping

In 2012, IAD initiated an internal investigation regarding complaints made by Agent Dobyns relating to the withdrawal of the fictitious undercover identification issued to him and his family.  On May 13, 2013, IAD completed Report of Investigation No. 20130060.  The report was submitted by Agent Trainor, reviewed by SAC Gwen A. Golden, and eventually approved by Michael P. Gleysteen, an Assistant Director of OPRSO.  The IAD report primarily focused on

---

[30]  Agent Trainor testified that he complained to his supervisors regarding how the charges against SAC Newell were being handled.  He further testified that the "timing" of the resolution of the charges against SAC Newell "was suspect."

the actions of three individuals: Chief Vidoli, SAC Newell and former NIBIN Chief Pugmire. In drafting the report, Agent Trainor drew on various materials, including the 2008 OIG Report, as well as internal ATF documents relating to threats to Agent Dobyns and his family.

The IAD report made several key findings about ATF's withdrawal of backstopping for Agent Dobyns and his family. It summarized the prior threats that had been made against Agent Dobyns, including those that had occurred between 2003 and 2006. The report described the 2003 issuance of backstopped fictitious identification to Agent Dobyns and his family by ATF's Undercover Branch, and the other steps taken to provide security for the Dobyns family. The report detailed ATF's failure to properly institute the 2004 "emergency relocation" of Agent Dobyns and his family – a relocation in which, inexplicably, no backstopping was provided.[31] The IAD report quoted from the June 22, 2007, OPSEC Threat Assessment for Agent Dobyns, which recommended "permanent relocation out of the western region with full backstopping."

The report closely examined the actions taken by Chief Vidoli, former NIBIN Chief Pugmire and SAC Newell relating to the withdrawal of the fictitious identification that had previously been issued to Agent Dobyns and his family. The report highlighted requests made by SAC Newell and others seeking the withdrawal, and it documented that these requests were based, at least in part, on the mistaken assumption either that Agent Dobyns had improperly used his identification or that all or some of the backstopping in question was no longer needed. It further emphasized that the withdrawal of identification demanded by Chief Vidoli was unprecedented – that this was the only instance in which Chief Vidoli ever withdrew backstopping issued to an ATF employee. In sum, the IAD Investigation found no valid reason for the withdrawal of the fictitious identification previously issued to the Dobyns family.

In general, the IAD investigation revealed that information available to Chief Vidoli confirmed that threats against the Dobyns family had been substantiated and were extant, the evidence of which included a copy of the June 2007 threat assessment that Chief Walck provided to IAD. Indeed, the central conclusion of the report was that Chief Vidoli, NIBIN Chief Pugmire and SAC Newell ignored information about threats to Agent Dobyns and his family in deciding to remove the fictitious identification. And the report underscored that the removal of fictitious identification put Agent Dobyns and his family at risk.

### H.    The Book

From 2004 through 2010, W. Larry Ford served as the Assistant Director in ATF's Office of Strategic Intelligence and Information. In that role, Assistant Director Ford was responsible for educating the public, Congress and the media regarding ATF programs, goals, objectives and missions. Pursuant to ATF Order 9000.1A, Assistant Director Ford also was responsible for reviewing and, in conjunction with ATF's Office of Chief Counsel, determining the propriety of allowing an ATF employee to publish material related to his or her employment with the agency. ATF Order 9000.1A provided that no ATF employee may publish books or articles based upon information obtained as an employee of ATF unless that employee obtains authorization from

---

[31]  Agent Dobyns complained about problems with this relocation in his EEO complaint.

the Assistant Director and the Office of Chief Counsel.  The pre-publication submission requirement was meant to assist ATF in protecting classified, sensitive or otherwise protected information from being released to the public by ATF agents or other employees.

On June 9, 2006, Agent Dobyns executed a contract with Fox 2000 Pictures (Fox) concerning rights to his "life story."  On that same day, Agent Dobyns entered into a second contract with Fox, in which he "agreed to render consultant services in connection with the development and possible production of the theatrical motion picture entitled 'Hell's Angel.'"  In February of 2007, then ATF Deputy Director Edgar Domenech heard rumors that plaintiff was writing a book; Deputy Director Domenech heard additional rumors about the book in March of 2007.[32]  There is no indication that Deputy Director Domenech took any steps to prevent the publication of the book.

As previously noted, on or about May 1, 2007, Agent Sullivan learned about the book's existence from the Internet and contacted Crown/Random House vice-president Richard Horgan, seeking information about plaintiff's possible participation in a book project.  On May 4, 2007, Mr. Horgan wrote an email to Agent Sullivan, in which he advised –

> [W]e're glad to have the chance to publish the book you heard about, which will focus on the community of outlaw bikers and ATF's efforts to rein in their criminal activity.  We have no set title or pub date and would encourage you to ask Jay Dobyns himself about the project as it develops.

As also previously noted, Agent Sullivan immediately notified his superior, Chief Walck, as well as another Agent Conley.[33]  Chief Walck also notified James Rosebrock, the Chief of the Security Emergency Program Division (a subset of OPRSO), about the email and the book.  On May 18, 2007, Agent Dobyns executed a contract with The Crown Publishing Group, a division of Random House, concerning a book provisionally titled "Almost Angels."

On June 23, 2008, InkWell Management LLC and Agent Dobyns executed an agency agreement.  Between September 15, 2008, and October 6, 2008, Agent Dobyns executed three other agreements regarding the Spanish, English and Swedish language versions of *No Angel, The True Story of the First Cop to Infiltrate the Hells Angels*.  In December of 2008, Agent Dobyns executed a similar agreement for the Dutch edition of the book.

On December 4, 2008, Chief Rowley wrote Agent Dobyns, requesting information about the publication of *No Angel*.  The memorandum cited the regulations in 5 C.F.R. § 2635.807, governing the restrictions on when and how an employee may receive compensation for teaching, speaking or writing.  On February 6, 2009, Chief Rowley requested additional information about the book, noting, *inter alia*, that the book's cover displayed Agent Dobyns'

---

[32]  Ronald Carter replaced Domenech as Deputy Director of ATF, effective February 15, 2007.  At that time, SAC Domenech became the new head of ATF's Washington Field Office.

[33]  At trial, Agent Sullivan testified that Chief Walck told him that there was "no reason for [him] to contact Jay Dobyns for any further information" regarding the book.

title, as an ATF Special Agent.  Chief Rowley directed Agent Dobyns to take the following actions: (i) submit an outside employment request to the Chief of the NIBIN Branch, with a copy of the most recent manuscript; (ii) remove the subtitle "ATF Special Agent" from the cover of the book; and (iii) inform the publisher, agents and others involved with the book that Federal employees are prohibited from using their title for the promotion of teaching, speaking and writing engagements, and that this prohibition applies to Agent Dobyns.

On February 10, 2009, the book *No Angel:  My Harrowing Undercover Journey to the Inner Circle of the Hells Angels* by Jay Dobyns and Nils Johnson-Shelton was released for sale to the public.  The original version of the book's cover included Agent Dobyns' title.  On February 18, 2009, Agent Dobyns submitted to Chief Rowley the information that the latter had requested, including a request for outside employment and an electronic copy of the most recent version of the manuscript.  Subsequently, over the next year and a half, Agent Dobyns executed various outside agreements regarding the publication of *No Angel* in various other languages.

## I.        Credibility Findings

A few words are in order regarding the credibility determinations that underlie some of the foregoing findings.  In particular, the court finds significant portions of the testimony of two witnesses – Agent Charles Higman and ASAC George Gillett – unworthy of belief.

Agent Higman wove a remarkable tapestry of fiction concerning his response to the fire and the investigation that followed.  Contrary to the testimony of nearly every witness at trial, as well as numerous investigative reports, Agent Higman testified that he sent ATF agents to the scene of the fire on the day it happened.  Further, at trial, Agent Higman expressed doubt that Agent Dobyns and Agent Celaya had a history of conflict – before he was reminded that the two agents had a history of "bad blood."  Based on this testimony, the court found incredible Agent Higman's claims that he did not know, at the time of the fire, that Agent Celaya was an unlikely candidate to respond to the fire scene.  Likewise, when asked whether he ever considered Agent Dobyns to be an arson suspect, Agent Higman testified flatly, "[n]ever" – even though Agent Higman later acknowledged that he directed two ATF agents to tape record conversations with Agent Dobyns without his knowledge.  Ultimately, Agent Higman admitted that he viewed Agent Dobyns as a potential suspect – "[h]e, along with everyone else."  Agent Higman also provided incredible testimony regarding who authorized the taping of Agent Dobyns – first indicating that authorization was not required and then testifying that he had received authorization to make the recordings from ASAC Gillett.

In the court's view, Agent Higman also exhibited his lack of candor in asserting that his use of the phraseology "slow roll" – which other agents described as Agent Higman's way of indicating that the fire investigation should be dragged out and not be handled by ATF – was instead an indication that the investigation was to be deliberate.  The court also failed to credit Agent Higman's testimony that he believed that ATF lacked the jurisdiction to investigate the fire as a threat to one of its agents (even though ATF plainly has the jurisdiction to investigate arsons).  And the court found thoroughly unbelievable Agent Higman's excuses as to why the files for the arson investigation were not included in the N-Force filing system.  As his testimony progressed, Agent Higman was, time and again, contradicted not only by his own sworn testimony – given at trial and in prior depositions – but by that of other ATF witnesses.  Based

on the roll and surge of this contrary evidence, and for other reasons (including his general demeanor and nonresponsiveness to questions), the court concluded that Agent Higman's testimony lacked credibility.

ASAC Gillett's testimony likewise posed serious credibility issues.  Like Agent Higman, ASAC Gillett professed the belief that he did not view Agent Dobyns as a suspect – even though every indication was that he did.  Indeed, there is strong indication that ASAC Gillett either approved the surreptitious taping of Agent Dobyns or at least tacitly approved the same.  In addition, ASAC Gillett's claims that he had good reasons to deviate from the normal ATF protocols for managing files and evidence associated with the arson have a decidedly hollow ring.  Yet, more so than Agent Higman, it appears that ASAC Gillett purposely attempted to shield critical investigative information from senior ATF officials and did so, knowing full well that he was not complying with the procedures used for filing information in the N-Force system.[34]  Highly damaging to ASAC Gillett's credibility is also the fact that he lied in denying to Agent Hildick and other agents that he viewed Agent Hildick's Cause and Origin Report (regarding the fire) as being "unpopular."  Finally, it should not be overlooked that ASAC Gillett's testimony was repeatedly contradicted by other witnesses and his prior depositions.[35]

On the other hand, the court attaches considerable weight to the testimony of Agent Trainor, who authored the 2012 and 2013 IAD reports.  This point warrants particular attention.  At the outset, it is conspicuous that the Justice Department attorneys in this case strenuously attempted to impeach Agent Trainor's testimony – an odd tactical decision to say the least.  More importantly though, there is every indication that Agent Trainor's reports were thorough, well-

---

[34]  Various emails in the record plainly demonstrate that ASAC Gillett failed to tell the truth when he testified that he had not prevented senior ATF officials from learning critical details about the arson investigation.  Contrary to this evidence, ASAC Gillett testified at trial:

> Q:     Did you ever withhold information that your supervisors needed to know concerning the fire investigation?
>
> A:     No, sir, I never physically did, actually did that.
>
> Q:     Did you ever withhold information that your supervisors requested from you with regard to the fire investigation?
>
> A:     No, sir. Never.

[35]  It should be noted that ASAC Gillett initially refused to comply with subpoenas to testify at the trial in this case – essentially secreting himself in Tennessee to avoid service of those subpoenas.  While ASAC Gillett's attorney eventually agreed to have his client comply with the subpoenas, he did so only after the court threatened to find his client in civil contempt and to have the U.S. Marshal in Tucson effectuate a writ of body attachment (a civil writ ordering the seizure of a person).  *See http://www.usmarshals.gov/process/body-attachment.htm* (discussing this process); *see also Armstrong v. Squatrito*, 152 F.3d 564, 574 (7th Cir. 1998) (body attachment writ for contempt constitutes civil warrant*); Greater St. Louis Constr. Laborers Welfare Fund v. Town & Country Masonry & Tuckpointing, LLC*, 2013 WL 5346645, at *1 (E.D. Mo. Sept. 27, 2013).

documented and accurately reflected the substance of the more than 4,000 pages of documents, electronic messages, depositions and notes of interview that he reviewed and summarized in his two reports. Those reports, indeed, corroborate hundreds of critical facts that are otherwise reflected by the testimony and documents in the record. In general, the court was impressed with Agent Trainor's testimony – his capabilities, knowledge of the subject matter of the investigations, general integrity and willingness to respond to the court's questions.

### J.     Procedural History

The complaint in this case originally was filed on October 2, 2008, and later amended. On January 15, 2010, this court granted, in part, and denied, in part, defendant's motion to dismiss the complaint for lack of jurisdiction and for failure to state a claim under RCFC 12(b)(6). *Dobyns v. United States*, 91 Fed. Cl. 412 (2010) (*Dobyns I*). On October 1, 2012, the court denied the parties' cross-motions for summary judgment, holding that issues of material fact existed as to a number of questions underlying the claims and counterclaim. *See Dobyns v. United States*, 106 Fed. Cl. 748 (2012) (*Dobyns II*).

Trial in this case commenced in Tucson, Arizona, from June 10, 2013, through June 21, 2013; trial continued in Washington, D.C., on July 22, 2013, through July 26, 2013. All told, the court heard testimony of twenty-nine witnesses, including a number of ATF supervisors and other ATF agents. In addition, the court heard expert testimony from Dr. Todd Linaman, who served as Agent Dobyns' psychologist.[36] On February 18, 2014, closing arguments in the case were held in Tucson, Arizona.

## II.   DISCUSSION

As should be obvious at this point, this is **not** your typical contract case. While there are some indications otherwise, in the main, this is also not a story of conspiracies, plots of downfall, or midnight interludes – at least provable ones. Nor of demonstrated bad faith, designed to injure, at least in the traditional legal sense. No, this is a story of organizational weaknesses, the inability of agency officials to supervise and control, and of demonstrated misfeasance – all rooted in the sorry failure of some ATF officials to abide with the spirit of a contract that was designed to protect one of their own. As the statement of facts above reveals, the story of how Agent Dobyns was treated is neither entertaining nor an easy read. But, to understand what follows, the entire story – including the legal conclusions that flow therefrom – must be understood.

What follows is the court's consideration of the claims made by plaintiff and defendant, beginning with plaintiff's claim that ATF breached the Settlement Agreement.

---

[36] Plaintiff also attempted to admit, as an expert witness, Dr. Edward Ackerley, as a specialist in marketing, accounting and advertising. However, plaintiff ultimately was forced to withdraw this witness because his expert report did not comply with the requirements of RCFC 26(a).

## A.      Breach of Contract

We begin with common ground.  A breach of contract claim requires: (i) a valid contract between the parties; (ii) an obligation or duty arising out of that contract; (iii) a breach of that duty; and (iv) damages caused by the breach.  *See Bell/Heery v. United States*, 739 F.3d 1324, 1330-31 (Fed. Cir. 2014); *Hercules, Inc. v. United States*, 24 F.3d 188, 198 (Fed. Cir. 1994); *San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).  A breach arises when a party fails to perform a contractual duty when it is due.  *See Winstar Corp. v. United States*, 64 F.3d 1531, 1545 (Fed. Cir. 1995) (citing Restatement (Second) of Contracts § 235(2) (1981)); *Eden Isle Marina, Inc. v. United States*, 113 Fed. Cl. 372, 492 (2013).  Here, plaintiff claims that defendant failed to meet its obligations under the Settlement Agreement.  Plaintiff bears the burden of establishing that breach by a preponderance of the evidence.  *Gibson v. Dep't of Veteran Affairs*, 160 F.3d 722, 728 (Fed. Cir. 1998); *Tech. Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1373 (Fed. Cir. 1998).

To determine whether plaintiff's contractual rights were breached, the court must first determine what those rights were.  *San Carlos Irr.*, 877 F.2d at 959; *Alli v. United States*, 83 Fed. Cl. 250, 269 (2008); *Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 759 (2003).  "Contract interpretation begins with the language of the written agreement."  *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003); *see also Bell/Heery*, 739 F.3d at 1331; *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993).  When interpreting a contract, "if the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning.'"  *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (quoting *Alaska Lumber & Pulp Co. Inc. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993)).  On the other hand, extrinsic evidence may be considered where a contract is ambiguous – that is, "if its language is susceptible to more than one reasonable interpretation."  *Ace Constructors, Inc. v. United States*, 499 F.3d 1357, 1361 (Fed. Cir. 2007); *see also TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006).  At all events, a contract must also be construed as a whole and "in a manner that gives meaning to all of its provisions and makes sense."  *McAbee Constr.*, 97 F.3d at 1435 (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993)); *see also Shell Oil Co. v. United States*, 751 F.3d 1282, 1293 (Fed. Cir. 2014).

Because the Settlement Agreement continues in effect, this necessarily is a suit for a partial breach of contract.  "If the injured party elects to or is required to await the balance of the other party's performance under the contract, his claim is said . . . to be one for damages for partial breach [rather than for a total breach]."  Restatement (Second) of Contracts § 236 cmt. b (1981); *see also Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1374 (Fed. Cir. 2005) (applying Restatement (Second) of Contracts § 236).  In essence, "[a] partial breach is '[a] claim for damages . . . based on only part of the injured party's remaining rights to performance.'"  *Ind. Mich.*, 422 F.3d at 1374 (quoting Restatement (Second) of Contracts § 236(2)).  "[W]here there has been no repudiation  [*e.g.*, no total breach], the plaintiff can recover damages for his injury only to the date of the writ. . . . [H]e must treat the breach as only 'partial.'"  10 Arthur L. Corbin, Corbin on Contracts § 956 (interim ed. 2007).

The parties do not dispute that the Settlement Agreement is a valid contract, but they interpret differently the obligations or duties that arise therefrom. The focal point of plaintiff's breach argument is paragraph 10 of the Settlement Agreement, which states:

> This Agreement does not constitute an admission by the Agency or Employee of any violation of law, rule or regulation or wrongful acts or omissions. The Agency agrees that *it will comply with all laws regarding or otherwise affecting the Employee's employment by the Agency*.

(Emphasis added.) The parties vigorously contest the meaning of this bolded language. Plaintiff contends that this language should be construed broadly to include not only rules and regulations affecting his employment, but also ATF Orders. And plaintiff contends that the ATF Orders affecting his employment were violated by ATF officials. Defendant, for its part, asserts that no laws regarding, or otherwise affecting, Agent Dobyns' employment were violated.

Plaintiff's banner argument is that the words "all laws," as used in the second sentence of paragraph 10, encompass rules, regulations and ATF Orders. He contends this is true, even though the word "law," as used in the first sentence of this paragraph, does not appear to encompass "rule or regulation," as that phrase is separately enumerated. Consistent usage suggests that plaintiff's claim is in error, as adoption of his view would render the phrase "rule or regulation," as used in the first sentence of paragraph 10, mere surplusage, contrary to the normal rules of contract interpretation.[37] Similar construction principles likewise require that the phrase "law" or "laws" be given the same meaning in the same paragraph (*i.e.*, the two sentences in paragraph 10 of the Settlement Agreement). *See Monarch Fire Prot. Dist. of St. Louis Cnty. Mo. v. Freedom Consulting & Auditing Servs., Inc.*, 644 F.3d 633, 638 (8th Cir. 2011); *Md. Cas. Co. v. W.R. Grace & Co.*, 128 F.3d 794, 799 (2d Cir. 1997); *Bill Call Ford, Inc. v. United States*, 48 F.3d 201, 205 (6th Cir. 1995); *In re Lehman Bros., Inc.*, 478 B.R. 570, 589 (Bankr. S.D.N.Y. 2012).[38] It follows that, if the word "law" does not encompass the phrase "rule or regulation" in

---

[37] *See United Int'l Investigative Serv. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997); *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992), *cert. denied*, 506 U.S. 1048 (1995); *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978) ("[A]n interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result."); *Spectrum Sciences & Software v. United States*, 84 Fed. Cl. 716, 735 (2008) (same); *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 730 (2004) (same); *see also* 11 Richard A. Lord, Williston on Contracts § 32:5 at 420 (4th ed. 1999). Canons of statutory construction would yield a similar result. *See Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) ("the normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning").

[38] *See also South Rd. Assocs., LLC v. Intern. Bus. Mach. Corp.*, 826 N.E 2d 806, 809-10 (N.Y. 2005); *State ex rel. Goddard v. R.J. Reynolds Tobacco Co.*, 75 P.3d 1075, 1079-80 (Ariz. App. 2003); *Triangle Constr., Div. of Bentley-Dille Grandall Rentals, Inc. v. City of Phoenix*, 720 P.2d 87, 91 (Ariz. App. 1985) (the "only reasonable construction" of a contract is that a term

the first sentence of paragraph 10, the same should hold true in the second sentence thereof. *See Monarch Fire Prot. Dist.*, 644 F.3d at 639-40; *Md. Cas.*, 128 F.3d at 799; *Bill Call Ford*, 48 F.3d at 205; *In re Lehman Bros.*, 478 B.R. at 589.

Of course, identical words can have different meanings when the subject matter or contexts to which they refer is dissimilar. *See Mohamad v. Rajoub*, 634 F.3d 604, 608 (D.C. Cir. 2011), *aff'd, Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702 (2012); *Macheca Transp. Co. v. Philadelphia Indem. Co.*, 463 F.3d 827, 832 (8th Cir. 2006); *Wood v. Dennis*, 489 F.2d 849, 853 (7th Cir. 1973), *cert. denied*, 415 U.S. 960 (1974); *see also Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932). Here, however, the context is the ***same*** – suggesting that the disparate word choices in the first two sentences of paragraph 10 were intentional.[39] At trial, plaintiff had the opportunity to demonstrate, via parol evidence, that the same words here could, indeed, have different meanings. But, he was unsuccessful in doing so. Based upon the record as a whole, plaintiff failed to provide any evidence suggesting that the word "law" had a different meaning in the second sentence of the Settlement Agreement than in the first.[40]

Nor, contrary to plaintiff's claims, does the court believe that the Settlement Agreement somehow otherwise incorporated various ATF Orders in question. For the reasons stated above, there is no indication that the ATF orders were included as "laws regarding or otherwise affecting the Employee's employment." Like a statute, a contract may, of course, incorporate, by reference, various laws, regulations, rules and orders. *See Hercules, Inc. v. United States*, 626 F.2d 832, 838 (Ct. Cl. 1980); *Earman v. United States*, 114 Fed. Cl. 81, 103-04 (2013); *see also Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 616 (2000). But, on this count, the Federal Circuit has indicated that "language used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract." *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008); *see also Lakeshore Eng'g Servs. v. United*

---

"has the same meaning throughout the paragraph"). The same rule, of course, applies to the construction of statutory provisions.

[39] *See Larson v. Nationwide Agribusiness Ins. Co.*, 739 F.3d 1143, 1148 (8th Cir. 2014); *AT&T Comm'ns of Cal., Inc. v. Pac-West Telecomms., Inc.*, 651 F.3d 980, 992 (9th Cir. 2011); *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996); *see also States Roofing Corp. v. Winter*, 587 F.3d 1364, 1370 (Fed. Cir. 2009).

[40] Plaintiff notes that in denying, in part, defendant's motion to dismiss, this court determined that the language of the Settlement Agreement was somewhat ambiguous. *See Dobyns I*, 91 Fed. Cl. at 420. But, this ruling primarily related to the court's jurisdiction and certainly did not preclude the court from determining that the language in question could be construed in the fashion defendant ultimately argued.

Plaintiff's main premise at trial was that the ATF Orders were "laws" because ATF employees are required to follow them and could be sanctioned if they failed to do so. But, as with the familiar dislogic involving Greeks and Spartans, the first of these propositions does not follow from the second.

*States*, 748 F.3d 1341, 1347 (Fed. Cir. 2014); *Precision Pine & Timber Inc. v. United States*, 596 F.3d 817, 826 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 997 (2011); *TEG-Paradigm Envtl.*, 465 F.3d at 1339; *Lab. Corp. of Am. v. United States*, 108 Fed. Cl. 549, 564 (2012).  And there is no indication that this standard for incorporation was remotely met here.

The sort of wholesale incorporation plaintiff desires would entail a tall order – as it would require the court to conclude that no less than a dozen ATF Orders were incorporated, *sub silentio*, into the Settlement Agreement.  Those orders are summarized in the chart below.[41]  As can be seen, these orders do not deal expressly or even tangentially with employment matters, but instead deal with issues involving security, investigative guidelines (*e.g.*, the use of electronic surveillance), and other operational issues.  Despite plaintiff's efforts to demonstrate otherwise, the court simply cannot conclude that when the Settlement Agreement required compliance with "all laws regarding or otherwise affecting the Employee's employment by the

---

[41]  As can be seen, these orders cover a variety of operational security issues, as well as various procedures governing ATF's use of investigative techniques:

| ATF Order | Title | Purpose |
|---|---|---|
| 3000.1E | Criminal Enforcement General Information | States ATF enforcement authority; organizational structure; functions of various parts; standards for agent conduct |
| 3040.1 | Operations Security (OPSEC) Program | Establishes OPSEC goals, methods, strategies |
| 3040.1A | Operations Security Program | Outlines Analytical Risk Management process assessing threats, identifying vulnerabilities and countermeasures |
| 3040.2 | Operations Security – Threat Program | Outlines the program to evaluate, assess and recommend countermeasures to ensure the safety and security of ATF employees once a threat has been identified |
| 3040.2A | Operations Security – Threat Policy | Outlines the program to evaluate, assess and recommend countermeasures to ensure the safety and security of ATF employees once a threat has been identified |
| 3111.1 | Use of N-Force | Sets forth policy and responsibilities regarding the entry, review and maintenance of records created in N-Force |
| 3210.7C | Investigative Priorities, Procedures, and Techniques | Contains policy and instructions relating to investigative guidelines, priorities, techniques, and aids |
| 3254.1A | Victim And Witness Assistance Programs | Outlines the various services/requirements ATF provides to victims |
| 3264.1 | Electronic Communications and Surveillance | Contains policies, procedures, laws, and technology regarding electronic surveillance approval and reporting requirements governing intercepting, monitoring, and/or recording telephone and other communications |
| 3270.10C | Law Enforcement Investigative Reports | Contains policies and instructions relating to ATF law enforcement investigative reports, including N-Force |
| 3400.1B | Property Taken Into Bureau Custody | Prescribes procedures governing the reporting and controlling of property, including electronic surveillance evidence, taken into ATF custody |
| 3530.2 | Electronic Surveillance | Prescribes the procedures governing the interception, monitoring, and/or recording of telephone and other communications |

Agency," it meant to refer to – and incorporate – all these sundry provisions.  And that conclusion is fatal to plaintiff's breach claim.

Based upon the foregoing, the court finds that the second sentence of paragraph 10 of the Settlement Agreement was not breached by defendant, as no statutory provision or other provision of law relating to plaintiff's employment was violated here.

### B.      Covenant of Good Faith and Fair Dealing

That said, plaintiff asserts that defendant is still liable here, albeit under a different theory, *to wit*, that the conduct of ATF officials and other employees grossly breached the covenant of good faith and fair dealing associated with the Settlement Agreement.  As will be seen, plaintiff is right.  As will be described in detail, there is clear indication that certain ATF officials violated the covenant literally within weeks after the execution of the Settlement Agreement and that they and other ATF employees continued to violate the covenant in the years that followed.

### (1)      Legal Framework

"Every contract implicitly contains a covenant of good faith and fair dealing, keyed to the obligations and opportunities established in the contract."  *Lakeshore Eng'g*, 748 F.3d at 1349; *see also Metcalf Constr. Co., Inc. v. United States*, 742 F.3d 984, 990-92 (Fed. Cir. 2014); *First Nationwide Bank v. United States*, 431 F.3d 1342, 1349 (Fed. Cir. 2005).[42]  The covenant imposes on each party a "duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005); *see also Lakeshore Eng'g*, 748 F.3d at 1349; *Pew Forest Prods., Inc. v. United States*, 105 Fed. Cl. 59, 66 (2012); *Dobyns I*, 91 Fed. Cl. at 421.  "The United States, no less than any other party, is subject to this covenant."  *Precision Pine & Timber*, 596 F.3d at 828; *see also First Nationwide Bank*, 431 F.3d at 1349.  "[A] breach of the good faith covenant can be established by a showing that defendant 'specifically designed to reappropriate the benefits [that] the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract.'"  *Lakeshore Eng'g*, 110 Fed. Cl. at 240 (quoting *Precision Pine & Timber*, 596 F.3d at 829); *see also Centex Corp.*, 395 F.3d at 1304.

---

[42]  Originally applied in late Nineteenth Century common law contract cases, *see, e.g.*, E. Allan Farnsworth, Farnsworth on Contracts § 7.17 (2004), the covenant gained increased acceptance upon the adoption of the Uniform Commercial Code in 1951.  U.C.C. § 1-201(b)(20).  The covenant was then adopted by the American Law Institute, as § 205 to the Restatement (Second) of Contracts in 1979:  "Duty of Good Faith and Fair Dealing.  Every contract imposes upon each party a duty of good faith and fair dealing in its performance and execution."  The comments to § 205 refer to the definition of "good faith" in the Uniform Commercial Code, which says, "'good faith' means honesty in fact in the conduct or transaction concerned."  *See also Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 40 (1st Cir. 2011); Robert L. Summers, "The General Duty of Good Faith – Its Recognition and Conceptualization," 67 Cornell L. Rev. 810 (1982).

To be sure, the implied covenant of good faith and fair dealing may not be used to craft a better deal than the parties made for themselves – it does not create an amorphous companion contract, with latent provisions that modify the parties' agreement.  *See Precision Pine & Timber*, 596 F.3d at 829; *Lakeshore Eng'g*, 110 Fed. Cl. at 240.  That said, the implied existence of the covenant is testament to the fact that "[t]he law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal."  *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214, 214 (N.Y. 1917) (Cardozo, J.); *see also CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 467 (S.D.N.Y. 2010); 6 Corbin § 26:8; Williston, § 38:15.  Insofar as contracts with the United States are involved, the existence of the covenant ensures that government officials cannot enter into a contract in the morning that will be undercut by other of its employees before nightfall.  *See Metcalf Constr. Co.*, 742 F.3d at 994; *Precision Pine & Timber*, 596 F.3d at 829.

In determining whether the covenant has been honored, defendant must be viewed in monolithic terms – that is to say, that the actions of its employees, as they relate to the performance of a given contract, must be viewed in concert.  Otherwise, an agency's ability to enter into contracts, including those designed to settle disputes, and the efficacy of the agreements so reached, is compromised.  In this fashion, a breach of the covenant of good faith and fair dealing can be viewed as thwarting the ability of the Attorney General to settle cases, as he is authorized to do by 28 U.S.C. §§ 516 and 519.  *Northrop Grumman Computing Sys., Inc. v. United States*, 101 Fed. Cl. 362, 363-64 (2011); *see also Sharman Co. v. United States*, 2 F.3d 1564, 1567-68 (Fed. Cir. 1993), *overruled on other grounds*, *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995).  To conclude otherwise would be to give contracts entered into by the Attorney General (and presumably also those entered into by the Director of ATF) a decidedly hollow ring.  *See Applegate v. United States*, 52 Fed. Cl. 751, 757 (2002) (discussing the Office of Legal Counsel, "The Attorney General's Role as Chief for the United States," 6 U.S. Op. OLC 47, 59-60 (1982)); Exec. Order No. 6166, June 10, 1933.  In the court's view, all these principles, *per force*, must apply to a settlement agreement of the sort at issue here.  *See Struck Constr. Co. v. United States*, 96 Ct. Cl. 186, 221 (1942); *Cuyahoga Metro. Hous. Auth.*, 57 Fed. Cl. at 752.[43]

In *Metcalf Construction*, the Federal Circuit recently provided useful guidance on how the covenant of good faith and fair dealing ought to apply in government contract cases.  In that

---

[43]  The notion that defendant's obligations under the covenant can apply collectively to multiple individuals is well-illustrated by the Federal Circuit cases involving the retroactive legislation passed by Congress and signed by the President to modify benefits received by savings and loan institutions in the 1980s ("the Guarini legislation").  In a series of cases, defendant was viewed as having breached the covenant of good faith and fair dealing when Congress and the President (the latter at the behest of Executive Branch officials) pursued and eventually adopted legislation that reneged on a series of obligations defendant owed to banks and savings institutions.  *See Local Okla. Bank, N.A. v. United States*, 452 F.3d 1371, 1377 (Fed. Cir. 2006); *First Nationwide Bank*, 431 F.3d at 1344-45; *First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1316 (Fed. Cir. 2005); *Centex Corp.*, 395 F.3d at 1311.

case, a construction contractor sued the Navy under the Contract Disputes Act, 41 U.S.C.A. § 7101 *et seq.*, alleging that it breached the duty of good faith and fair dealing under a contract to design and build military housing.  742 F.3d at 987-88.  This court largely denied the plaintiff's claims, asserting that a "breach of the duty of good faith and fair dealing claim against the Government can only be established by a showing that it 'specifically designed to reappropriate the benefits [that] the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract.'"  *Metcalf Constr. Co., Inc. v. United States*, 102 Fed. Cl. 334, 346 (2011) (quoting *Precision Pine & Timber*, 596 F.3d at 829).  It reached this decision based on a narrow interpretation of the Federal Circuit's decision in *Precision Pine* – one that held that a breach of the covenant occurred only where there was a violation of the underlying express contract.  *Id.*

The Federal Circuit reversed.  To be sure, that court reemphasized that the "implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions."  *Metcalf Constr.*, 742 F.3d at 991 (quoting *Precision Pine & Timber*, 596 F.3d at 831).  "The implied duty of good faith and fair dealing is limited by the original bargain," the Federal Circuit instructed, as it "prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Metcalf Constr.*, 742 F.3d at 991.[44]  That said, the Federal Circuit rejected defendant's "unduly narrow view of the duty of good faith and fair dealing," *id.* at 992, *to wit*, that an implied duty could be breached only where the plaintiff could identify a contract provision that defendant violated.  "That goes too far," the Federal Circuit indicated, stating that "a breach of the ***implied*** duty of good faith and fair dealing does not require a violation of an ***express*** provision in the contract."  *Id.* at 994 (emphasis in original).[45]  Nor does violation of the covenant occur only where defendant's actions were "specifically targeted" to deprive the contracting partners with the benefit of the contract, as might occur in some variation on the "old bait-and-switch."  *Id.* at 993 (quoting *Precision Pine & Timber*, 596 F.3d at 829).

*Metcalf Construction* confirms what other decisions of this court have long held, *to wit*, that defendant may breach the covenant of good faith and fair dealing even if it does not breach a

---

[44]  *See Precision Pine & Timber*, 596 F.3d at 830; *First Nationwide Bank*, 431 F.3d at 1350; *see also Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (D.C. Cir. 1984).

[45]  The Federal Circuit rejected this court's interpretation of *Precision Pine*.  In this regard, it adumbrated that:

> [t]he passage cited by the trial court, after saying as a descriptive matter that cases of breach "typically involve some variation on the old bait-and-switch," *Precision Pine*, 596 F.3d at 829, says that the government "*may* be liable" – not that it is liable *only* – when a subsequent government action is "specifically designed to reappropriate the benefits the other party expected to obtain from the transaction."  *Id.*

*Metcalf Constr.*, 742 F.3d at 993.

provision of the underlying contract.[46]  This ruling is important.  A contrary holding would leave the covenant with no purpose or utility whatsoever, except to confuse – a breach of the covenant would occasion no payment of additional damages.  *See N. Star Alaska Hous.*, 76 Fed. Cl. at 188 ("[I]t does not follow . . . that the covenant must be deemed fulfilled unless the express terms of the contract are breached.").  Established law indicates that this cannot be the case.

### (2)    Application of Covenant

So was the covenant breached by defendant here?  Based upon the extensive record, the court firmly believes that this was the case for several reasons.

To begin with, the essence of the Settlement Agreement was to ensure the safety of Agent Dobyns and his family – and, secondarily, that ATF employees would not discriminate against Agent Dobyns.  Based on how ATF functioned, and given the intent underlying the Settlement Agreement, those assurances took at least three forms.  The first related to the risk assessments that ATF regularly conducted – assessments designed to ensure that threats to agents were identified, but not realized.  The second involved protecting the identity of the agents and providing them "backstopping" – both while they acted undercover and after their work on particular investigations was at an end.  And, finally, other assurances focused on the interaction between fellow agents and their superiors – interactions that potentially proved important when life-and-death decisions hung in the balance.

The ATF officials who entered into the Settlement Agreement with Agent Dobyns understood all this, as they had years of law enforcement experience with the agency.  They recognized that this was no ordinary employment dispute and that the $373,000 being paid to Agent Dobyns related to the fundamental failure of ATF officials to act in conformity with the assurances that had been given to Agent Dobyns and his family – the same assurances that were given to all ATF agents in the form of policies, procedures and orders designed to promote agent safety.  The record makes this understanding clear.  And yet it appears that certain ATF officials – albeit not the ones who signed the Settlement Agreement – set out to reappropriate the benefits that Agent Dobyns expected to obtain from the bargain; to act in a fashion designed to undercut the Settlement Agreement's purpose so as to "deprive [Agent Dobyns] of the contemplated value."  *Metcalf Constr.*, 742 F.3d at 991.

---

[46]  *See Chevron v. United States*, 116 Fed. Cl. 202, 206 (2014); *N. Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 188 (2007); *Craig-Buff Ltd. P'ship v. United States*, 69 Fed. Cl. 382, 388 (2006) ("a claim for a breach of the implied covenant of good faith and fair dealing is not limited to specific contract terms"); *Nat'l Australia Bank v. United States*, 63 Fed. Cl. 352, 354-55 (2004), *aff'd, in part, rev'd in part on other grounds*, 452 F.3d 1321 (Fed. Cir. 2006); *Cuyahoga Metro. Hous. Auth.*, 65 Fed. Cl. at 543; *see also Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); *United States v. Basin Elec. Power Coop.*, 248 F.3d 781, 796 (8th Cir. 2001), *cert. denied*, 534 U.S. 1115 (2002) ("[s]ince good faith is merely a way of effectuating the parties intent in unforeseen circumstances, the implied covenant has 'nothing to do with the enforcement of terms actually negotiated'").

Some of these ATF officials undermined that bargain literally within weeks after it was first cut. On October 31, 2007, SAC Newell, proceeding on the flawed belief that Agent Dobyns had improperly used his undercover identification, questioned NIBIN Chief Pugmire and OPSEC Chief Walck as to whether the identification was necessary. SAC Newell purportedly expressed concern that the use of the identification would "cause interagency relationship problems." (Curiously, while minimizing the risks Agent Dobyns was experiencing at this time, SAC Newell continued to bar Agent Dobyns from entering one of the Tucson Field Offices because he believed that the agent's mere presence posed a risk for other personnel.) In early November, Chiefs Pugmire, Vidoli and Walck determined that Agent Dobyns would be required to return all identifications and license plates issued to him and his family. They took this action even though, at the time of the Settlement Agreement, a June 22, 2007, assessment still viewed Agent Dobyns as at risk of harm. The subsequent IAD investigation revealed that the information presented to, or available to, SAC Newell and Chiefs Pugmire, Vidoli and Walck should have made clear that risks were still present and that backstopping was still necessary. Moreover, the IAD investigation confirmed that this had been the only instance in which Chief Vidoli ever withdrew the backstopping of an ATF Agent.

Now, contrary to the detailed findings made by the IAD investigation, an ATF review board summarily found, on the eve of trial, that there were not "any integrity or conduct issues" associated with Chiefs Pugmire and Vidoli, and SAC Newell, in removing the protections previously given to Agent Dobyns.[47] But, even that board acknowledged that the IAD investigation regarding the treatment of Agent Dobyns raised serious questions concerning ATF's policy for issuing and withdrawing credentials used for undercover operations. Was the conduct of individuals like SAC Newell, in withdrawing Agent Dobyns' backstopping, negligent? Certainly there are indications of this. However, the critical point here is not whether these individuals acted negligently, or even in bad faith – but whether their lack of diligence and failure to cooperate, coming little more than five weeks after the signing of the Settlement Agreement, had the effect of putting Agent Dobyns at risk, thereby breaching the covenant of good faith and fair dealing. The court believes that it did. *See Malone v. United States*, 849 F.2d 1441, 1445-46, *modified*, 857 F.2d 787 (Fed. Cir. 1988) (government breached covenant via its "lack of diligence and interference with or failure to cooperate"); *see also N. Star Alaska Hous. Corp.*, 76 Fed. Cl. at 212.

Moreover, the withdrawal of the backstopping revealed a more deep-seated problem – that, despite the efforts reflected by the Settlement Agreement, ATF still was inadequately prepared to respond systematically and individually to the sorts of threats experienced by Agent Dobyns and his family. Documentation of this may be found in both of the IAD reports in

---

[47] By comparison to the single paragraphs that constituted the PRB's memoranda clearing these individuals, Agent Trainor's IAD report on the removal of the backstopping provided hundreds of findings, and was based upon hundreds of documents and five months of interviews. That report concluded that there was "no valid reason" to explain ATF's withdrawal of the fictitious identifications previously held by Agent Dobyns and his family. Agent Trainor's IAD findings were reviewed and approved by SAC Golden on May 9, 2013, and forwarded to the PRB by OPRSO Assistant Director Gleysteen on May 13, 2013.

question.  Indeed, nearly two years after the Settlement Agreement, on June 18, 2009, the U.S.
Office of Special Counsel, working with the DOJ Inspector General, generally sustained Agent
Dobyns' allegations regarding the inadequate response to threats against him, finding that ATF
failed to investigate adequately and "needlessly and inappropriately" delayed its response to
additional threats made against him.[48]  As this report confirmed, ATF appeared to encounter
potentially critical problems not only in conducting risk assessments, but in recognizing the risks
identified thereby and in effectuating the steps taken to negate those risks.  The effect was to
leave agents like Agent Dobyns exposed.  Put another way, it is evident that ATF officials failed
to follow through in implementing the steps that were supposed to minimize the risks that might
affect Agent Dobyns and his family.  In the court's view, this represented another instance in
which ATF violated the covenant of good faith and fair dealing.

        The record in this case reveals other instances in which the covenant was breached.  This
is certainly the case with respect to actions taken by ASAC Gillett and Agent Higman in regards
to the investigation of the August 10, 2008, fire at the Dobyns home.  Although the fire occurred
less than eleven months after the Settlement Agreement was signed, it is important to recognize
that the breach of the covenant did not occur here because of the arson itself.  Rather, the breach
occurred because of the way officials like ASAC Gillett and Agent Higman functioned – and
were allowed to function – after the fire, especially in terms of how Agent Dobyns was treated.
In the court's view, the evidence showed that ASAC Gillett and Agent Higman knew that Agent
Dobyns was not responsible for the fire, and still allowed him to be treated as a suspect as a form
of payback.  Moreover, ATF officials knew, or should have known, that individuals like ASAC
Gillett and Agent Higman should not have been allowed to participate in the investigation – as it
turned out their conduct was not only reprehensible, but predictably so.  In donning blinders in
this regard, ATF officials compounded the potential harm that might have befallen the Dobyns
family.  And acting in the aggregate, these ATF officials and employees further reappropriated
essential features of the bargain represented by the Settlement Agreement, thereby again
breaching the covenant of good faith and fair dealing.[49]

_____

        [48]  In this regard, the Special Counsel indicated that:

        I noted with concern the absence of any corrective measures to address the failure
        to conduct timely and thorough investigations into the death threats made against
        SA Dobyns.  ATF does not appear to have held anyone accountable in this regard.
        Fully addressing the problems and failures identified in this case requires more
        than amending ATF policies and procedures.  It requires that threats against ATF
        agent be taken seriously and pursue aggressively and ATF officials at all levels
        cooperate to ensure the timely and comprehensive investigation of threats leveled
        against its own agents.

While most of the threats catalogued in the OIG report occurred prior to the Settlement
Agreement, it is noteworthy that the OIG concluded that ATF had failed to address the concerns
raised by its report at least as of June 18, 2009.

        [49]  As this court's predecessor once stated, "[i]f the aggregate of the actions of all of the
agents would, if all done by one individual, fall below the standard of good faith, [the
government] for whom the various agents acted should be held to have violated that standard."

Now, the court is loath to conclude that every alleged misfeasance and transgression occurring since the Settlement Agreement was executed represented yet another violation of the covenant – at least without more proof.  In part, that hesitancy derives not merely from the passage of time, but from a variety of intervening actions that may have broken the chain of causation here – including both the gallant and dubious responses of certain ATF officials to the arson of the Dobyns home.  Moreover, it cannot be overlooked that some of the harm experienced by Agent Dobyns and his family occurred at the hands of third parties – including the yet identified arsonist.  That said, it is the court's view that the actions taken by ATF officials and agents during the time period proximate to the execution of the Settlement Agreement severely undermined the intent of the agreement and thereby effectuated a breach of the covenant of good faith and fair dealing.  And those actions, and the covenant breached thereby, entitle plaintiff to damages.[50]

### C.    Damages

It next remains to determine the damages to which Agent Dobyns is owed.  Plaintiff, of course, has the burden of proving those damages.  *See Fifth Third Bank v. United States*, 518 F.3d 1368, 1374-75 (Fed. Cir. 2008); *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997).  Nevertheless, it is "well-settled" that "subject to certain controlling principles (for example, the recovery of damages must not serve as a windfall to the non-breaching party), determination of damages is a matter within the trial court's discretion." *Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1382 (Fed. Cir. 2004); *see also Elk v. United States*, 87 Fed. Cl. 70, 89 (2009).

"Damages for a breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty."  *Ind. Mich. Power*, 422 F.3d at 1373; *see also Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007); *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002).  Regarding foreseeability, the Federal Circuit has instructed –"[w]hat is required is merely that the injury actually suffered must be one of a kind that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction." *Citizens Fed. Bank*, 474 F.3d at 1321 (quoting 11 Corbin on Contracts § 56.7 at 108); *see also*

---

*Struck Constr. Co.,* 96 Ct. Cl. at 221; *see also N. Star Alaska Hous. Corp.*, 76 Fed. Cl. at 212; *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 769 (2005); *Libertatia Assoc. Inc. v. United States*, 46 Fed. Cl. 702, 710 (2000).

[50]   Some of the decisions of this court have treated breaches of the covenant of good faith and fair dealing as material breaches of the underlying contract.  *See D'Andrea Bros. LLC v. United States*, 109 Fed. Cl. 243, 262 (2013); *see also Scott Timber, Inc. v. United States*, 86 Fed. Cl. 102, 111-12 (2009), *rev'd on other grounds*, 692 F.3d 1365 (Fed. Cir. 2012).  At least in a case like this, the court's view is that issues concerning the performance of ATF officials who were not signatories of the Settlement Agreement are better addressed as violations of the covenant of good faith and fair dealing.

*Landmark Land Co., Inc. v. FDIC*, 256 F.3d 1365, 1378 (Fed. Cir. 2001).  As for causation, plaintiff must show that defendant's breach produced damage "inevitably and naturally, not possibly nor even probably."  *Ramsey v. United States*, 101 F. Supp. 353, 357 (Ct. Cl. 1951), *cert. denied*, 343 U.S. 977 (1952) (citing *Myerle v. United States*, 33 Ct. Cl. 1, 27 (1897)).  In other words, it must show that "the damages would not have occurred but for the breach."  *Fifth Third Bank*, 518 F.3d at 1374; *see also Cal. Fed. Bank v. United States*, 395 U.S. 1263, 1267 (Fed. Cir. 2005), *cert. denied*, 596 U.S. 817 (2005); *Spectrum Sciences & Software, Inc. v. United States*, 98 Fed. Cl. 8, 14 (2011).

Finally, as to reasonable certainty, "[c]are must be taken lest the calculation of damages become a quixotic quest for delusive precision or worse, an insurmountable barrier to any recovery."  *Franconia Assocs.*, 61 Fed. Cl. at 746; *see also Spectrum Sciences*, 98 Fed. Cl. at 14.  "The ascertainment of damages is not an exact science," the Federal Circuit has stated, and "where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision."  *Bluebonnet Sav. Bank*, 266 F.3d at 1355; *see also* Restatement (Second) of Contracts § 352, cmt. a (1981) ("[d]amages need not be calculable with mathematical accuracy and are often at best approximate").  "'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'"  *Elec. & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358 (Ct. Cl. 1969) (quoting *Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 572 (Ct. Cl. 1966)); *see also Bluebonnet Sav. Bank*, 266 F.3d at 1355.  Thus, "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery . . . ."  *Ace-Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000) (quoting *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960)).[51]

In the case *sub judice*, the potential damages for the breach of the covenant of good faith and fair dealing fall into two basic categories:  economic and noneconomic damages, with the latter including pain, suffering and emotional distress.  Plaintiff's post-trial briefs have not provided any degree of detail regarding the economic damages he seeks, particularly insofar as the breach of the covenant goes.  Accordingly, the court concludes that plaintiff is entitled to no recovery of economic damages.  More specific are plaintiff's claims that the breach of the covenant engendered pain and suffering, as well as emotional distress, on his part.  Overall, while plaintiff's original complaint sought damages in excess of $4 million,[52] he now seeks

_____

[51]  *See Bell BCI Co. v. United States*, 570 F.3d 1337, 1340 (Fed. Cir. 2009); *Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004); *Spectrum Sciences & Software*, 98 Fed. Cl. at 14; *Stovall v. United States*, 94 Fed. Cl. 336, 346 (2010).

[52]  The original complaint sought $1.6 million for pain and suffering incurred by Agent Dobyns and his family; $1.85 million for lost wages; and $200,000 for attorney's fees.  Plaintiff's first amended complaint dropped Gwen Jones, Dale Dobyns and Jack Dobyns from the lawsuit, but did not otherwise alter the claim for relief.  Plaintiff's second amended complaint did not seek a specific amount of damages, but instead sought "[t]otal damages for ATF's breach of the express and implied terms of the Settlement Agreement, including, but not limited to the implied covenant of good faith and fair dealing, to be established at trial."

damages totaling approximately $17.2 million. $7.2 million of this figure is attributable to pain, suffering and emotional distress, with the remainder attributable to "economic damages."

So where does the court go from here? Defendant asserts that this court lacks jurisdiction to award damages for pain and suffering, as those claims sound in tort. *See* 28 U.S.C. § 1491(a)(1). And it cites cases to that effect.[53] But, it appears that defendant's position reflects a rather substantial overstatement of the law.

In *Bohac v. Department of Agriculture*, 239 F.3d 1334 (Fed. Cir. 2001), the Federal Circuit generally summarized the decisional law involving the recovery of damages for emotional distress in contract cases, thusly:

> Under the traditional contract law approach, "[i]t is well established that, as a general rule, no damages will be awarded for the mental distress or emotional trauma that may be caused by a breach of contract." John D. Calamari & Joseph M. Perillo, The Law of Contracts § 14.5(b), at 549 (4th ed. 1998); *see also* Williston, Williston on Contracts §§ 1338, 1341, at 200, 214; Restatement (Second) of Contracts § 353. To be sure there are exceptions, such as contracts of carriers and innkeepers with passengers and guests, contracts for the carriage or proper disposition of dead bodies, and contracts for the delivery of messages concerning death. Restatement (Second) of Contracts § 353 cmt. a; 5 Arthur L. Corbin, Corbin on Contracts § 1076, at 434 (1964). In these cases, however, breach of the contract is particularly likely to cause serious emotional disturbance. Restatement (Second) of Contracts § 353, cmt. a.

239 F.3d at 1340. While *Bohac* stated the general rule in this regard, a number of the authorities cited in the passage above hold that, in certain types of cases, damages for emotional distress, and pain and suffering, may be recovered if the nature of the contract is such that its breach would be expected to produce such damages. In this regard, Restatement (Second) of Contracts § 353 states that: "Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm ***or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result***." *Id.* (emphasis added); *see also id.* at § 353, comment a; 24 Williston § 64:7.[54] Cases have indicated that "the requisite emotional

---

[53] *See Mata v. United States*, 114 Fed. Cl. 736, 752 n.20 (2014); *Mastrolia v. United States*, 91 Fed. Cl. 369, 381 (2010) ("[C]laims for pain and suffering, emotional distress, and mental anguish sound in tort. As such, this Court lacks jurisdiction to award damages for pain and suffering and emotional distress." (internal quotation marks omitted)); *Pratt v. United States*, 50 Fed. Cl. 469, 482 (2001) ("The court lacks jurisdiction to award plaintiff's prayer for damages for emotional distress and pain and suffering. Except in limited circumstances related to common carriers and innkeepers not applicable here, the court cannot award damages for the emotional consequences of a breach of contract because such consequences are speculative as a matter of law.").

[54] *See Rivera Agredano v. United States*, 70 Fed. Cl. 564, 577 (2006); *see also Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1200 (11th Cir. 2007) ("[W]hen the nature of the

disturbance may come where the contract's express intent is either to enhance or to protect a plaintiff's mental state." *Pedroza v. Lomas Auto Mall, Inc.*, 625 F. Supp. 2d 1156 (D.N.M. 2009) (citing Restatement (Second) of Contracts § 353); *see also Jones v. Benefit Trust Life Ins. Co.*, 617 F. Supp. 1542, 1548 (D. Miss. 1985), *aff'd, in part, rev'd, in part*, 800 F.2d 1397 (5th Cir. 1986).

The court believes that the exception provided by the Restatement ought to apply here – that is, that the breach of the covenant here was "of such a kind that serious emotional distress was a particularly likely result." After all, the breach of the covenant related to a contract in which the underlying subject matter involved, in part, the resolution of claims involving emotional distress, as well as pain and suffering. And the breach of that covenant – and the conduct that effectuated that breach – plainly engendered its own emotional distress, as well as pain and suffering. To conclude that the Restatement rule would not apply to such an instance would be to suggest that there should be no recovery for the breach of a covenant of good faith and fair dealing associated with a contract resolving claims for emotional distress, and pain and suffering. That makes no sense. There is no indication that any of the cases cited by defendant remotely dealt with circumstances like this. And, indeed, a number of cases suggest that the Restatement rule ought to apply to a case like this.[55]

_____

contract is such that emotional distress is foreseeable, emotional damages will lie."); *Johnson v. State Farm Life Ins.*, 695 F. Supp. 2d 201, 212-13 (W.D. Pa. 2010) (same, discussing Pennsylvania law); *Dalkilic v. Titan Corp.*, 516 F. Supp. 2d 1177, 1195-96 (S.D. Cal. 2007) (same, discussing California law); *Price v. Delta Airlines, Inc.*, 5 F. Supp. 2d 226, 238 (D. Vt. 1998) (same, discussing Vermont law); *Huskey v. Nat'l Broad. Co., Inc.*, 632 F. Supp. 1282, 1292-93 (N.D. Ill. 1986) ("[D]amages will be awarded for mental suffering caused by the wanton or reckless breach of a contract to render a performance of such character that the promisor had reason to know when the contract was made that a breach would cause such suffering, for reasons other than mere pecuniary loss."); *Smith v. NBC Universal*, 524 F. Supp. 2d 315, 327 (S.D.N.Y. 2007) (allowing damages where the express purpose was "the mental and emotional well-being of one of the contracting parties") (quoting 5 Corbin on Contracts § 1076, at 429 (1964 ed.)); *Lamm v. Shingleton*, 55 S.E.2d 810, 813 (N.C. 1949) (Where contracts concern "the sensibilities of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, and it should be known to the parties from the nature of the contract that such suffering will result from its breach, compensatory damages therefor may be recovered."); *see generally, Tannenbaum v. UNUM Life Ins. Co. of Am.*, 2005 WL 645237, at *2 (E.D. Pa. March 18, 2005) (citing Pennsylvania state cases); *Wynn v. Monterey Club*, 111 Cal. App. 3d 789, 799-801 (Cal. App. 1980) (citing California cases).

[55]   *See Munday v. Waste Mgmt. of N. Am., Inc.*, 997 F. Supp. 681, 687 (D. Md. 1998) (breach of a settlement agreement to resolve claims of mental anguish was of a kind likely itself to induce severe emotional distress); *see also Miranda v. Said*, 836 N.W.2d 8, 19-20 (Iowa 2013) ("[w]here the contract is personal in nature and the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the sensibilities of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, and it should be known to the parties from the nature of the contract that such suffering

Now, the question remains whether this court lacks jurisdiction over breaches of covenants in which the underlying contract involves the recovery of damages for emotional distress, and pain and suffering.  This court has held that such jurisdiction lies for cases involving common carriers and innkeepers – despite the admonition in section 1492(a) that the court lacks jurisdiction over cases "sounding in tort."[56]  And despite the same statutory language, this court has awarded damages for emotional distress, as well as pain and suffering, for cases involving the violation of treaties, which are treated by this court as a form of contract.[57]  In the court's view, the limitation involving torts likewise does not prohibit the award of damages for the breach of covenants associated with contracts, such as occurred here.  Logic suggests, indeed, that if this court has jurisdiction to consider the breach of covenants that flow from such agreements – and decisional law suggests that it does[58] – this court must have jurisdiction to consider the damages that flow thereupon.  Sovereign immunity provides defendant no solace in this regard – a contrary conclusion would again cast doubt on the government's ability to enter into contracts that presume good faith and fair dealing.[59]

This leaves the question of the amount of the recovery here.  The unusual nature of the inquiry brings to mind the potential use here of the "jury verdict method," which is "most often employed when damages cannot be ascertained by any reasonable computation from actual figures."  *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 880 (Fed. Cir. 1991), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995); *see also United States v. Smith*, 94 U.S. 214, 219 (1876); *Hi–Shear Tech. Corp.*, 356 F.3d at 1376.  In order to adopt the jury verdict method, "[a] court must first determine three things:  (1) that clear proof of

---

will result from its breach, compensatory damages therefor may be recovered.") (quoting *Meyer v. Nottger*, 241 N.W.2d 911, 921 (Iowa 1976) (quoting *Lamm*, 55 S.E.2d at 813)).

[56]  *See Bohac*, 239 F.3d at 1340; *Iran Nat'l Airlines Corp. v. United States*, 360 F.2d 640 (Ct. Cl. 1966); *see also Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995).  In *Pratt*, 50 Fed. Cl. at 482, this court suggested that it could award damages for emotional distress, and pain and suffering, in "limited circumstances related to common carriers and innkeepers."  The court, however, provided no explanation for this exception.

[57]  *See, e.g.*, *Begay v. United States*, 219 Ct. Cl. 599 (1979); *Hebah v. United States*, 428 F.2d 1334 (Ct. Cl. 1970), *as modified*, 456 F.2d 696 (Ct. Cl.), *cert. denied*, 409 U.S. 870 (1972); *Elk v. United States*, 70 Fed. Cl. 405 (2006); *see also Richard v. United States*, 677 F.3d 1141, 1144 (Fed. Cir. 2012); Note, "A Bad Man is Hard to Find," 127 Harv. L. Rev. 2521, 2529 (2014).

[58]  This court, of course, has held so in this case.  *See Dobyns I*, 91 Fed. Cl. at 419 (citing cases); *see also, e.g.*, *Outlaw v. United States*, 116 Fed. Cl. 656 (2014); *Pucciariello v. United States*, 116 Fed. Cl. 390, 402 (2014); *Stovall v. United States*, 71 Fed. Cl. 696, 699 (2006).

[59]  It is well-established that courts are "vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them."  *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992); *see also Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.").

injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages." *Dawco*, 930 F.2d at 880.[60]   "'In estimating damages, [this court] occupies the position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties." *Bluebonnet Sav. Bank*, 266 F.3d at 1357 (quoting *Specialty Assembling & Packing*, 355 F.2d at 572 (citing *United States v. Smith*, 94 U.S. 214, 219 (1876))).   The jury verdict offers a "means for achieving a result that is fair and just to both parties when neither party has been able to present an independently complete or acceptable measure of damages."   *Bluebonnet Sav. Bank*, 466 F.3d at 1359.

In the court's view, the requirements for application of the jury verdict method fully are met here, at least insofar as the breach of the covenant involves damages relating to Agent Dobyns' mental distress, and pain and suffering.  First, clear proof of injury exists – indeed, that proof appears to be overwhelming.  In the court's view, there is more than ample evidence that the covenant of good faith and fair dealing was breached by ATF and that that breach produced damages in the form of mental distress, and pain and suffering.  Second, there is no more reliable method for computing damages with respect to that breach.  This is not a case in which the amount of damages recoverable here may be derived via the tabulation of receipts, costs avoided, or other forms of economic proxies.[61]   Finally, as will be discussed in greater detail below, it seems apparent that the evidence is sufficient for the court to make a fair and reasonable approximation of the damages.

So how do we bring this *tour d'horizon* to an end?   In the court's view, the most reasonable starting point for developing a jury verdict amount is to consider the terms of the Settlement Agreement.  Under that negotiated agreement, plaintiff received $373,000, plus back pay.  A majority of the $373,000 figure appears to have related to the mental distress, as well as pain and suffering, occasioned by the actions of ATF officials that predated the settlement (approximately from 2004 through 2007).[62]   And the assumption – indeed, explicit in the

---

[60]   *See also Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1358 (Fed. Cir. 2007); *Bluebonnet Sav. Bank*, 266 F.3d at 1357 ("We have also allowed so-called 'jury verdicts,' if there was clear proof of injury and there was no more reliable method for computing damages – but only where the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation.").

[61]   *Cf. Ravens Grp., Inc. v. United States*, 112 Fed. Cl. 39, 56 (2013*); Servidone Constr. Corp. v. United States*, 19 Cl. Ct. 346, 367 (1990), *aff'd*, 931 F.2d 860 (Fed. Cir. 1991); *see also Dawco*, 930 F.2d at 880; *Joseph Pickard's Sons Co. v. United States*, 532 F.2d 739, 742 (Ct. Cl. 1976).

[62]   Deputy Director Hoover testified that a portion of the $373,000 represented out-of-pocket expenses incurred by Agent Dobyns for various purposes, including expenses associated with his moves.  Neither Assistant Director Hoover nor Deputy Director Carter were able to recollect other components of this figure.  In his testimony, Agent Dobyns indicated that at least $73,000 of the $373,000 was associated with the moves and related costs.

agreement – was that the conduct of ATF officials and employees that led to the agreement would cease. Indeed, Agent Dobyns testified that he would have demanded additional compensation if there had been no assurance that the conduct in question would cease.[63]  Various testimony also suggests that about $173,000 of the $373,000, represented the approximate amount that Agent Dobyns believed he was entitled to receive in terms of non-damages – such as mental distress, as well as pain and suffering.  In the court's view, this leads, by extension, to the conclusion that, under the jury verdict method, plaintiff is entitled to receive $173,000 – approximating the emotional distress, as well as pain and suffering, that Agent Dobyns experienced in the period (approximately two years) while the covenant of good faith and fair dealing was being breached.

There are several indicia that this $173,000 represents an appropriate recovery.  First, the case law has developed several factors to consider in assessing damages for mental pain and suffering, including:  (i) the expected duration of the pain and suffering; (ii) the intensity of the distress; (iii) the impact that the pain and suffering has on the injured party's productivity and lifestyle; (iv) whether sedatives or other drugs were used to relieve pain and whether they were effective; and (v) whether the suffering was occasioned by apprehension of impending death. *See, e.g., Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Elk*, 87 Fed. Cl. at 96; *Juiditta v. Bethlehem Steel Corp.*, 428 N.Y.S.2d 535, 543 (N.Y. App. Div. 1980); *see also MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 560-61 (S.D.N.Y. 2012); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 81-82 (D.D.C. 2011).  As documented throughout this opinion, Agent Dobyns plainly experienced intense mental distress as the result of the breach of the covenant, particularly in 2008 – distress that was heightened by the feelings exhibited by certain ATF officials who appeared bound and determined to affect adversely one of their own.[64]  Moreover, it appears that virtually every aspect of Agent Dobyns' personal and

---

[63]  In his testimony, Agent Dobyns testified that "[t]he promises made to me by Mr. Carter and Mr. Hoover . . . [were] to make sure that nothing like I had previously experienced with ATF ever happened to me again or even happened to any other ATF agent again."  He further answered this question:

> Q.     Agent Dobyns, if as part of that contract six years ago ATF had reserved a right to with withdraw your fictitious documents for any reason whatsoever, would you have wanted to be paid more for ATF to have that reservation of right?
>
> A.     Yes.

Agent Dobyns answered similarly in responding to questions as to whether he would have modified the Settlement Agreement to require the payment of additional compensation if he had known how ATF would have addressed the investigation of the arson.

[64]  Between December 28, 2005, and January 8, 2011, Agent Dobyns met thirty-eight times with Dr. Linaman, a psychologist licensed in Arizona.  At least some of these sessions focused on problems experienced by Agent Dobyns with his family, but the record makes it impossible to determine which sessions focused primarily or exclusively on these family problems, as opposed to problems Agent Dobyns was experiencing with ATF.  Between August 2008, the month of the arson at his home, and January 2011, Agent Dobyns reported consistent symptoms of anxiety, depression, and uncertainty relating to his conflict with ATF.  At trial, Dr.

professional life was effected by the mental anguish that the actions of these ATF agents engendered.  *See Doe v. Chao*, 306 F.3d 170, 180-81 (4th Cir. 2002), *aff'd*, 540 U.S. 614 (2004).

Second, various cases, including those arising under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, suggest that the process of determining damages associated with mental distress, and pain and suffering awards should look to awards in similar cases.  *See, e.g.*, *Bravo v. United States*, 532 F.3d 1154, 1162 (11th Cir. 2008); *Muniz-Olivari v. Stiefel Labs, Inc.*, 496 F.3d 29, 40-41 (1st Cir. 2007); *DiSorbo v. Hoy*, 343 F.3d 172, 183-86 (2d Cir. 2003); *Jutzi-Johnson v. United States*, 263 F.3d 753, 758-79 (7th Cir. 2001); *see also Elk*, 87 Fed. Cl. at 96.  Of course, there are limitations to this approach – as noted by one district court, "[a] reported decision concerning a trial cannot possibly relate the course of trial with the same detail and flavor in which it was presented to the fact finder."  *Zurba v. United States*, 247 F. Supp. 2d 951, 961 (N.D. Ill. 2001), *aff'd*, 318 F.3d 736 (7th Cir. 2003).  And this case certainly is unique in so many problematic dimensions.  Nevertheless, a review of the decisional law suggests that the court's determination of damages for emotional distress, as well as pain and suffering, is reasonable as compared to the awards made in similar cases, surveyed below.[65]

### D.    Defendant's Counterclaim

In its counterclaim, defendant asserts a breach of contract claim, *to wit*, that Agent Dobyns violated his employment contract and, in doing so, violated various Federal regulations and ATF orders, by publishing a book based upon his experiences as an agent, and by

---

Linaman further testified that Agent Dobyns' primary care physician prescribed Lexapro and Trazodone, both drugs used to treat anxiety and depression. While it is unclear, from the record, that Agent Dobyns met the formal criteria for a diagnosis of Post-Traumatic Stress Disorder, there is little doubt that he experienced symptoms of depression and anxiety.

[65] *Lancaster v. Norfolk & W. Ry. Co.*, 773 F.2d 807 (7th Cir. 1985), *cert. denied*, 480 U.S. 945 (1987) (affirming judgment of $850,000 under Federal Employer's Liability Act (FELA), 45 U.S.C. §51, *et seq.*, for railroad employee who suffered emotional and physical abuse by supervisor); *Welch v. United Parcel Serv.*, 2011 WL 7403649 (E.D.N.Y. 2011) (employer retaliated against employee for complaining about disability discrimination; although jury held that employee did not have a disability within the meaning of the Americans With Disabilities Act of 1990, 104 Stat. 327, it awarded $200,000 in damages because employee suffered emotional distress due to defendant's retaliation); *Gonzalez v. Dallas Cnty., Texas*, 2010 WL 5814195 (Dist. Tex. Nov. 19, 2010) (deputy constable who was pressured to give false testimony before grand jury suffered retaliation and was harassed by supervisors; awarded $132,500 for emotional pain and suffering, mental anguish, loss of enjoyment of life); *Werner v. Kalamazoo Cmty. Mental Health & Substance Abuse Servs.*, 2006 Mealey's Jury Verdicts & Settlements 2596, 06-CV-0310 (W.D. Mich. 2006) (employee terminated for filing complaints with the U.S. Dept. of Education about deficiencies in employer's health services program; awarded $150,000 for injury to reputation, mental anxiety and emotional distress); *Daily v. Kaiser Found. Hosp.*, 2003 Mealey's Jury Verdicts & Settlements 259, BC234153 (Cal. Super. 2003) (employee awarded $150,000 for emotional distress when she complained about patient care and patient confidentiality issues).

contracting his story to create a motion picture.  Defendant must carry the burden of proof on its counterclaim.[66]  The court concludes that defendant has failed to meet this burden.

It is undisputed that on June 9, 2006, Agent Dobyns executed a contract with Fox concerning rights to his "life story," and that on May 18, 2007, he executed a contract with The Crown Publishing Group concerning a book, provisionally titled "Almost Angels."  Both projects related to his experiences with the Black Biscuit investigation.  It is further undisputed that, absent the Settlement Agreement, Agent Dobyns was required to comply with a variety of regulations and ATF Orders before he signed these contracts.  Moreover, there is no question that, at the time these contracts were signed, ATF Order 9000.1A provided that no employee of ATF should publish books or articles based upon information obtained as an employee of ATF, unless that employee obtained authorization from the Assistant Director and the Office of Chief Counsel.  The pre-publication submission requirement of ATF Order 9000.1A was meant to assist ATF in protecting classified, sensitive or otherwise protected information from being released to the public by ATF agents or other employees.

It is also undisputed, however, that the contracts discussed above were signed before September 20, 2007, the date on which the Settlement Agreement in question was executed.  In critical terms this agreement stated thusly:

> This Agreement is entered into by Jay Dobyns (hereafter Employee) and the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosive (hereafter ATF or Agency) ***to fully resolve and settle any and all issues and disputes arising out of Employee's employment with ATF***, including, but not limited to the Agency Grievance filed by the Employee, the Employee's complaints to the Office of Special Counsel, and his complaints to the Department of Justice's Office of Inspector General.

(Emphasis added.)  As part of the settlement, ATF further agreed that:  (i) it would consider requests by Agent Dobyns for outside employment "in a manner consistent with Agency practice;" and (ii) it would "not pursue discipline against [Agent Dobyns] for any matter that is currently under investigation by the Department of Justice's Office of Inspector General (OIG) or ATF's Office of Professional Responsibility and Security Operations (OPRSO)."

Before the Settlement Agreement was signed, a number of individuals at ATF knew about Agent Dobyns' forthcoming book.  Deputy Director Domenech, ATF's Chief Operating Officer and its number-two ranking official, knew about the book project as early as February of 2007.  And he continued to hear rumors about the book when he became the SAC for the Washington Field Office in mid-February of 2007.  In May of 2007, Agent Sullivan (who was responsible for threat, risk and vulnerability assessments) also knew about the book, having

---

[66]  *See, e.g.*, *Trans Ocean Van Serv. v. United States*, 426 F.2d 329, 355 (Ct. Cl. 1970); *Int'l Harvester Co. v. United States*, 342 F.2d 432, 447 (Ct. Cl. 1965); *Miglionico v. United States*, 108 Fed. Cl. 512, 524 (2012); *Alli v. United States*, 83 Fed. Cl. at 276; *G.M. Shupe, Inc. v. United States*, 5 Cl. Ct. 662, 740 (1984).

obtained information about the project on the Internet.  In emails, he contacted Richard Horgan, the vice-president of Crown/Random House, to request further information about the book and was given that information.  Knowledge of the book project then spread to Agent Bernard Conley, another OPSEC official, and up the chain to Chief Walck and her supervisor Chief Rosebrock.  All this happened before the Settlement Agreement was executed.

To be sure, Deputy Director Carter testified at trial that he did not discuss any book or media projects with Agent Dobyns at the time they signed the Settlement Agreement.  But he also acknowledged that, before he signed the agreement, he conducted no due diligence with anyone at ATF regarding the scope of the pre-existing claims he was waiving in the Settlement Agreement – claims that it would appear would relate to the aforementioned contracts. Moreover, while Assistant Director Hoover believed that Agent Dobyns' activities relating to his media projects were not "under investigation" at the time the agreement was signed, he admitted that it would not have been acceptable to begin such an investigation after the Settlement Agreement was signed if ATF officials had previously known about the book.  And, as indicated above, ATF officials **did** know about the book.  Defendant thus should not be allowed to premise its claims on the Settlement Agreement.

Defendant primarily bases its counterclaim on *Snepp v. United States*, 444 U.S. 507 (1980), a *per curiam* decision.  In that case, Snepp published a book about his experiences as a CIA agent in South Vietnam.  Snepp published this account without submitting it to the CIA for prepublication review – despite the fact that he had "executed an agreement promising that he would 'not . . . publish . . . any information or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of [his] employment . . . without specific prior approval by the Agency.'"  *Id*. at 508.  Defendant brought suit to enforce the agreement, seeking a declaration that Snepp had breached the contract, an injunction requiring him to submit future writings for prepublication review, and an order imposing a constructive trust for defendant's benefit on all profits that Snepp might earn from publishing the book in violation of his fiduciary obligations to the CIA.  *Id*.

The district court found that Snepp had "willfully, deliberately and surreptitiously breached his position of trust with the CIA and the [1968] secrecy agreement" by publishing his book without submitting it for prepublication review. 456 F. Supp. 176, 179 (E.D. Va. 1978).  It found that Snepp deliberately misled CIA officials into believing that he would submit the book for prepublication clearance and that the publication of the book had "caused the United States irreparable harm and loss."  *Id*. at 180.  The district court, therefore, enjoined future breaches of Snepp's agreement and imposed a constructive trust on his profits.  *Id*.  The Fourth Circuit affirmed the district court's finding that Snepp had breached his employment agreement, and it upheld the injunction against further violations of its prepublication agreement, but refused to uphold the district court's imposition of a constructive trust.  595 F.2d 926, 935 (4th Cir. 1979).

In a *per curiam* opinion, the Supreme Court granted *certiorari* to "correct the judgment from which both parties seek relief."  444 U.S. at 507.  The Court noted that the agreement signed by Snepp specifically recognized that he was entering into a trust relationship and that he would not publish any information relating to the Agency without submitting the information for clearance.  *Id*. at 510-11.  "Undisputed evidence in this case," the Court moreover found, "shows that a CIA agent's violation of his obligation to submit writings about the Agency for

prepublication review impairs the CIA's ability to perform its statutory duties." *Id*. at 512.  The Court determined that the imposition of a constructive trust was appropriate under the circumstances, stating:

> A constructive trust . . . protects both the Government and the former agent from unwarranted risks.  This remedy is the natural and customary consequence of a breach of trust.  It deals fairly with both parties by conforming relief to the dimensions of the wrong.  If the agent secures prepublication clearance, he can publish with no fear of liability.  If the agent publishes unreviewed material in violation of his fiduciary and contractual obligation, the trust remedy simply requires him to disgorge the benefits of his faithlessness.  Since the remedy is swift and sure, it is tailored to deter those who would place sensitive information at risk.

*Id*. at 515.  On this basis, the Court held that the district court had correctly imposed "a constructive trust on Snepp's profits."  *Id*. at 516.

For a variety of reasons, however, *Snepp* does not support defendant's counterclaim.  First, unlike the facts in that case, plaintiff here did not execute a contract preventing him from divulging any information associated with his work with the ATF.  Nor did defendant here seek to enjoin the prepublication of the book in question.  Nor did it otherwise meet the requirements for the creation of a constructive trust.[67]  Indeed, there is no indication that defendant here was eligible for the sort of equitable relief obtained by the agency in *Snepp* – or that such relief is even obtainable in this court.[68]  Moreover, unlike what happened with the CIA in *Snepp*, when

---

[67]  A constructive trust arises when "the defendant (i) has been unjustly enriched (ii) by acquiring legal title to specifically identifiable property (iii) at the expense of the claimant or in violation of the claimant's rights . . . ."  Restatement (Third) of Restitution & Unjust Enrichment § 55 cmt. a (2011); *see also* Caryl A. Yzenbaard, George Gleason Bogert, George Taylor Bogert, The Law of Trusts and Trustees § 471 (2014).  A constructive trust, however, ought not be imposed where the party seeking the trust comes to court with unclean hands.  *See United States v. Emor*, 2013 WL 3005366, at *14 (D.D.C. 2013); *United States v. $3,000 in Cash*, 906 F. Supp. 1061, 1066 (E.D. Va. 1995).  As Chief Judge (later Justice) Cardozo stated many years ago, "a constructive trust is the formula through which the conscience of equity finds expression."  *Beatty v. Guggenheim Exp. Co.*, 122 N.E. 378, 387 (N.Y. 1919).

[68]  Defendant appears to leap over questions regarding whether this court has jurisdiction to afford the sorts of relief it seeks.  Other cases have established that this court lacks the equitable jurisdiction, for example, to create constructive trusts at the behest of plaintiffs.  *See Frank & Breslow, LLP v. United States*, 43 Fed. Cl. 65, 68 (1999); *Last Chance Mining Co. v. United States*, 12 Cl. Ct. 551, 555 (1987), *aff'd without op.*, 846 F.2d 77 (Fed. Cir.), *cert. denied*, 488 U.S. 823 (1988); *see also Carney v. United States*, 462 F.2d 1142, 1145 (Ct. Cl. 1972).  And there is no indication that this court's counterclaim jurisdiction extends farther.  *See* 28 U.S.C. § 1503; *Shippen v. United States*, 654 F.2d 45, 47 (Ct. Cl. 1981) (holding that defendant may not seek declarations via its counterclaims); *see also* 28 U.S.C. § 2508.

*No Angel* was published in early 2009, the only significant objection raised by any ATF official was with the cover, which listed Agent Dobyns title as "Agent" – a problem that was cured by the publisher, at ATF's request, upon the printing of the next edition of the book.[69]

Most importantly, by way of contradistinction to *Snepp*, the parties here signed a Settlement Agreement that retrospectively waived defendant's rights to seek compensation for the alleged violations, by Agent Dobyns, of ATF Orders and procedures, including those orders requiring the review of publications. ATF officials signed that Settlement Agreement knowing full well that there had been disputes involving the application of ATF Orders and procedures to Agent Dobyns. The book and media contracts that Agent Dobyns signed with Crown Publishing and Fox were executed more than a year before that Settlement Agreement took effect. And ATF officials knew about those contracts before the Settlement Agreement was signed. That being the case, the court's view is that defendant should not be heard to complain about projects that were already in the works when the Settlement Agreement was executed, and to seek compensation that originates from the efforts that those contracts represent. And that this is true even if certain of the moneys in question derive from activities (*e.g.*, the printing of the books and the marketing thereof) that occurred after the Settlement Agreement was executed.[70] To hold otherwise, would be to provide defendant with a windfall that is most undeserving.

―――――――――――――――――

Even if this court could impose a constructive trust, various cases hold that a mere breach of contract does not constitute the sort of wrongdoing that gives rise to imposition of a constructive trust. *See Amendola v. Bayer*, 907 F.2d 760, 763 (7th Cir. 1990) (holding that a mere breach of contract did not constitute "wrongdoing" for purposes of imposing a constructive trust); *see also Islip U-Slip LLC v. Gander Mountain Co.*, 2014 WL 795981 (N.D.N.Y. Feb. 27, 2014). And, of course, defendant offers no support suggesting that relief of this sort has been ordered ever in this court.

[69] A number of ATF officials, including the then Deputy Director, were aware of the book project as early as 2006, but took no action to prohibit its publication. ATF did not seek to prohibit the publication as part of the September 2007 Settlement Agreement. On December 4, 2008, Chief Rowley sent a memorandum to Agent Dobyns in which he noted the existence of the book and requested that Agent Dobyns: (i) identify the party or parties with whom he had contracted to promote or distribute the book; (ii) provide a "prospectus, summary or manuscript of the books;" and (iii) provide the details of any arrangements made to promote the book. On February 6, 2009, Chief Rowley sent Agent Dobyns a further memorandum indicating that while Agent Dobyns had properly submitted a request for outside employment associated with prior speaking engagements, he had not submitted a request to write a book. Notably, while this memorandum discussed various regulations concerning outside employment, it did not specifically prohibit Agent Dobyns from publishing the book. Instead, it directed him to (i) submit an outside employment request with a copy of the most recent manuscript; (ii) take action to remove the subtitle "ATF Special Agent" from the cover of the book; and (iii) inform his publisher that ATF employees are prohibited to use their ATF title for the promotion of teaching, speaking and writing engagements, and that "this prohibition applies to [him]." Agent Dobyns complied with these requests.

[70] Viewed in breach of contract terms, defendant can hardly claim that the damages it seeks "were reasonably foreseeable by the breaching party at the time of contracting." *Ind.*

In sum, while this matter might have been handled better by all concerned, it would appear that defendant's counterclaim, nevertheless, suffers from numerous flaws – both factual and legal.  The court concludes that defendant is entitled to – nothing.[71]

## III.   CONCLUSION

"The United States wins its point whenever justice is done its citizens in the courts."  So wrote Solicitor General Frederick Lehman in the government's brief in *Brady v. Maryland*, 373 U.S. 83, 87 (1962), in words now carved into the office rotunda of the Attorney General. Presumably, what holds true for the citizenry in general ought to hold true for Federal agents who risk their lives in law enforcement.  But if that is so, how does one explain this case?

Unfortunately, how certain ATF officials acted in the aftermath of the Settlement Agreement bears little resemblance to the lofty sayings carved into the facades of the Department of Justice.  What happened here is more reminiscent of a Franz Kafka novel, "The Trial." [72] There, Kafka depicts a totalitarian state in which the government suppressed freedom via a deluge of circuitous and irrational process.  One of the techniques employed was the "non-final acquittal."  Kafka describes these acquittals thusly:  "That is to say, when [the accused] is acquitted in this fashion the charge is lifted from [his] shoulders for the time being, but it continues to hover above [him] and can, as soon as an order comes from on high, be laid upon

---

*Mich. Power Co.*, 422 F.3d at 1373.  For one thing, it is unclear what "contract" defendant is talking about – plaintiff's employment contract with ATF as it existed before the Settlement Agreement; as modified by that agreement (and the waivers contained therein); or perhaps some "modified" employment contract that included only the provisions that benefited ATF, but did not account for the conduct of the agency (and officers like ASAC Gillett and Agent Higman) thereafter.  To support such a claim, defendant, at a minimum, should have provided proof of damages that were segregated only to the alleged breach – and that would not include, for example, all of the royalties that Agent Dobyns might receive in the future.

[71]  Based on the foregoing, the court need not consider the First Amendment implications of defendant's counterclaim.  To be sure, defendant has "a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large."  *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality opinion); *accord Snepp*, 444 U.S. at 509 n.3.  But, the unique facts in this case – which include not only the circumstances associated with the Settlement Agreement, but also ATF's willingness to highlight its investigative techniques while publicly promoting Agent Dobyns' actions in the media (in shows like *America's Most Wanted*) – cast doubt on the notion that the same sort of compelling interests that supported the result in *Snepp* would support the harsh result defendant would have the court reach here.  *See generally*, *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454 (1995); Mary-Rose Papandrea, "Leaker Traitor Whistleblower Spy:  National Security Leaks and the First Amendment," 94 B.U. L. Rev. 449, 523-24 (2014) ("The government is not entitled to condition federal employment as it pleases." (citing cases)).

[72]  Franz Kafka, The Trial (Willa & Edwin Muir, trans., Alfred A. Knopf, rev. ed. 1992).

[him] again." *Id*. at 158.  Experiences like these unfortunately bring to mind those that Agent Dobyns experienced in the years following the execution of the Settlement Agreement – a time that should have been one of healing and reconciliation, but that instead gave certain ATF officials and agents the opportunity to harm Agent Dobyns further.  In the court's view, the actions of these ATF employees indisputably breached the covenant of good faith and fair dealing.  That breach caused Agent Dobyns to suffer mental distress, as well as pain and suffering, which, in turn, entitles him to the damages awarded below.  Hopefully, this will bring this Kafkaesque story to an end.

Based on the foregoing, the court finds that defendant did not breach the Settlement Agreement, but did breach the covenant of good faith and fair dealing.  Based on the breach of the covenant, the court finds that plaintiff is entitled to damages in the amount of $173,000.  The court further finds that defendant is not entitled to recover anything with respect to its counterclaim.[73]

**IT IS SO ORDERED**.[74]

s/Francis M. Allegra
Francis M. Allegra
Judge

---

[73]  By separate order, the court will direct the Clerk of Court to serve a copy of this opinion upon the Attorney General of the United States, the Office of Professional Responsibility for the Department of Justice, and the Office of the Inspector General of the Department of Justice.  The transmittal letter should call attention to this opinion, and, in particular, to footnote 25 thereof.  *See* 28 C.F.R. § 0.39 (2013); *see generally, United States v. Hasting*, 461 U.S. 499, 506 n.5 (1983); *United States v. Bartko*, 728 F.3d 327, 342-43 (4th Cir. 2013).  Until it receives a final response from the Department of Justice, the court will reserve the question whether one or more of defendant's attorneys acted in violation of the court's rules and should be disciplined thereunder.

[74]  This opinion shall be published, as issued, after September 15, 2014, unless the parties identify protected and/or privileged materials subject to redaction prior to that date.  Any such materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for each redaction (including appropriate citations to authority).  This deadline will not be extended for any reason.

## ACRONYMS

| ACRONYM | |
|---------|---|
| ASAC | Assistant Special Agent in Charge |
| ATF | Bureau of Alcohol, Tobacco, Firearms, and Explosives |
| CFI | Chief Fire Investigator |
| DAD | Deputy Assistant Director |
| DOJ | Department of Justice |
| EPS | Office of Enforcement Programs and Services |
| IAD | Internal Affairs Division |
| NIBIN | National Integrated Ballistic Information Network |
| OFO | Office of Field Operations |
| OIG | Office of the Inspector General |
| OMO | Outlaw Motorcycle Organization |
| OPGA | Office of Public and Government Affairs |
| OPRSO | Office of Professional Responsibility and Security Operations |
| OPSEC | ATF Operations Security |
| OSC | Office of Special Counsel |
| PCSO | Pima County Sheriff's Office |
| PGA | Public and Government Affairs Office |
| PRB | Professional Review Board |
| RAC | Resident Agent in Charge |
| ROI | Report of Investigation |
| SA | Special Agent |
| SAC | Special Agent in Charge |
| SEPD | Security Emergency Programs Division |
| SIR | Significant Incident Report |
| SOD | Special Operations Division |